(Slip Opinion) OCTOBER TERM, 2025 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LEARNING RESOURCES, INC., ET AL. *v.* TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.

### CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 24–1287.   Argued November 5, 2025—Decided February 20, 2026[*]

The question presented is whether the International Emergency Economic Powers Act (IEEPA) authorizes the President to impose tariffs. See 91 Stat. 1626. Shortly after taking office, President Trump sought to address two foreign threats: the influx of illegal drugs from Canada, Mexico, and China, Presidential Proclamation No. 10886, 90 Fed. Reg. 8327; Exec. Order No. 14193, 90 Fed. Reg. 9113; Exec. Order No. 14194, 90 Fed. Reg. 9117; Exec. Order No. 14195, 90 Fed. Reg. 9121, and "large and persistent" trade deficits, Exec. Order No. 14257, 90 Fed. Reg. 15041. The President determined that the drug influx had "created a public health crisis," 90 Fed. Reg. 9113, and that the trade deficits had "led to the hollowing out" of the American manufacturing base and "undermined critical supply chains," *id.*, at 15041. The President declared a national emergency as to both threats, deeming them "unusual and extraordinary," and invoked his authority under IEEPA to respond.

He imposed tariffs to deal with each threat. As to the drug trafficking tariffs, the President imposed a 25% duty on most Canadian and Mexican imports and a 10% duty on most Chinese imports. *Id.*, at 9114, 9118, 9122–9123. As to the trade deficit ("reciprocal") tariffs, the President imposed a duty "on all imports from all trading partners" of

——————

*Together with No. 25–250, *Trump, President of the United States, et al.* v. *V.O.S. Selections, Inc., et al.*, on certiorari to the United States Court of Appeals for the Federal Circuit.

at least 10%, with dozens of nations facing higher rates. *Id.*, at 15045, 15049. Since imposing each set of tariffs, the President has issued several increases, reductions, and other modifications.

Petitioners in *Learning Resources* and respondents in *V.O.S. Selections* filed suit, alleging that IEEPA does not authorize the reciprocal or drug trafficking tariffs. The *Learning Resources* plaintiffs—two small businesses—sued in the United States District Court for the District of Columbia. That court denied the Government's motion to transfer the case to the United States Court of International Trade (CIT) and granted the plaintiffs' motion for a preliminary injunction, concluding that IEEPA did not grant the President the power to impose tariffs. The *V.O.S. Selections* plaintiffs—five small businesses and 12 States—sued in the CIT. That court granted summary judgment for the plaintiffs. And the Federal Circuit, sitting en banc, affirmed in relevant part, concluding that IEEPA's grant of authority to "regulate . . . importation" did not authorize the challenged tariffs, which "are unbounded in scope, amount, and duration." 149 F. 4th 1312, 1338. The Government filed a petition for certiorari in *V.O.S. Selections*, and the *Learning Resources* plaintiffs filed a petition for certiorari before judgment. The Court granted the petitions and consolidated the cases.

*Held*: IEEPA does not authorize the President to impose tariffs. The judgment in No. 24–1287 is vacated, and the case is remanded with instructions to dismiss for lack of jurisdiction; the judgment in No. 25–250 is affirmed.

No. 24–1287, 784 F. Supp. 3d 209, vacated and remanded; No. 25–250, 149 F. 4th 1312, affirmed.

THE CHIEF JUSTICE delivered the opinion of the Court with respect to Parts I and II–A–1:

Article I, Section 8, of the Constitution specifies that "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises." The Framers recognized the unique importance of this taxing power—a power which "very clear[ly]" includes the power to impose tariffs. *Gibbons* v. *Ogden*, 9 Wheat. 1, 201. And they gave Congress "alone . . . access to the pockets of the people." The Federalist No. 48, p. 310 (J. Madison). The Framers did not vest any part of the taxing power in the Executive Branch. See *Nicol* v. *Ames*, 173 U. S. 509, 515.

The Government thus concedes that the President enjoys no inherent authority to impose tariffs during peacetime. It instead relies exclusively on IEEPA to defend the challenged tariffs. It reads the words "regulate" and "importation" to effect a sweeping delegation of Congress's power to set tariff policy—authorizing the President to impose tariffs of unlimited amount and duration, on any product from any

country.  50 U. S. C. §1702(a)(1)(B).  Pp. 5–7.

THE CHIEF JUSTICE, joined by JUSTICE GORSUCH and JUSTICE BARRETT, concluded in Part II–A–2:

The Court has long expressed "reluctan[ce] to read into ambiguous statutory text" extraordinary delegations of Congress's powers.  *West Virginia* v. *EPA*, 597 U. S. 697, 723 (quoting *Utility Air Regulatory Group* v. *EPA*, 573 U. S. 302, 324).  In several cases described as involving "major questions," the Court has reasoned that "both separation of powers principles and a practical understanding of legislative intent" suggest Congress would not have delegated "highly consequential power" through ambiguous language.  *Id.*, at 723–724.  These considerations apply with particular force where, as here, the purported delegation involves the core congressional power of the purse.  Congressional practice confirms as much.  When Congress has delegated its tariff powers, it has done so in explicit terms and subject to strict limits.

Against that backdrop of clear and limited delegations, the Government reads IEEPA to give the President power to unilaterally impose unbounded tariffs and change them at will.  That view would represent a transformative expansion of the President's authority over tariff policy.  It is also telling that in IEEPA's half century of existence, no President has invoked the statute to impose *any* tariffs, let alone tariffs of this magnitude and scope.  That "'lack of historical precedent,' coupled with the breadth of authority" that the President now claims, suggests that the tariffs extend beyond the President's "legitimate reach."  *National Federation of Independent Business* v. *OSHA*, 595 U. S. 109, 119 (quoting *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 505).  The "'economic and political significance'" of the authority the President has asserted likewise "provide[s] a 'reason to hesitate before concluding that Congress' meant to confer such authority."  *West Virginia*, 597 U. S., at 721 (quoting *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 159–160).  The stakes here dwarf those of other major questions cases.  And as in those cases, "a reasonable interpreter would [not] expect" Congress to "pawn[]" such a "big-time policy call[] . . . off to another branch."  *Biden* v. *Nebraska*, 600 U. S. 477, 515 (BARRETT, J., concurring).

There is no exception to the major questions doctrine for emergency statutes.  Nor does the fact that tariffs implicate foreign affairs render the doctrine inapplicable.  The Framers gave "Congress alone" the power to impose tariffs during peacetime.  *Merritt* v. *Welsh*, 104 U. S. 694, 700.  And the foreign affairs implications of tariffs do not make it any more likely that Congress would relinquish its tariff power through vague language, or without careful limits.  Accordingly, the President must "point to clear congressional authorization" to justify

his extraordinary assertion of that power.  *Nebraska*, 600 U. S., at 506 (internal quotation marks omitted).  He cannot.  Pp. 7–13.

THE CHIEF JUSTICE delivered the opinion of the Court with respect to Part II–B, concluding:

(a) IEEPA authorizes the President to "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit . . . importation or exportation."  §1702(a)(1)(B). Absent from this lengthy list of specific powers is any mention of tariffs or duties.  Had Congress intended to convey the distinct and extraordinary power to impose tariffs, it would have done so expressly, as it consistently has in other tariff statutes.

The power to "regulate . . . importation" does not fill that void.  The term "regulate," as ordinarily used, means to "fix, establish, or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws."  Black's Law Dictionary 1156.  The facial breadth of this definition places in stark relief what "regulate" is not usually thought to include: taxation.  Many statutes grant the Executive the power to "regulate."  Yet the Government cannot identify any statute in which the power to regulate includes the power to tax.  The Court is therefore skeptical that in IEEPA—and IEEPA alone—Congress hid a delegation of its birth-right power to tax within the quotidian power to "regulate."

While taxes may accomplish regulatory ends, it does not follow that the power to regulate includes the power to tax as a means of regulation.  Indeed, when Congress addresses both the power to regulate and the power to tax, it does so separately and expressly.  That it did not do so here is strong evidence that "regulate" in IEEPA does not include taxation.

A contrary reading would render IEEPA partly unconstitutional. IEEPA authorizes the President to "regulate . . . importation or exportation."  §1702(a)(1)(B).  But taxing exports is expressly forbidden by the Constitution.  Art. I, §9, cl. 5.

The "neighboring words" with which "regulate" "is associated" also suggest that Congress did not intend for "regulate" to include the revenue-raising power.  *United States* v. *Williams*, 553 U. S. 285, 294. Each of the nine verbs in §1702(a)(1)(B) authorizes a distinct action a President might take in sanctioning foreign actors or controlling domestic actors engaged in foreign commerce, as Presidential practice confirms.  And none of the listed authorities includes the distinct and extraordinary power to raise revenue—a power which no President has ever found in IEEPA.  Pp. 14–16.

(b) Several arguments marshaled in response are unpersuasive. First, the contention that IEEPA confers the power to impose tariffs because early commentators and the Court's cases discuss tariffs in

Syllabus

the context of the Commerce Clause answers the wrong question. The question is not whether tariffs can ever be a means of regulating commerce. It is instead whether *Congress*, when conferring the power to "regulate . . . importation," gave the President the power to impose tariffs at his sole discretion. And Congress's pattern of usage is plain: When Congress grants the power to impose tariffs, it does so clearly and with careful constraints. It did neither in IEEPA.

Second, the argument that "regulate" naturally includes tariffs because the term lies between two poles in IEEPA—"compel" on the affirmative end and "prohibit" on the negative end—is unavailing. Although tariffs may be less extreme than an outright compulsion or prohibition, it does not follow that tariffs lie on the spectrum between those poles; they are different in kind, not degree, from the other authorities in IEEPA. Tariffs operate directly on domestic importers to raise revenue for the Treasury and are "very clear[ly] . . . a branch of the taxing power." *Gibbons*, 9 Wheat., at 201. Thus, they fall outside the spectrum entirely.

Third, the argument based on IEEPA's predecessor, the Trading with the Enemy Act (TWEA), and the Court of Customs and Patent Appeals' decision in *United States* v. *Yoshida Int'l, Inc.*, 526 F. 2d 560, cannot bear the weight placed on it. A single, expressly limited opinion from a specialized intermediate appellate court does not establish a well-settled meaning that the Court can assume Congress incorporated into IEEPA.

Fourth, the historical argument based on the Court's wartime precedents fails. Those precedents are facially inapposite, as all agree the President lacks inherent peacetime authority to impose tariffs. And the attenuated chain of inferences from wartime precedents through multiple iterations of TWEA to IEEPA cannot support—much less clearly support—a reading of IEEPA that includes the distinct power to impose tariffs.

Finally, arguments relying on this Court's precedents lack merit. *Federal Energy Administration* v. *Algonquin SNG, Inc.*, 426 U. S. 548, bears little on the meaning of IEEPA. Section 232(b) of the Trade Expansion Act of 1962 contains sweeping, discretion-conferring language that IEEPA does not contain, and the explicit reference to duties in Section 232(a) renders it natural for Section 232(b) itself to authorize duties. Nor does *Dames & Moore* v. *Regan*, 453 U. S. 654, offer support because that case was exceedingly narrow, did not address the President's power to "regulate," and did not involve tariffs at all. Pp. 16–20.

JUSTICE KAGAN, joined by JUSTICE SOTOMAYOR and JUSTICE JACKSON, agreed that IEEPA does not authorize the President to impose tariffs, but concluded that the Court need not invoke the major

Syllabus

questions doctrine because the ordinary tools of statutory interpretation amply support that result.  Pp. 1–7.

JUSTICE JACKSON would also consult legislative history—in particular, the House and Senate Reports that accompanied IEEPA and its predecessor statute, TWEA—to determine that Congress did not intend for IEEPA to authorize the Executive to impose tariffs.  Pp. 1–5.

ROBERTS, C. J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–A–1, and II–B, in which SOTOMAYOR, KAGAN, GORSUCH, BARRETT, and JACKSON, JJ., joined, and an opinion with respect to Parts II–A–2 and III, in which GORSUCH and BARRETT, JJ., joined.  GORSUCH, J., and BARRETT, J., filed concurring opinions.  KAGAN, J., filed an opinion concurring in part and concurring in the judgment, in which SOTOMAYOR and JACKSON, JJ., joined. JACKSON, J., filed an opinion concurring in part and concurring in the judgment.  THOMAS, J., filed a dissenting opinion.  KAVANAUGH, J., filed a dissenting opinion, in which THOMAS and ALITO, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 24–1287 and 25–250

————

## LEARNING RESOURCES, INC., ET AL., PETITIONERS
24–1287                 *v.*
### DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT


## DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., PETITIONERS
25–250                 *v.*
### V.O.S. SELECTIONS, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

[February 20, 2026]

CHIEF JUSTICE ROBERTS announced the judgment of the Court and delivered the opinion of the Court, except as to Parts II–A–2 and III.*

We decide whether the International Emergency Economic Powers Act (IEEPA) authorizes the President to impose tariffs.

————

*JUSTICE SOTOMAYOR, JUSTICE KAGAN, and JUSTICE JACKSON join only Parts I, II–A–1, and II–B of this opinion.

# I
## A

Shortly after taking office, President Trump sought to address two foreign threats.  The first was the influx of illegal drugs from Canada, Mexico, and China.  Presidential Proclamation No. 10886, 90 Fed. Reg. 8327 (2025); Exec. Order No. 14193, 90 Fed. Reg. 9113 (2025); Exec. Order No. 14194, 90 Fed. Reg. 9117 (2025); Exec. Order No. 14195, 90 Fed. Reg. 9121 (2025).  The second was "large and persistent" trade deficits.  Exec. Order No. 14257, 90 Fed. Reg. 15041 (2025).  The President determined that the first threat had "created a public health crisis," 90 Fed. Reg. 9113, and that the second had "led to the hollowing out" of the American manufacturing base and "undermined critical supply chains," *id*., at 15041.  He invoked his authority under IEEPA to respond.

Enacted in 1977, IEEPA gives the President economic tools to address significant foreign threats.  91 Stat. 1626.  When acting under IEEPA, the President must identify an "unusual and extraordinary threat" to American national security, foreign policy, or the economy, originating primarily "outside the United States."  50 U. S. C. §1701(a).  And he must "declare[] a national emergency" under the National Emergencies Act.  *Ibid*.; see 90 Stat. 1255.  He may then, "by means of instructions, licenses, or otherwise," take the following actions to "deal with" the threat: "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest."  §§1701(a), 1702(a)(1)(B).

President Trump declared a national emergency as to both the drug trafficking and the trade deficits, which he

deemed "unusual and extraordinary" threats. He then imposed tariffs to deal with each threat. As to the drug trafficking tariffs, the President imposed a 25% duty on most Canadian and Mexican imports and a 10% duty on most Chinese imports. 90 Fed. Reg. 9114, 9118, 9122–9123. As to the trade deficit (or "reciprocal") tariffs, the President imposed a duty "on all imports from all trading partners" of at least 10%. *Id.*, at 15045. Dozens of nations faced higher rates. *Id.*, at 15049. And these tariffs applied notwithstanding any extant trade agreements. *Id.*, at 15045.

Since imposing each set of tariffs, the President has issued several increases, reductions, and other modifications. One month after imposing the 10% drug trafficking tariffs on Chinese goods, he increased the rate to 20%. See Exec. Order No. 14228, 90 Fed. Reg. 11463 (2025). One month later, he removed a statutory exemption for Chinese goods under $800. Exec. Order No. 14256, 90 Fed. Reg. 14899 (2025). Less than a week after imposing the reciprocal tariffs, the President increased the rate on Chinese goods from 34% to 84%. Exec. Order No. 14259, 90 Fed. Reg. 15509 (2025). The very next day, he increased the rate further still, to 125%. Exec. Order No. 14266, 90 Fed. Reg. 15625, 15626 (2025). This brought the total effective tariff rate on most Chinese goods to 145%. The President has also shifted sets of goods into and out of the reciprocal tariff framework. See, *e.g.*, Exec. Order No. 14360, 90 Fed. Reg. 54091 (2025) (exempting from reciprocal tariffs beef, fruits, coffee, tea, spices, and some fertilizers); Exec. Order No. 14346, 90 Fed. Reg. 43737 (2025). And he has issued a variety of other adjustments. See, *e.g.*, Exec. Order No. 14358, 90 Fed. Reg. 50729, 50730 (2025) (extending "the suspension of heightened reciprocal tariffs" on Chinese imports).

B

Petitioners in *Learning Resources* and respondents in *V.O.S. Selections* filed suit, alleging that IEEPA does not

authorize the reciprocal or drug trafficking tariffs.  The
*Learning Resources* plaintiffs—two small businesses—sued
in the United States District Court for the District of Co-
lumbia.  The *V.O.S. Selections* plaintiffs—five small busi-
nesses and 12 States—sued in the United States Court of
International Trade (CIT).

The Government moved to transfer the *Learning Re-
sources* case to the CIT.  It argued that the District Court
lacked jurisdiction under 28 U. S. C. §1581(i)(1), which
gives the CIT "exclusive jurisdiction of any civil action com-
menced against" the Government "that arises out of any
law of the United States providing for . . . tariffs" or their
"administration and enforcement."  The District Court de-
nied that motion and granted the plaintiffs' motion for a
preliminary injunction, concluding that IEEPA did not
grant the President the power to impose tariffs.   784
F. Supp. 3d 209 (DC 2025).

In the *V.O.S. Selections* case, the CIT granted the plain-
tiffs' motion for summary judgment.  772 F. Supp. 3d 1350
(2025).  The Federal Circuit, sitting en banc, affirmed in
relevant part.  149 F. 4th 1312 (2025).  It first concluded
that the CIT had exclusive jurisdiction because the plain-
tiffs' claims arose out of modifications to the Harmonized
Tariff Schedule of the United States (HTSUS).  *Id.*, at 1329.
On the merits, it agreed with the CIT that IEEPA's grant
of authority to "regulate . . . importation" did not authorize
the challenged tariffs, which "are unbounded in scope,
amount, and duration."  *Id.*, at 1338.  Judge Cunningham
concurred (for four judges), reasoning that IEEPA did not
authorize the President to impose *any* tariffs.  *Id.*, at 1340.
Judge Taranto dissented (for four judges), concluding that
IEEPA authorized the challenged tariffs.  *Id.*, at 1348.

The Government filed a motion to expedite and a petition
for certiorari in *V.O.S. Selections*, and the *Learning Re-
sources* plaintiffs filed a petition for certiorari before

judgment. We granted the motion and petitions and consolidated the cases. 606 U. S. 1050 (2025).[1]

## II

Based on two words separated by 16 others in Section 1702(a)(1)(B) of IEEPA—"regulate" and "importation"—the President asserts the independent power to impose tariffs on imports from any country, of any product, at any rate, for any amount of time. Those words cannot bear such weight.

### A

#### 1

Article I, Section 8, of the Constitution sets forth the powers of the Legislative Branch. The first Clause of that provision specifies that "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises." It is no accident that this power appears first. The power to tax was, Alexander Hamilton explained, "the most important of the authorities proposed to be conferred upon the Union." The Federalist No. 33, pp. 202–203 (C. Rossiter ed. 1961). It is both a "power to destroy," *McCulloch* v. *Maryland*, 4 Wheat. 316, 431 (1819), and a power "necessary to the existence and prosperity of a nation"—"the one great power upon which the whole national fabric is based." *Nicol* v. *Ames*, 173 U. S. 509, 515 (1899).

---

[1] We agree with the Federal Circuit that the *V.O.S. Selections* case falls within the exclusive jurisdiction of the CIT. The plaintiffs' challenges "arise[] out of" modifications to the HTSUS. 28 U. S. C. §1581(i)(1). Where, as here, such modifications are made under an "Act[] affecting import treatment," 19 U. S. C. §2483, they are "considered to be statutory provisions of law for all purposes," §3004(c)(1)(C). Thus, the plaintiffs' challenges "arise[] out of [a] law of the United States providing for . . . tariffs." 28 U. S. C. §1581(i)(1). For the same reasons, the United States District Court for the District of Columbia lacked jurisdiction in the *Learning Resources* case.

The power to impose tariffs is "very clear[ly] . . . a branch of the taxing power." *Gibbons* v. *Ogden*, 9 Wheat. 1, 201 (1824). "A tariff," after all, "is a tax levied on imported goods and services." Congressional Research Service (CRS), C. Casey, U. S. Tariff Policy: Overview 1 (2025). And tariffs "raise[] revenue," *West Lynn Creamery, Inc.* v. *Healy*, 512 U. S. 186, 193 (1994)—the defining feature of a tax, *United States* v. *Kahriger*, 345 U. S. 22, 28, and n. 4 (1953); *Sonzinsky* v. *United States*, 300 U. S. 506, 514 (1937). Indeed, the Framers expected that the Government would for "a long time depend . . . chiefly on" tariffs for revenue. The Federalist No. 12, at 93 (A. Hamilton). Little wonder, then, that the First Congress's first exercise of its taxing power (and its second enacted law, right after the one providing for the new officials to take an oath) was a tariff law. See Act of July 4, 1789, ch. 2, 1 Stat. 24.

Recognizing the taxing power's unique importance, and having just fought a revolution motivated in large part by "taxation without representation," the Framers gave Congress "alone . . . access to the pockets of the people." The Federalist No. 48, at 310 (J. Madison); see also Declaration of Independence ¶19. They required "All Bills for raising Revenue [to] originate in the House of Representatives." U. S. Const., Art. I, §7, cl. 1. And in doing so, they ensured that only the House could "propose the supplies requisite for the support of government," thereby reducing "all the overgrown prerogatives of the other branches." The Federalist No. 58, at 359 (J. Madison). They did not vest any part of the taxing power in the Executive Branch. See *Nicol*, 173 U. S., at 515 ("[T]he whole power of taxation rests with Congress").

The Government thus concedes, as it must, that the President enjoys no inherent authority to impose tariffs during peacetime. Tr. of Oral Arg. 70–71. And it does not defend the challenged tariffs as an exercise of the President's warmaking powers. The United States, after all, is not at

war with every nation in the world. The Government instead relies exclusively on IEEPA. It reads the words "regulate" and "importation" to effect a sweeping delegation of Congress's power to set tariff policy—authorizing the President to impose tariffs of unlimited amount and duration, on any product from any country. 50 U. S. C. §1702(a)(1)(B).

2

We have long expressed "reluctan[ce] to read into ambiguous statutory text" extraordinary delegations of Congress's powers. *West Virginia* v. *EPA*, 597 U. S. 697, 723 (2022) (quoting *Utility Air Regulatory Group* v. *EPA*, 573 U. S. 302, 324 (2014)). In *Biden* v. *Nebraska*, 600 U. S. 477 (2023), for example, we declined to read authorization to "waive or modify" statutory or regulatory provisions applicable to financial assistance programs as a delegation of power to cancel $430 billion in student loan debt. *Id.*, at 494 (quoting 20 U. S. C. §1098bb(a)(1)). In *West Virginia* v. *EPA*, we declined to read authorization to determine the "best system of emission reduction" as a delegation of power to force a nationwide transition away from the use of coal. 597 U. S., at 732 (quoting 42 U. S. C. §7411(a)(1)). And in *National Federation of Independent Business* v. *OSHA*, 595 U. S. 109 (2022) (*per curiam*), we declined to read authorization to ensure "safe and healthful working conditions" as a delegation of power to impose a vaccine mandate on 84 million Americans. *Id.*, at 114, 117 (quoting 29 U. S. C. §651(b)); see also, *e.g.*, *Alabama Assn. of Realtors* v. *Department of Health and Human Servs.*, 594 U. S. 758, 764–765 (2021) (*per curiam*); *King* v. *Burwell*, 576 U. S. 473, 485–486 (2015); *Utility Air*, 573 U. S., at 324.

We have described several of these cases as "major questions" cases. *Nebraska*, 600 U. S., at 505; *West Virginia*, 597 U. S., at 732; see also *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 159 (2000) (citing S. Breyer,

Judicial Review of Questions of Law and Policy, 38 Admin. L. Rev. 363, 370 (1986)). In each, the Government claimed broad, expansive power on an uncertain statutory basis. And in each, the statutory text might "[a]s a matter of definitional possibilities" have been read to delegate the asserted power. *West Virginia*, 597 U. S., at 732 (internal quotation marks omitted). But "context" counseled "skepticism." *Id*., at 721, 732. That context included not just other language within the statute, but "constitutional structure" and "common sense." *Nebraska*, 600 U. S., at 512, 515 (BARRETT, J., concurring). "[B]oth separation of powers principles and a practical understanding of legislative intent" suggested Congress would not have delegated "highly consequential power" through ambiguous language. *West Virginia*, 597 U. S., at 723–724.

These considerations apply with particular force where, as here, the purported delegation involves the core congressional power of the purse. "Congress would likely . . . intend[] for itself" the "basic and consequential tradeoffs," *id*., at 730, inherent in uses of this "most complete and effectual weapon," The Federalist No. 58, at 359. And if Congress were to relinquish that weapon to another branch, a "reasonable interpreter" would expect it to do so "'clearly.'" *Nebraska*, 600 U. S., at 514–515 (BARRETT, J., concurring) (quoting *Utility Air*, 573 U. S., at 324).

What common sense suggests, congressional practice confirms. When Congress has delegated its tariff powers, it has done so in explicit terms, and subject to strict limits. Congress has consistently used words like "duty" in statutes delegating authority to impose tariffs. (A customs "duty" is simply "the federal tax levied on goods shipped into the United States." Black's Law Dictionary 638 (12th ed. 2024).) See, *e.g*., 19 U. S. C. §1338(d) ("rates of duty"); §2132(a) ("temporary import surcharge . . . in the form of duties"); §2253(a)(3)(A) ("duty on the imported article"); §2411(c)(1)(B) ("duties or other import restrictions"). It has

capped the amount and duration of tariffs. See, *e.g.*, §1338(d) (50% cap); §2132(a) (15% cap, 150-day time limit); §2253(e) (50% cap, phasedown requirement after one year). And it has conditioned exercise of the tariff power on demanding procedural prerequisites. See, *e.g.*, §2252 (investigation by the United States International Trade Commission, public hearings, report of findings and recommendation); §§2411–2414 (investigation by the United States Trade Representative, consultation with relevant country and interested parties, publication of findings).[2]

Against this backdrop of clear and limited delegations, the Government reads IEEPA to give the President power to unilaterally impose unbounded tariffs. On this reading, moreover, the President is unconstrained by the significant procedural limitations in other tariff statutes and free to issue a dizzying array of modifications at will. See *supra*, at 3. All it takes to unlock that extraordinary power is a Presidential declaration of emergency, which the Government asserts is unreviewable. Brief for Federal Parties 42. And the only way of restraining the exercise of that power is a veto-proof majority in Congress. See 50 U. S. C. §1622(a)(1) (requiring a "joint resolution" "enacted into law" to terminate a national emergency). That view, if credited, would "represent[] a 'transformative expansion'" of the President's authority over tariff policy, *West Virginia*, 597

───────────

[2] The same is true of Section 232 of the Trade Expansion Act of 1962, 76 Stat. 877, which we have held authorizes sector-specific import "license fee[s]." *Federal Energy Administration* v. *Algonquin SNG, Inc.*, 426 U. S. 548, 571 (1976). Section 232(a) expressly references "duties." 19 U. S. C. §1862(a); see *infra*, at 19. And Section 232(c) authorizes the President to "adjust the imports" of an "article," §1862(c), but only after the Secretary of Commerce, in consultation with the Secretary of Defense, conducts an investigation and prepares a report finding that the "article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security," §1862(b).

U. S., at 724 (quoting *Utility Air*, 573 U. S., at 324), and in-deed—as demonstrated by the exercise of that authority in this case—over the broader economy as well.  See Congres-sional Budget Office, CBO's Current View of the Economy From 2025 to 2028, p. 5 (Sept. 2025); Brief for Federal Par-ties 2–3.  It would replace the longstanding executive-legis-lative collaboration over trade policy with unchecked Pres-idential policymaking.  See CRS, Trade Promotion Authority (TPA) and the Role of Congress in Trade Policy (2015).  Congress seldom effects such sea changes through "vague language."  *West Virginia*, 597 U. S., at 724.

It is also telling that in IEEPA's "half century of exist-ence," no President has invoked the statute to impose *any* tariffs—let alone tariffs of this magnitude and scope.  *Na-tional Federation of Independent Business*, 595 U. S., at 119.[3]  Presidents have, by contrast, regularly invoked IEEPA for other purposes.  CRS, C. Casey, J. Elsea, & L. Rosen, The International Emergency Economic Powers Act: Origins, Evolution, and Use 18–21 (2025).  At the same time, they have invoked other statutes—but never IEEPA—to impose tariffs, on products ranging from car tires to washing machines.  See, *e.g.*, Presidential Procla-mation No. 8414, 3 CFR 115 (2009 Comp.); Presidential

---

[3] Indeed, even before IEEPA was enacted, only one President relied on its predecessor, the Trading with the Enemy Act (TWEA), ch. 106, 40 Stat. 411, to impose tariffs—and then only as a *post hoc* defense to a legal challenge.  See Presidential Proclamation No. 4074, 36 Fed. Reg. 15724 (1971) (initially invoking the Tariff Act of 1930 and Trade Expansion Act of 1962); *United States* v. *Yoshida Int'l, Inc.*, 526 F. 2d 560, 572 (CCPA 1975).  Those tariffs were also of limited amount, duration, and scope. See *id*., at 568–569, 577–578 (noting that the 10-percent surcharge was described by President Nixon as "'a temporary measure,'" was in effect less than five months, applied only to "articles which had been the sub-ject of prior tariff concessions," and was capped at congressionally au-thorized rates); Economic Report of the President 70 (1972) ("When all exceptions to the 10-percent rule were taken into account, the effective rate of surcharge came down to 4.8 percent").

Proclamation No. 9694, 83 Fed. Reg. 3553 (2018). And those tariffs did not "even beg[in] to approach the size or scope" of the IEEPA tariffs at issue here. *Nebraska*, 600 U. S., at 502 (quoting *Alabama Assn.*, 594 U. S., at 765). The "'lack of historical precedent'" for the IEEPA tariffs, "coupled with the breadth of authority" that the President now claims, "is a 'telling indication'" that the tariffs extend beyond the President's "legitimate reach." *National Federation of Independent Business*, 595 U. S., at 119 (quoting *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 505 (2010)).

The "'economic and political significance'" of the authority the President has asserted likewise "provide[s] a 'reason to hesitate before concluding that Congress' meant to confer such authority." *West Virginia*, 597 U. S., at 721 (quoting *Brown & Williamson*, 529 U. S., at 159–160). The President's assertion here of broad "statutory power over the national economy" is "extravagant" by any measure. *Utility Air*, 573 U. S., at 324. And as the Government admits— indeed, boasts—the economic and political consequences of the IEEPA tariffs are astonishing. The Government points to projections that the tariffs will reduce the national deficit by $4 trillion, and that international agreements reached in reliance on the tariffs could be worth $15 trillion. Brief for Federal Parties 3, 11. In the President's view, whether "we are a rich nation" or a "poor" one hangs in the balance. *Id.*, at 2. These stakes dwarf those of other major questions cases. See, *e.g.*, *Nebraska*, 600 U. S., at 483 ($430 billion); *Alabama Assn.*, 594 U. S., at 764 (nearly $50 billion); *West Virginia*, 597 U. S., at 714 ("billions of dollars in compliance costs"). As in those cases, "a reasonable interpreter would [not] expect" Congress to "pawn[]" such a "big-time policy call[] . . . off to another branch." *Nebraska*, 600 U. S., at 515 (BARRETT, J., concurring).

The Government and the principal dissent attempt to avoid application of the major questions doctrine on several grounds. None is convincing.

The Government argues first that the doctrine should not apply to emergency statutes. Brief for Federal Parties 35–36. But this argument is nearly identical to one it already advanced in *Nebraska*. There, the Government contended that a different emergency statute should be interpreted broadly because its "whole point" was to provide "substantial discretion to . . . respond to unforeseen emergencies." 600 U. S., at 500 (internal quotation marks omitted). We rejected that argument in *Nebraska*, and we reject it here as well. "Emergency powers," after all, "tend to kindle emergencies." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 650 (1952) (Jackson, J., concurring). Dozens of IEEPA emergencies remain ongoing today, including the first—declared over four decades ago in response to the Iranian hostage crisis. CRS, Casey, International Emergency Economic Powers Act, at 20. And as the Framers understood, emergencies can "afford a ready pretext for usurpation" of congressional power. *Youngstown*, 343 U. S., at 650 (Jackson, J., concurring). Where Congress has reason to be worried about its powers "slipping through its fingers," *id.*, at 654, we in turn have every reason to expect Congress to use clear language to effectuate unbounded delegations— particularly of its "one great power," *Nicol*, 173 U. S., at 515.

The Government's and the principal dissent's proposed foreign affairs exception fares no better. Brief for Federal Parties 34–35; *post*, at 45–57 (opinion of KAVANAUGH, J.). As a general matter, the President of course enjoys some "independent constitutional power[s]" over foreign affairs "even without congressional authorization." *FCC* v. *Consumers' Research*, 606 U. S. 656, 707 (2025) (KAVANAUGH, J., concurring). And Congress certainly may intend to "give the President substantial authority and flexibility" in many

foreign affairs or national security contexts. *Post*, at 48 (opinion of KAVANAUGH, J.) (quoting *Consumers' Research*, 606 U. S., at 706 (KAVANAUGH, J., concurring)). But "flip[ping]" the "presumption" under the major questions doctrine, Brief for Federal Parties 34, makes little sense when it comes to tariffs. As the Government admits, the President and Congress *do not* "enjoy concurrent constitutional authority" to impose tariffs during peacetime. *Ibid*.; Tr. of Oral Arg. 70–71. The Framers gave that power to "Congress alone"—notwithstanding the obvious foreign affairs implications of tariffs. *Merritt* v. *Welsh*, 104 U. S. 694, 700 (1882). And whatever may be said of other powers that implicate foreign affairs, we would not expect Congress to relinquish its tariff power through vague language, or without careful limits.

The central thrust of the Government's and the principal dissent's proposed exceptions appears to be that ambiguous delegations in statutes addressing "the most major of major questions" should necessarily be construed broadly. Brief for Federal Parties 35. But it simply does not follow from the fact that a statute deals with major problems that it should be read to delegate all major powers for which there may be a "colorable textual basis." *West Virginia*, 597 U. S., at 722. It is in precisely such cases that we should be alert to claims that sweeping delegations—particularly delegations of core congressional powers—"lurk[]" in "ambiguous statutory text." *Id*., at 723 (internal quotation marks omitted). There is no major questions exception to the major questions doctrine.

Accordingly, the President must "point to clear congressional authorization" to justify his extraordinary assertion of the power to impose tariffs. *Nebraska*, 600 U. S., at 506 (internal quotation marks omitted). He cannot.

## B

To begin, IEEPA authorizes the President to "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit . . . importation or exportation."  50 U. S. C. §1702(a)(1)(B).  Absent from this lengthy list of powers is any mention of tariffs or duties.  That omission is notable in light of the significant but specific powers Congress *did* go to the trouble of naming.  It stands to reason that had Congress intended to convey the distinct and extraordinary power to impose tariffs, it would have done so expressly—as it consistently has in other tariff statutes.  See *supra*, at 8; accord, *post*, at 11, 26–27 (opinion of KAVANAUGH, J.).

The power to "regulate . . . importation" does not fill that void.  "Regulate," as that term is ordinarily used, means to "fix, establish, or control; to adjust by rule, method, or established mode; to direct by rule or restriction; to subject to governing principles or laws."  Black's Law Dictionary 1156 (5th ed. 1979); see also *Ysleta del Sur Pueblo* v. *Texas*, 596 U. S. 685, 697 (2022).  This definition captures much of what a government does on a day-to-day basis.  Indeed, if "regulate" is as broad as the principal dissent suggests, *post*, at 10–11, then the other eight verbs in §1702(a)(1)(B) are simply wasted ink.  But the facial breadth of "regulate" places in stark relief what the term is not usually thought to include: taxation.  The U. S. Code is replete with statutes granting the Executive the authority to "regulate" someone or something.  Yet the Government cannot identify any statute in which the power to regulate includes the power to tax.  The Government concedes, for example, that the Securities and Exchange Commission cannot tax the trading of securities, even though it is expressly authorized to "regulate the trading of . . . securities."  15 U. S. C. §78i(h)(1); see Brief for Federal Parties 31–32.  We are therefore skeptical that in IEEPA—and IEEPA alone—Congress hid a

delegation of its birth-right power to tax within the quotidian power to "regulate."

Taxes, to be sure, may accomplish regulatory ends. See *Sonzinsky*, 300 U. S., at 513; *Gibbons*, 9 Wheat., at 201–202. But it does not follow that the power to regulate something includes the power to tax it as a means of regulation. Congressional practice suggests as much. When Congress addresses both the power to regulate and the power to tax, it does so separately and expressly. See, *e.g.*, 16 U. S. C. §460bbb–9(a) (distinguishing between the power to "tax persons, franchise, or private property" on lands and the power "to regulate the private lands"); 2 U. S. C. §622(8)(B)(i) ("government-sponsored enterprise" does not have the "power to tax or to regulate interstate commerce"). That is unsurprising, as the "power to regulate commerce" is "entirely distinct from the right to levy taxes." *Gibbons*, 9 Wheat., at 201. That Congress did not grant those authorities separately here is strong evidence that "regulate" in IEEPA does not include taxation.

A contrary reading would render IEEPA partly unconstitutional. IEEPA authorizes the President to "regulate . . . importation *or exportation*." 50 U. S. C. §1702(a)(1)(B) (emphasis added). Taxing exports, however, is expressly forbidden by the Constitution. Art. I, §9, cl. 5.

The "neighboring words" with which "regulate" "is associated" also suggest that Congress did not intend for "regulate" to include the revenue-raising power. *United States* v. *Williams*, 553 U. S. 285, 294 (2008). "Regulate" is one of nine verbs listed in §1702(a)(1)(B). Each authorizes a distinct action a President might take in sanctioning foreign actors or controlling domestic actors engaged in foreign commerce—blocking imports, for example, or prohibiting transactions. Presidential practice under IEEPA demonstrates as much. See CRS, Casey, International Emergency Economic Powers Act, at 79–106 (Table A–3); see, *e.g.*, Exec. Order No. 13194, 3 CFR 741 (2001 Comp.) (blocking

importation of diamonds from insurgent regime in Sierra
Leone); Exec. Order No. 12947, 3 CFR 319 (1995 Comp.)
(prohibiting transactions with those "who threaten to dis-
rupt the Middle East peace process").  None of IEEPA's au-
thorities includes the distinct and extraordinary power to
raise revenue.  And the fact that no President has ever
found such power in IEEPA is strong evidence that it does
not exist.  See *supra,* at 10; *FTC* v. *Bunte Brothers, Inc.*, 312
U. S. 349, 351–352 (1941).

We do not attempt to set forth the metes and bounds of
the President's authority to "regulate . . . importation" un-
der IEEPA.  That "interpretive question" is "not at issue" in
this case, and any answer would be "plain dicta."  *West Vir-
ginia*, 597 U. S., at 734–735, and n. 5.  Our task today is to
decide only whether the power to "regulate . . . importa-
tion," as granted to the President in IEEPA, embraces the
power to impose tariffs.  It does not.[4]

The Government, echoed point-for-point by the principal
dissent, marshals several arguments in response.  First, it
contends that IEEPA confers the power to impose tariffs be-
cause early commentators and this Court's cases discuss
tariffs in the context of the Constitution's Commerce
Clause.  See Brief for Federal Parties 24–25; *post*, at 12–13
(opinion of KAVANAUGH, J.).  But that answers the wrong
question.  The question is not, as the Government would
have it, whether tariffs can ever be a means of regulating
commerce.  It is instead whether *Congress*, when conferring
the power to "regulate . . . importation," gave the President
the power to impose tariffs at his sole discretion.  And

---

[4] The principal dissent surmises that the President could impose "most
if not all" of the tariffs at issue under statutes other than IEEPA.  *Post*,
at 62 (opinion of KAVANAUGH, J.).  The cited statutes contain various com-
binations of procedural prerequisites, required agency determinations,
and limits on the duration, amount, and scope of the tariffs they author-
ize.  See *supra*, at 8–9; *post*, at 62–63.  We do not speculate on hypothet-
ical cases not before us.

Congress's pattern of usage is most relevant to answering that question. That pattern is plain: When Congress grants the power to impose tariffs, it does so clearly and with careful constraints. It did neither here.

The Government raises another contextual argument. Because "regulate" "lies between" two "poles" in IEEPA— "compel" on the affirmative end and "prohibit" on the negative end—the term naturally includes the "less extreme, more flexible" tool of tariffs. Reply Brief 9 (internal quotation marks omitted); see *post*, at 29–30 (opinion of KAVANAUGH, J.) (making a greater-includes-the-lesser argument). But tariffs, as discussed above, are different in kind, not degree, from the other authorities in IEEPA. Unlike those authorities, tariffs operate directly on domestic importers to raise revenue for the Treasury. See 19 U. S. C. §1505(a); 19 CFR §141.1(b) (2025). Even though a tariff is, in some sense, "less extreme" than an outright compulsion or prohibition, it does not follow that tariffs lie on the spectrum between those poles. They are instead "very clear[ly] . . . a branch of the taxing power," *Gibbons*, 9 Wheat., at 201, and fall outside the spectrum entirely.

Finding no support in the statute the President invoked, the Government turns to one he did not: IEEPA's predecessor, TWEA. Ch. 106, 40 Stat. 411. In 1975, the Court of Customs and Patent Appeals held that the authority to "regulate . . . importation" in TWEA authorized President Nixon to impose limited tariffs. *United States* v. *Yoshida Int'l, Inc.*, 526 F. 2d 560, 572, 577–578. When Congress enacted IEEPA two years later, the Government contends, it conveyed that same authority (except without the limits). See also *post*, at 14–17 (opinion of KAVANAUGH, J.).

This argument cannot bear the weight the Government places on it. While this Court sometimes assumes that Congress incorporates judicial definitions into legislation, we do so "only when [the] term's meaning was 'well-settled'" before the adoption. *Kemp* v. *United States*, 596 U. S. 528,

539 (2022) (quoting *Neder* v. *United States*, 527 U. S. 1, 22 (1999)); see also *United States* v. *Kwai Fun Wong*, 575 U. S. 402, 412–415 (2015). A single, expressly limited opinion from a specialized intermediate appellate court does not clear that hurdle.[5] See *BP p.l.c.* v. *Mayor and City Council of Baltimore*, 593 U. S. 230, 244 (2021). The tariff authority asserted by President Nixon, moreover, was "far removed" from TWEA's "original purposes" of sanctioning foreign belligerents. Cohen, Fundamentals of U. S. Foreign Trade Policy, at 178–179. We are therefore skeptical that Congress enacted IEEPA with an eye toward granting that novel power.

The Government has another historical argument based on this Court's wartime precedents. See generally Brief for Professor Aditya Bamzai as *Amicus Curiae*; Reply Brief 9–11, 18. According to the Government, those precedents acknowledge an inherent Presidential power to impose tariffs during armed conflict. And, the argument goes, Congress in TWEA, and then in IEEPA, codified those precedents. But this argument fails at both steps. Insofar as the Government relies on our wartime cases themselves, they are facially inapposite. Regardless of what they might mean for the President's inherent *wartime* authority, all

─────────────

[5] The Government, citing the IEEPA House Committee Report, contends that Congress "indisputably knew of" *Yoshida*'s interpretation of TWEA. Brief for Federal Parties 26; see also *post*, at 15–16, and n. 11 (opinion of KAVANAUGH, J.). But even taking the Report at face value, it hardly helps the Government. The Report explains that "[s]uccessive Presidents have seized upon the open-endedness of [TWEA] section 5(b) to turn that section, through usage, into something quite different from what was envisioned in 1917." H. R. Rep. No. 95–459, pp. 8–9 (1977); accord, S. Cohen, R. Blecker, & P. Whitney, Fundamentals of U. S. Foreign Trade Policy 178–179 (2d ed. 2003). That is not exactly a stamp of approval on the action *Yoshida* guardedly endorsed. And in any event, the Government's "knew of" standard falls well short of the "broad and unquestioned" "judicial consensus" we have required to conclude that Congress incorporated a judicial definition into a statutory term. *Jama* v. *Immigration and Customs Enforcement*, 543 U. S. 335, 349 (2005).

agree that the President has no inherent peacetime author-ity to impose tariffs.

Nor are we persuaded that the dots connect from our war-time precedents, through multiple iterations of TWEA, to IEEPA, such that IEEPA should be interpreted to grant the President an expansive peacetime tariff power. This argu-ment relies extensively on a series of inferences drawn from scant legislative history. Such an attenuated chain cannot support—much less "clearly" support—a reading of IEEPA that includes the distinct power to impose tariffs. *Alabama Assn.*, 594 U. S., at 764.

Turning to this Court's precedents, the Government first relies on *Federal Energy Administration* v. *Algonquin SNG, Inc.*, 426 U. S. 548 (1976). There, we held that Section 232(b) of the Trade Expansion Act of 1962, which allows the President to "adjust the imports" of particular goods to pro-tect national security, includes the power to impose "license fees." *Id.*, at 561. But that holding bears little on the mean-ing of IEEPA. As a textual matter, Section 232(b) author-izes the President not only to "adjust . . . imports," but (as the Government emphasized in *Algonquin*) to "*take such ac-tion . . . as he deems necessary*" to adjust the imports of a good. Brief for Petitioners 26 (emphasis in original) and Tr. of Oral Arg. 6–7, in *Federal Energy Administration* v. *Al-gonquin SNG, Inc.*, O. T. 1975, No. 75–382. IEEPA does not contain such sweeping, discretion-conferring language. As for context, Section 232(a) states that "[n]o action shall be taken" to "decrease or eliminate" an existing "duty or other import restriction" if doing so would threaten national se-curity. 19 U. S. C. §1862(a) (1970 ed.). This explicit refer-ence to duties preceding Section 232(b) renders it natural for Section 232(b) itself to authorize duties. Thus, we de-cline to extend *Algonquin*'s expressly "limited" holding any further. 426 U. S., at 571.

Finally, the Government invokes *Dames & Moore* v. *Re-gan*, 453 U. S. 654 (1981), but that case offers no support.

*Dames & Moore* was exceedingly narrow,[6] did not address the President's power to "regulate," and did not involve tariffs at all. If anything, that case highlights the importance of close attention to IEEPA's text. "The terms of . . . IEEPA," we held, "do not authorize" the suspension of claims. *Id.*, at 675. So too here; the terms of IEEPA do not authorize tariffs.

## III

The President asserts the extraordinary power to unilaterally impose tariffs of unlimited amount, duration, and scope. In light of the breadth, history, and constitutional context of that asserted authority, he must identify clear congressional authorization to exercise it.

IEEPA's grant of authority to "regulate . . . importation" falls short. IEEPA contains no reference to tariffs or duties. The Government points to no statute in which Congress used the word "regulate" to authorize taxation. And until now no President has read IEEPA to confer such power.

We claim no special competence in matters of economics or foreign affairs. We claim only, as we must, the limited role assigned to us by Article III of the Constitution. Fulfilling that role, we hold that IEEPA does not authorize the President to impose tariffs.

———————

[6] See, *e.g.*, 453 U. S., at 660 ("We are confined to a resolution of the dispute presented to us"); *ibid.* (We are "acutely aware of the necessity to rest decision on the narrowest possible ground capable of deciding the case"); *id.*, at 661 ("We attempt to lay down no general 'guidelines' covering other situations not involved here, and attempt to confine the opinion only to the very questions necessary to decision of the case"); *ibid.* ("[T]he decisions of the Court in this area have been rare, episodic, and afford little precedential value for subsequent cases"); *id.*, at 688 ("[W]e re-emphasize the narrowness of our decision"). This is not quite "no, no, a thousand times no," but should have sufficed to dissuade the principal dissent from invoking the case, see *post*, at 55–56, with respect to the quite distinct legal and factual issues present here.

Opinion of the Court

The judgment of the United States Court of Appeals for the Federal Circuit in case No. 25–250 is affirmed. The judgment of the United States District Court for the District of Columbia in case No. 24–1287 is vacated, and the case is remanded with instructions to dismiss for lack of jurisdiction.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 24–1287 and 25–250

_____

LEARNING RESOURCES, INC., ET AL., PETITIONERS
24–1287　　　　　　　　_v._
DONALD J. TRUMP, PRESIDENT OF THE UNITED
STATES, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED
STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA
CIRCUIT

DONALD J. TRUMP, PRESIDENT OF THE UNITED
STATES, ET AL., PETITIONERS
25–250　　　　　　　　_v._
V.O.S. SELECTIONS, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FEDERAL CIRCUIT

[February 20, 2026]

JUSTICE GORSUCH, concurring.

The President claims that Congress delegated to him an extraordinary power in the International Emergency Economic Powers Act (IEEPA)—the power to impose tariffs on practically any products he wants, from any countries he chooses, in any amounts he selects. Applying the major questions doctrine, the principal opinion rejects that argument. I join in full. The Constitution lodges the Nation's lawmaking powers in Congress alone, and the major questions doctrine safeguards that assignment against executive encroachment. Under the doctrine's terms, the President must identify clear statutory authority for the extraordinary delegated power he claims. And, as the principal opinion explains, that is a standard he cannot meet.

Whatever else might be said about Congress's work in IEEPA, it did not clearly surrender to the President the sweeping tariff power he seeks to wield.

Not everyone sees it this way. Past critics of the major questions doctrine do not object to its application in this case, and they even join much of today's principal opinion. But, they insist, they can reach the same result by employing only routine tools of statutory interpretation. *Post*, at 1 (KAGAN, J., joined by SOTOMAYOR and JACKSON, JJ., concurring in part and concurring in judgment). Meanwhile, one colleague who joins the principal opinion in full suggests the major questions doctrine *is* nothing more than routine statutory interpretation. *Post,* at 1 (BARRETT, J., concurring). Still others who have joined major questions decisions in the past dissent from today's application of the doctrine. *Post*, at 1 (KAVANAUGH, J., joined by THOMAS and ALITO, JJ., dissenting). Finally, seeking to sidestep the major questions doctrine altogether, one colleague submits that Congress may hand over to the President most of its powers, including the tariff power, without limit. *Post*, at 1–2 (THOMAS, J., dissenting). It is an interesting turn of events. Each camp warrants a visit.

## I

Start with the critics. In the past, they have criticized the major questions doctrine for two main reasons. The doctrine, they have suggested, is a novelty without basis in law. *West Virginia* v. *EPA*, 597 U. S. 697, 779 (2022) (KAGAN, J., joined by, *inter alios*, SOTOMAYOR, J., dissenting) (calling the doctrine a "special cano[n]" that has "magically appear[ed]"). And, they have argued, the doctrine is rooted in an "anti-administrative-state stance" that prevents Congress from employing executive agency officials to "d[o] important work." *Id.*, at 780. Today, the critics proceed differently. They join a section of the principal opinion that applies the major questions doctrine. *Ante,* at 14–20.

And rather than critique the doctrine, they say only that it is "unnecessary" in this case "because ordinary principles of statutory interpretation lead to the same result." *Post*, at 2–3 (opinion of KAGAN, J.).

## A

Unpack that last claim first. My concurring colleagues contend that, as a matter of "straight-up statutory construction," IEEPA does not grant the President the power to impose tariffs. *Post*, at 7. In doing so, they make thoughtful points about the statute's text and context. But their approach today is difficult to square with how they have interpreted other statutes. Dissenting in past major questions cases, they have argued that broad statutory language granting powers to executive officials should be read for all it is worth. Yet, now, when it comes to IEEPA's similarly broad language granting powers to the President, they take a more constrained approach.

Consider some examples of how they have proceeded in the past. Dissenting in *National Federation of Independent Business* v. *OSHA*, 595 U. S. 109 (2022) (*per curiam*) (*NFIB*), two of my concurring colleagues confronted a statute charging the Occupational Safety and Health Administration with promoting "safe and healthful working conditions." *Id.*, at 127, 132 (joint opinion of Breyer, SOTOMAYOR, and KAGAN, JJ.) (internal quotation marks omitted). They read that language as authorizing the agency to impose a vaccine mandate on 84 million Americans. *Id.*, at 132; *id.*, at 120 (*per curiam*). In support of their reading, my colleagues stressed the statute's "expansive language," another provision authorizing the agency to issue temporary "emergency standards," and "the scope of the crisis" the agency was trying to address. *Id.*, at 132, 135 (joint dissent) (internal quotation marks omitted).

Dissenting in *Alabama Assn. of Realtors* v. *Department of Health and Human Servs.*, 594 U. S. 758 (2021)

(*per curiam*), my colleagues addressed a statute permitting the Centers for Disease Control and Prevention to issue regulations "necessary to prevent the . . . transmission . . . of communicable diseases." *Id.*, at 768 (opinion of Breyer, J., joined by SOTOMAYOR and KAGAN, JJ.) (internal quotation marks omitted). As they saw it, those terms granted the agency the power to regulate landlord-tenant relations nationwide during COVID–19. *Ibid.* In reaching this conclusion, my colleagues again highlighted the statute's "broad" language and suggested that it permitted the agency to impose even "greater restrictions" than the ones at issue in the case. *Id.*, at 769.

Dissenting in *West Virginia*, my colleagues faced a statute allowing the Environmental Protection Agency to ensure power plants employ the "best system of emission reduction." 597 U. S., at 758 (opinion of KAGAN, J.) (internal quotation marks omitted). They read that provision as authorizing the agency to effectively close many power plants and transform the electricity industry from coast to coast. See *id.*, at 754–755. In support, they once more argued that the statutory language was "broad" and "expansive," with "no ifs, ands, or buts." *Id.*, at 756–758. They stressed, too, that the relevant statutory terms appeared in "major legislation" intended to address "big problems," and that the statute authorized actions in the agency's "traditional lane" or "wheelhouse." *Id.*, at 756–757, 765.

Finally, dissenting in *Biden* v. *Nebraska*, 600 U. S. 477 (2023), my colleagues took up a statute permitting the Secretary of Education to "waive or modify any statutory or regulatory provision applying to [a federal] student-loan program" during a national emergency. *Id.*, at 533 (opinion of KAGAN, J., joined by SOTOMAYOR and JACKSON, JJ.) (internal quotation marks omitted). They said that language allowed the Secretary to cancel $430 billion in federal student-loan debt because of COVID–19. See *ibid.*; *id.*, at 501 (majority opinion). Once again, they argued that the

statutory terms were "broad," "expansive," "capacious," and designed to afford the Secretary a "poten[t]" power to respond to "national emergencies" that were "major in scope." *Id.*, at 533–542 (KAGAN, J., dissenting).

Now compare all that to how my colleagues proceed here. This case, they say, is "nearly the opposite." *Post*, at 3. While straight-up statutory interpretation granted executive officials all the power they sought in all those other cases, my colleagues insist this one is different because IEEPA simply does not "give the President the power he wants." *Ibid.*

That's a striking turn given the statutory terms before us. When the President declares a national emergency "to deal with any unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States," 50 U. S. C. §1701(a), IEEPA permits him to "regulate . . . importation . . . of . . . any property in which any foreign country or a national thereof has any interest," §1702(a)(1)(B). Surely, the authority granted here is "broad" and "expansive." See *West Virginia*, 597 U. S., at 758–759 (KAGAN, J., dissenting). It has "no ifs, ands, or buts" either. *Id.*, at 756. As a matter of ordinary meaning, the term "regulate" means to "fix, establish or control," "adjust by rule, method, or established mode," "direct by rule or restriction," or "subject to governing principles or laws." Black's Law Dictionary 1156 (5th ed. 1979); see also *post*, at 4. And tariffs do just that—they fix rules that control, adjust, or govern imports of "property in which any foreign country or a national thereof has any interest." §1702(a)(1)(B).

Without question IEEPA is also "major legislation" designed to address "big problems" and "crises," *West Virginia*, 597 U. S., at 754, 756–758 (KAGAN, J., dissenting) (internal quotation marks omitted), along with "emergencies" that are "major in scope," *Nebraska*, 600 U. S., at 542 (KAGAN, J., dissenting). By its terms, the statute applies

only during declared national emergencies involving "threat[s]" to the "national security, foreign policy, or economy of the United States." §1701(a). And it tasks the President personally with responding to those emergencies, a responsibility surely more in his "lane" or "wheelhouse" than that of any other executive official. See *West Virginia*, 597 U. S., at 765 (KAGAN, J., dissenting). Notably, too, IEEPA grants the President the power to impose even "greater restrictions" than tariffs, *Alabama Assn. of Realtors*, 594 U. S., at 769 (Breyer, J., dissenting), because the statute also permits him to "nullify," "prevent," and "void" imports, §1702(a)(1)(B); see also *Nebraska*, 600 U. S., at 539 (KAGAN, J., dissenting).

Why do my concurring colleagues read IEEPA so much more narrowly than they have other broad statutory terms found in other major legislation addressing other emergencies? They say contextual clues justify a narrowing construction here. See *post*, at 3–7. But what the concurrence calls "context" looks remarkably like the major questions doctrine's rule that, when executive branch officials claim Congress has granted them an extraordinary power, they must identify clear statutory authority for it. See *ante,* at 13 (reciting the rule).

Take some examples. The concurrence points to the "unparalleled authority" the President asserts "to impose a tariff of any amount, for any time, on only his own say-so." *Post*, at 6. In other words, the President claims an "[e]xtraordinary" power. *West Virginia*, 597 U. S., at 723 (majority opinion). The concurrence observes that no "President until now understood IEEPA to authorize imposing tariffs." *Post*, at 6. In other words, the power is an "unheralded" one. *West Virginia*, 597 U. S., at 722 (internal quotation marks omitted). Along the way, the concurrence also adds "a modicum of common sense about how Congress typically delegates" and "consideration of whether Congress ever has before, or likely would, delegate the power the

Executive asserts."  *Post*, at 2 (internal quotation marks
omitted).  In other words, the statutory text must be read
in light of "separation of powers principles."  *West Virginia*,
597 U. S., at 723.

   Having borrowed all those concepts from the major ques-
tions doctrine, the concurrence then turns to the key statu-
tory terms before us—"regulate . . . importation"—and ob-
serves that they "sa[y] nothing" (at least not expressly)
"about imposing tariffs."  *Post*, at 3.  And why is that fatal
to the President's case?  Because the President is attempt-
ing to exercise the "'core congressional power'" over taxes
and tariffs, a power Article I of the Constitution vests in
Congress alone.  *Post*, at 5 (quoting *ante,* at 8); see also *West
Virginia*, 597 U. S., at 737 (GORSUCH, J., concurring) (ex-
plaining that the major questions doctrine "protect[s] the
Constitution's separation of powers," and particularly Arti-
cle I, which vests "all federal legislative . . . [p]owers in . . .
Congress" (internal quotation marks and alteration omit-
ted)).

   If my colleagues all but apply the major questions doc-
trine today, maybe they are simply recognizing what they
have in other separation of powers cases involving the del-
egation of legislative power: that "[t]he guidance needed is
greater" when the executive branch seeks to take "action[s]
[that] will affect the entire national economy."  *FCC* v. *Con-
sumers' Research*, 606 U. S. 656, 673 (2025) (opinion for the
Court by KAGAN, J.) (internal quotation marks omitted).  Or
maybe my colleagues believe the power the President as-
serts here outstrips even those powers executive officials
asserted in our past major questions cases.  But whatever
the case, my concurring colleagues' course today suggests
that skeptics owe the major questions doctrine a second
look.

   All of which leads me to take up the challenges they have
posed to it in the past.  Is the doctrine really some "special
cano[n]" that has only recently "magically appear[ed]"?

*West Virginia*, 597 U. S., at 779 (KAGAN, J., dissenting). And is it really grounded in an "anti-administrative-state stance" that prevents Congress from using executive branch officials to perform "important work"? *Id.*, at 780.

## B

The major questions doctrine teaches that, to sustain a claim that Congress has granted them an extraordinary power, executive officials must identify clear authority for that power. Far from a novelty, much the same principle has long applied to those who claim extraordinary delegated authority, whether in private or public law.

### 1

Examples stretch across many fields. Consider first the common law of corporations. In early modern England, corporations could be formed only with "an explicit, ex ante and direct authorization." R. Harris, Industrializing English Law: Entrepreneurship and Business Organization, 1720–1844, p. 17 (2000). That authorization could be given by the Crown, an Act of Parliament, or a combination of the two. *Ibid.*; see also *id.*, at 19. Some of these corporations exercised regulatory functions not unlike those performed by modern administrative agencies. M. Bilder, The Corporate Origins of Judicial Review, 116 Yale L. J. 502, 516–517, 519–520 (2006). Indeed, the "[i]nitial settlements in Virginia and Massachusetts Bay, among others, were structured as corporations." *Id.*, at 535.

English law treated these corporations as having authority to issue bylaws. But that authority was subject to restrictions, one of which was that corporations could not regulate on major subjects without express authorization. Take *Kirk* v. *Nowill*, 1 T. R. 118, 99 Eng. Rep. 1006 (K. B. 1786). That case involved the Company of Cutlers, a corporation for makers of knives and other cutlery. See *id.*, at 118–119, 99 Eng. Rep., at 1006. An Act of Parliament gave

the company broad authority to regulate its members. *Id.*, at 118–121, 99 Eng. Rep., at 1006–1007. The company used that authority to adopt a bylaw allowing its officials to enter its members' "workshops and warehouses" and search for "deceitful and unworkmanly" cutlery. *Id.*, at 121–122, 99 Eng. Rep., at 1007. After the company seized supposedly unworkmanly forks, the aggrieved owner challenged the company's actions in court, arguing that the bylaw under which it acted was "bad in point of law" because the power to incur a forfeiture was not "expressly given to [the company] by Act of Parliament." *Id.*, at 118, 122–123, 99 Eng. Rep., at 1008. Applying a clear-statement rule, the King's Bench declared the bylaw, and therefore the seizure, unlawful. Lord Mansfield explained that the "power of making bye-laws to incur a forfeiture" was an "extraordinary power" over and above the default powers of corporations "created by charter." *Id.*, at 124, 99 Eng. Rep., at 1009. For this reason, the power needed to be "expressly given" by the company's progenitor, Parliament. *Ibid.* Since no such power had been clearly conferred, the seizure was unlawful. See *ibid.*

The same principle applied in American law. In *In re Election of Directors of Long Island R. Co.*, 19 Wend. 37, 40 (N. Y. Sup. Ct. 1837), a New York court addressed a case involving 2,700 shares of stock in the Long Island Railroad Company that the company had declared forfeited. *Ibid.* All agreed that the company had broad power to regulate its shares. See *id.*, at 41–42. Still, the court called the forfeiture an "extraordinary penalty," and held that no such power had been "expressly conferred" on the corporation by its charter. *Ibid.* In fact, the court borrowed the clear-statement rule from *Nowill*: If "extraordinary authority . . . is intended to be given, it must be by *express words* to that effect." *Id.*, at 43 (describing *Nowill* in detail).

The court in *Ex parte Burnett*, 30 Ala. 461 (1857), proceeded similarly. That case involved the incorporated town

of Cahaba, Alabama. See *id.*, at 464. The town set the price of a liquor license at $1,000, fined James Burnett for failing to obtain one, and eventually imprisoned him for not paying the fine. See *ibid.* Burnett sought a writ of habeas corpus and argued that Cahaba had acted beyond the scope of its corporate authority. *Ibid.*

Without a clear-statement rule, Burnett's argument would have stood little chance. That's because the town's charter granted it the authority "to make and establish all such rules, by-laws, and ordinances, respecting the streets, markets, buildings, . . . and police of said town, that shall appear to them requisite and necessary for the security, welfare, and convenience of said town, or for preserving health, peace, order, and good government within the same." *Id.*, at 467 (internal quotation marks omitted). The charter even specifically gave the town the "privileg[e] of granting licenses for retailing of spirituous and other liquors." *Ibid.* (internal quotation marks omitted). Semantically, the town's power was broad indeed and encompassed liquor licensing. But the court sided with Burnett anyway. Reasoning that the town's exorbitant licensing fee effectively banned the sale of liquor, the court held that Cahaba did not enjoy such extraordinary "prohibitory" power because it was "not authorized by any express grant of power" in the town's charter. *Id.*, at 469; see also *id.,* at 466.

These cases are not outliers. Treatises confirm that the extraordinary power principle was fundamental to municipal corporations. A statute could "not by implication invest [a] body with any extraordinary authority." J. Willcock, The Law of Municipal Corporations ¶226, p. 99 (1827). Extraordinary powers required "express words to that effect." *Ibid.* And "[a]ny fair, reasonable doubt concerning the existence of power [was] resolved by the courts against the corporation, and the power [was] denied." 1 J. Dillon, Commentaries on the Law of Municipal Corporations 145 (4th ed. 1890).

The takeaway is simple enough. Early corporations often functioned much like today's executive branch, exercising delegated regulatory authority. And, when interpreting the scope of that authority, the common law had a clear-statement rule that looked strikingly like the major questions doctrine.

Historically, a similar precept applied in agency law. As the leading early American treatise put it, instruments conferring powers of attorney were "ordinarily subjected to a strict interpretation." J. Story, Commentaries on the Law of Agency 80–81 (2d ed. 1844). So, for example, in *Attwood* v. *Munnings*, 7 Barn. & Cress. 278, 108 Eng. Rep. 727 (K. B. 1827), a principal had delegated broad power to an agent to act "generally for him and in his name," including in all things "as should be requisite, expedient, and advisable to be done in . . . his affairs and concerns, and as he might or could do if personally acting therein." *Id.*, at 279–280, 108 Eng. Rep., at 728 (internal quotation marks omitted). The agent then accepted certain debts on behalf of the principal. *Id.*, at 280, 108 Eng. Rep., at 728. The question for the court was whether this action was within the scope of the agent's authority. *Id.*, at 281, 108 Eng. Rep., at 728. The court said no. Powers of attorney are "instruments to be construed strictly." *Id.*, at 283, 108 Eng. Rep., at 729. And the power of attorney contained "no express power" to accept debts, so no such power had been given. *Ibid.*

Other examples abound. A power to sell casks of whiskey did not include the "unusual and extraordinary" power to offer a warranty against future seizures of the casks, unless granted by "express authority." *Palmer* v. *Hatch,* 46 Mo. 585, 587 (1870). Under a power of attorney, authority to enter contracts for a principal was subject to "strict interpretation" and generally did not authorize "contracts of an extraordinary character" outside those "connected with [the principal's] ordinary business." *Reynolds* v. *Rowley*, 4 La. Ann. 396, 398–399 (1849). And a power to manage a mine

did not authorize an agent to borrow money for the mine's operations on the principal's credit because there was no "express authority" for such a departure from the "usual manner" of running a mine. *Hawtayne* v. *Bourne*, 7 M. & W. 595, 599, 151 Eng. Rep. 905, 906 (Ex. 1841). This was true even "in cases of necessity," *id.*, at 599, 151 Eng. Rep., at 907, where the manager borrowed funds to address an "emergency suddenly arising," *id.,* at 600, 151 Eng. Rep., at 907.

Much the same principle applied to executive officials. Often, "[t]he legality of an executive action depended on the relationship between the size of the asserted power and the clarity of the underlying legal authority." T. Arvind & C. Burset, Partisan Legal Traditions in the Age of Camden and Mansfield, 44 Oxford J. Legal Studies 376, 388 (2024). *Entick* v. *Carrington*, 19 How. St. Tr. 1029 (C. P. 1765), offers an illustration. There, as part of an investigation for seditious libel, the English Secretary of State claimed authority to issue a warrant for the seizure of an author's papers. Lord Camden declared the seizure unlawful, reasoning that power asserted by the executive "ought to be as clear as it is extensive." T. Arvind & C. Burset, A New Report of *Entick* v. *Carrington* (1765), 110 Ky. L. J. 265, 324 (2022) (Arvind & Burset). Or, as another reporter described Camden's decision, "one should naturally expect that the law to warrant [the exercise of power] should be clear in proportion as the power is exorbitant." 19 How. St. Tr., at 1065–1066. The seizure represented an extraordinary exercise of power, Lord Camden found, and no legal authority clearly authorized it. See Arvind & Burset 324. Accordingly, the warrant was unlawful and the seizure could not stand. *Id.*, at 332.

2

Perhaps unsurprisingly given this history, American courts applied the extraordinary power principle when

Congress and the States started delegating new regulatory powers to executive agencies in the late 19th century. Take railroad commissions. After the Civil War, governments worried about the increasing power of railroad companies responded by creating new agencies and imbuing them with broad regulatory authority. These bodies were among the first modern administrative agencies. See *West Virginia*, 597 U. S., at 740 (GORSUCH, J., concurring). And when they claimed some extraordinary delegated power, both state and federal courts enforced a clear-statement rule. See, *e.g., Siler* v. *Louisville & Nashville R. Co.*, 213 U. S. 175, 193–194 (1909) (declaring, in the course of interpreting a state statute, that an "enormous power" "must be conferred in plain language" "free from doubt"); *Board of R. Comm'rs of Ore.* v. *Oregon R. & Navigation Co.*, 17 Ore. 65, 77, 19 P. 702, 707–708 (1888) (When an agency exercises "powers delegated to [it] by the legislature" to carry out "important functions," the text must "define and specify the authority given it so clearly that no doubt can reasonably arise"); *ICC* v. *Cincinnati, N. O. & T. P. R. Co.*, 167 U. S. 479, 505 (1897) (holding a delegation of legislative power of "supreme delicacy and importance" must be "clear and direct"); *Gulf & Ship Island R. Co.* v. *Railroad Comm'n*, 94 Miss. 124, 134–135, 49 So. 118 (1908) ("It is universally held that a railroad commission . . . must be able to point to its grant of power . . . in clear and express terms, and nothing will be had by inference").

The railroad commissions may have been the first, but they were not the last. Whether executive officials claimed the power to criminally punish noncompliance with regulations, force employers to retain employees regardless of their unlawful conduct, or regulate intrastate candy sales, this Court held them to much the same standard. Because their claimed powers were so substantial, executive officials had to identify a "distinc[t]" authority for them, *United States* v. *Eaton*, 144 U. S. 677, 688 (1892), a "clear

legislative basis," *United States* v. *George*, 228 U. S. 14, 22 (1913), a "definite and unmistakable expression," *NLRB* v. *Fansteel Metallurgical Corp.*, 306 U. S. 240, 255 (1939), or a "clea[r] mandate," *FTC* v. *Bunte Brothers, Inc.*, 312 U. S. 349, 351, 355 (1941). Cf. *Industrial Union Dept., AFL–CIO* v. *American Petroleum Institute*, 448 U. S. 607, 645 (1980) (plurality opinion) ("In the absence of a clear mandate . . . it is unreasonable to assume that Congress intended to give the Secretary [of Labor] the unprecedented power over American industry" he claimed).

It is no mystery why the Court proceeded this way when interpreting legislative directions to the executive branch. Article I of the Constitution vests all federal legislative power in Congress, and Article II charges the executive branch with seeing that Congress's laws are faithfully executed. In a very real sense, then, when it comes to legislative power, Congress is the principal and executive officials are the agents. See generally G. Lawson & G. Seidman, "A Great Power of Attorney": Understanding the Fiduciary Constitution (2017).

So what is the basis for the charge that the major questions doctrine represents some "magica[l]" innovation? See *West Virginia*, 597 U. S., at 779 (KAGAN, J., dissenting). Part of the answer may have to do with the fact that, in the latter half of the 20th century, this Court began experimenting with a very different approach. The Court pushed aside its long-held skepticism of claims to extraordinary delegated powers and began affirmatively encouraging them. *Chevron* deference is just one example of this phenomenon, though a stark one. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984). That case established a presumption that was nearly the opposite of the major questions doctrine: When Congress failed to speak clearly, courts put a thumb on the scale in *favor* of delegated power. *Id.*, at 843–844. Given that development, the longstanding principles animating

the major questions doctrine may have receded from view for a time. After all, the two doctrines often applied in the same places and counseled opposite results. But with *Chevron* gone, so is the conflict. This Court's application of the major questions doctrine is not invention so much as return to form.

C

Now turn to my concurring colleagues' other charge: that the major questions doctrine is premised on an "anti-administrative-state stance." *West Virginia*, 597 U. S., at 780 (KAGAN, J., dissenting). It is important, they argue, to allow Congress to delegate expansive powers. Members of Congress unfortunately "often don't know enough—and know they don't know enough—to regulate sensibly on an issue." *Id.*, at 781. Nor can Congress easily "anticipate changing circumstances." *Ibid.* For these reasons, Members of Congress must rely on more adept and less constrained "people . . . found in agencies." *Ibid.* Indeed, my colleagues say, "administrative delegations . . . have helped to build a modern Nation." *Id.*, at 782. And the major questions doctrine, they worry, could jeopardize all that "astonish[ing] . . . progress." *Ibid.*

This policy complaint, of course, is no reason to disregard our precedents or longstanding legal principles. But, even taken on its own terms, it is a bit perplexing. The major questions doctrine is not "anti-administrative state." It is pro-Congress. Common-law courts understood that few written instruments can anticipate every eventuality, and that principals sometimes draft broad delegation language to account for this. At the same time, courts appreciated the corresponding risk that delegees could easily exploit loose language in their commissions for their own benefit and to the detriment of those they purported to serve. So common-law courts often strictly construed delegated

powers, not because they were anti-delegee, but because they were pro-principal.

The major questions doctrine performs a similar function. Article I vests all federal legislative power in Congress. But like any written instrument, federal legislation cannot anticipate every eventuality, a point my concurring colleagues have observed in the past. *Id.*, at 781–782. And highly resourceful members of the executive branch have strong incentives to exploit any doubt in Congress's past work to assume new power for themselves. The major questions doctrine helps prevent that kind of exploitation. Our founders understood that men are not angels, and we disregard that insight at our peril when we allow the few (or the one) to aggrandize their power based on loose or uncertain authority. We delude ourselves, too, if we think that power will accumulate safely and only in the hands of dispassionate "people . . . found in agencies." *Id.*, at 781. Even if unelected agency officials were uniquely immune to the desire for more power (an unserious assumption), they report to elected Presidents who can claim no such modesty. See *Myers* v. *United States*, 272 U. S. 52 (1926).

Another feature of our separation of powers makes the major questions doctrine especially salient. When a private agent oversteps, a principal may fix that problem prospectively by withdrawing the agent's authority. Under our Constitution, the remedy is not so simple. Once this Court reads a doubtful statute as granting the executive branch a given power, that power may prove almost impossible for Congress to retrieve. Any President keen on his own authority (and, again, what President isn't?) will have a strong incentive to veto legislation aimed at returning the power to Congress. Perhaps Congress can use other tools, including its appropriation authority, to influence how the President exercises his new power. Maybe Congress can sometimes even leverage those tools to induce the President to withhold a veto. But retrieving a lost power is no easy

business in our constitutional order. And without doctrines like major questions, our system of separated powers and checks-and-balances threatens to give way to the continual and permanent accretion of power in the hands of one man. That is no recipe for a republic.

This case offers an example of the problem. Article I grants Congress, not the President, the power to impose tariffs. Still, the President claims, Congress passed that power on to him in IEEPA, permitting him to impose tariffs on nearly any goods he wishes, in any amount he wishes, based on emergencies he himself has declared. He insists, as well, that his emergency declarations are unreviewable. A ruling for him here, the President acknowledges, would afford future Presidents the same latitude he asserts for himself. See Tr. of Oral Arg. 69. So another President might impose tariffs on gas-powered automobiles to respond to climate change. *Ibid.* Or, really, on virtually any imports for any emergency any President might perceive. And all of these emergency declarations would be unreviewable. Just ask yourself: What President would willingly give up that kind of power?

I recognize the concerns about the major questions doctrine. But it is not so novel as some have supposed. And it serves Article I values we all share. My concurring colleagues all but endorse it today. I hope past skeptics will give it another look.

## II

Turn now to the second camp. If some have criticized the major questions doctrine, others have responded by seeking to soften its blow. Though joining today's principal opinion holding that "clear" statutory authority is required to sustain the exercise of an "extraordinary" power, *ante,* at 13, 20, JUSTICE BARRETT has suggested that the major questions doctrine might be reconceived. On her view, the doctrine need not be understood as a "substantive canon

designed to enforce Article I's Vesting Clause"—a "valu[e] external to a statute." *Nebraska*, 600 U. S., at 508, 510 (concurring opinion). Instead, the doctrine might be thought of as a "commonsense principl[e] of communication" that counsels "skepticism" when executive officials claim extraordinary powers derived from Congress. *Id.*, at 514, 516; see also *post*, at 1–4 (concurring opinion).

It is a thoughtful effort, but I harbor doubts. For one thing, there is no need to reconceive our doctrine; past critics all but apply the doctrine today and their previous criticisms fall flat. See Part I, *supra.* For another, this gloss on our major questions doctrine presents problems. Commonsense principles of communication do not explain many of our major questions cases—this one included. And if common sense really does go so far as to embrace a rule counseling "skepticism" of claims by executive officials that Congress has granted them extraordinary powers, that is common sense in name only. The reason for such skepticism must be Article I, a "substantive" source "external" to any statute.

## A

Introducing her view that "commonsense principles of communication" can sometimes help resolve disputes over the meaning of statutory terms, JUSTICE BARRETT points to an old chestnut. *Nebraska*, 600 U. S., at 512, 514 (concurring opinion). Suppose a legislature used the phrase "whoever drew blood in the streets" in a criminal statute imposing punishment. As a matter of "common sense," JUSTICE BARRETT says, it would "'g[o] without saying'" that the law doesn't apply to a surgeon accessing a patient's vein to save his life. *Ibid.* That is because the phrase "drew blood" is susceptible to two conventional idiomatic meanings: one "applicable to violent encounters with man or beast" and the other "to medical procedures," A. Scalia & B. Garner, Reading Law 357 (2012) (Scalia & Garner). And any

ordinary person faced with that phrase in a penal law would find it obvious which meaning applies. *Ibid.*; see also *Nebraska*, 600 U. S., at 512 (BARRETT, J., concurring).

The difficulty is, our major questions cases are different. Often, little about them "'goes without saying.'" *Ibid.* Take *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120 (2000). There, the question was whether the FDA could regulate tobacco products. *Id.*, at 125. Looking only to common sense, the answer would have been yes. Congress authorized the FDA to regulate "drugs," which Congress defined expressly and broadly as "'articles (other than food) intended to affect the structure or any function of the body.'" *Id.*, at 126. As a matter of common sense, nicotine qualifies as a "drug" based on this statutory definition, as it might even as a matter of everyday speech. *West Virginia*, 597 U. S., at 721–722 (noting the "colorable textual basis" for the executive branch's interpretation in *Brown & Williamson*). Still, we held the FDA could not regulate tobacco products. *Brown & Williamson*, 529 U. S., at 159–160.

Other cases follow suit. We have ruled that the term "air pollutant" does not include greenhouse gases, even though greenhouse gases pollute the air. *Utility Air Regulatory Group* v. *EPA*, 573 U. S. 302, 316, 323–324 (2014). We have held that the phrase "'[r]egulations . . . necessary to prevent the . . . spread of communicable diseases'" does not include eviction moratoriums, even without questioning that eviction moratoriums were necessary to prevent the spread of COVID–19, a communicable disease. *Alabama Assn. of Realtors*, 594 U. S., at 761, 764. And we have said that closing coal power plants is not the "'best system of emission reduction,'" even while acknowledging that closing them would reduce emissions. *West Virginia*, 597 U. S., at 721, 732–735.

None of these cases can be readily explained by "commonsense principles of communication." *Nebraska*, 600 U. S., at 514 (BARRETT, J., concurring). None involved a

phrase like "drew blood" susceptible to two conventional id-iomatic meanings, one of which any English speaker faced with the law at issue might quickly rule out. Quite the op-posite; in each case the agency had a strong argument that the statutory language, commonsensically read, granted the power it claimed. Meanwhile, all our major questions cases can be easily explained by reference to a rule requir-ing the executive branch to identify clear statutory author-ity when it claims Congress has granted it an extraordinary power. And that is a "dice-loading" rule, plain and simple, one designed to protect Article I, a "[s]ubstantive . . . valu[e] external" to the statutory terms at hand. *Id.*, at 508.

Common sense not only fails to explain many of our major questions cases. It doesn't explain even some of the cases JUSTICE BARRETT has held up as examples of commonsense cases. In *Bond* v. *United States*, 572 U. S. 844 (2014), for example, the Court confronted a statute that defined "chemical weapon" to include "'any chemical which through its chemical action on life processes can cause death, tem-porary incapacitation or permanent harm to humans or an-imals.'" *Id.*, at 851; see also *Nebraska*, 600 U. S., at 512–513 (BARRETT, J., concurring) (discussing *Bond*). Despite that broad definition, the Court held that "an arsenic-based compound" didn't fit the bill. *Bond*, 572 U. S., at 852, 866. To reach that result, we did not use common sense alone. How could we have? It hardly goes without saying that ar-senic doesn't qualify as a "chemical" which can cause "'per-manent harm to humans or animals.'" *Id.*, at 851; see also *id.*, at 867 (Scalia, J., concurring in judgment) (calling it "beyond doubt" that the ordinary meaning of the relevant statutory terms embraced the chemicals at issue). Instead, we relied on a clear-statement rule grounded in the sub-stance of the Constitution—namely, the federalism canon. *Id.*, at 860 (majority opinion) ("[W]e can insist on a clear indication that Congress meant to reach purely local crimes, before interpreting the statute's expansive

language in a way that intrudes on the police power of the States"). So *Bond* may well be like our major questions cases, but that is only because it applied a clear-statement rule grounded in another substantive feature of the Constitution.

Consider as well the babysitter hypothetical JUSTICE BARRETT has posed. Imagine a parent of young children who hands a babysitter a credit card and says, "'[m]ake sure the kids have fun.'" *Nebraska*, 600 U. S., at 513 (concurring opinion). Now suppose the babysitter takes the kids on a road trip to an amusement park, "where they spend two days on rollercoasters and one night in a hotel." *Ibid.* "Was the babysitter's trip consistent with the parent's instruction?" *Ibid.* JUSTICE BARRETT believes the answer is likely "no" as a matter of common sense. See *id.*, at 513–514.

Really, though, unless one is to believe children do not "have fun" on rollercoasters and at hotels, the babysitter hypothetical can be explained only with reference to some "external" and "substantive" norm. *Id.*, at 508, 513. And, in fact, just such a norm is baked into the babysitter hypothetical—one we encountered in Part I–B, *supra.* The babysitter is exercising authority the parents have *delegated* to her. She is acting as their *agent.* As a result, one might expect a clear statement from the parents before the babysitter may do something extraordinary, like take the kids on a road trip.

This substantive norm about delegated powers not only lurks beneath the surface of the babysitter hypothetical, it "'loads the dice'" against her. *Nebraska*, 600 U. S., at 510 (BARRETT, J., concurring). Doubtless, she would see it that way. The babysitter would argue that a trip to an amusement park is "fun." And she would be right under a commonsense understanding of the word. But because the babysitter is exercising delegated authority, she cannot

exercise such an extraordinary power without clear authorization for it.

Notice, too, the same outcome is no longer guaranteed when we remove the delegated power feature.  If one parent leaves the children with the other parent, the trip to the amusement park might well be fine.  No other contextual clues are needed.  See *id*., at 516 (agreeing with this).  So if the answer to the babysitter hypothetical seems a matter of common sense to many Americans, that is only because the substantive norms associated with parental delegations to babysitter agents are so deeply rooted in our society.  Say the same instruction were given to a babysitter in a community where children are raised collectively, like a kibbutz.  Same answer?  Hardly obvious.[1]

### B

To be sure, in places JUSTICE BARRETT concedes that her gloss on the major questions doctrine requires resort to something more than "common sense" instincts about what would "'g[o] without saying'" to an ordinary English speaker.  *Nebraska*, 600 U. S., at 512 (concurring opinion); see also *post*, at 2.  Sometimes, she suggests, common sense doesn't just help illuminate the "most natural" meaning of an idiomatic term like "drew blood" based on its presence in a penal law.  600 U. S., at 508.  Sometimes, she says, "commonsense principles of communication" go much further.  *Id*., at 514.  So much so that they wind up dictating a rule

––––––––

[1] Today, JUSTICE BARRETT protests that the foregoing discussion "takes down a straw man."  *Post*, at 1 (concurring opinion).  But it was JUSTICE BARRETT who previously wrote that the major questions doctrine "grows out of . . . commonsense principles of communication."  *Biden* v. *Nebraska*, 600 U. S. 477, 514 (2023) (same).  And it was JUSTICE BARRETT who used the various illustrations recounted above to suggest that our major questions decisions can be explained by reference to the kind of "common sense . . . that 'goes without saying.'"  *Id*., at 512.  If JUSTICE BARRETT now means to put all that to the flame, the major questions doctrine is better for it.

counseling "skepticism" of executive claims to extraordinary delegated powers. *Id.*, at 516. Why? Because, JUSTICE BARRETT says, a "reasonable observer" consults "our constitutional structure." *Id.*, at 515, 520. But if that's true, this version of common sense *does* require us to account for "values" entirely "external to a statute," including specifically the "substan[ce]" of Article I. *Id.*, at 508. And in so doing, this expanded version of common sense just becomes the substantive major questions doctrine by another name.

Today's decision illustrates the point. The principal opinion gestures at "common sense." *Ante,* at 8. But throughout, this "common sense" is linked to "'constitutional structure'" and "'separation of powers principles.'" *Ibid.* The principal opinion begins with the Constitution, observing that Article I vests the tariff power in Congress, not the executive branch. *Ante*, at 5–6. The principal opinion recounts the President's claim that Congress has "delegated" an "extraordinary" amount of its tariff power to him in IEEPA. *Ante,* at 8–9. And from there, the principal opinion proceeds to apply a clear-statement rule. It acknowledges that the ordinary meaning of the key statutory term in IEEPA—the word "regulate"—is capacious, so much so that it could be understood to "captur[e] much of what a government does." *Ante*, at 14. Still, the principal opinion reasons, that is not enough to sustain the President's claim because the statute does not "clear[ly]" grant him the "extraordinary" delegated power he seeks. *Ante,* at 13, 20. When it comes down to it, common sense serves as little more than a segue to Article I's Vesting Clause.

That is as it must be. The statutory terms contain no ambiguity we could use (or need) "commonsense principles of communication" to resolve. *Nebraska*, 600 U. S., at 514 (BARRETT, J., concurring). This case is nothing like the "'drew blood'" illustration, where it might "'g[o] without saying'" that any ordinary person would immediately

understand which of two idiomatic meanings a penal stat-
ute employed. *Id.*, at 512. Indeed, today's principal opinion
does not even "attempt to set forth the metes and bounds"
of IEEPA's key phrase "'regulate . . . importation,'" *ante*, at
16, much less find the "best" or "most natural" meaning of
those words, *Nebraska*, 600 U. S., at 508, 521 (BARRETT, J.,
concurring); *post*, at 1. Instead, we need go no further than
to recognize that IEEPA fails to "clear[ly]" authorize tariffs.
*Ante*, at 13, 20. And the only reason we can stop there is
because Article I—a "[s]ubstantive . . . valu[e] external to a
statute," 600 U. S., at 508 (BARRETT, J., concurring)—im-
poses a clear-statement rule when executive officials claim
Congress has afforded them an extraordinary authority.

There's another problem too. The equivocation on
whether "commonsense principles of communication" in-
clude only those things that might "go without saying," or
also include "external" and "substantive" Article I "values,"
leads to a further equivocation on how much "skepticism"
common sense might dictate when assessing an executive
official's claim to an extraordinary delegated power. Com-
mon sense, we are told, does not impose a "'clarity tax,'" but
it does add an "expectation of clarity." *Id.*, at 508, 514.
Common sense does not "'loa[d] the dice,'" but it does coun-
sel "skepticism." *Id.*, at 510–511, 516. Common sense
means never "forgo[ing] the most natural reading of a stat-
ute," *post*, at 3, but it always means "expect[ing that] Con-
gress [will] make the big-time policy calls," *post*, at 2 (inter-
nal quotation marks omitted). I am uncertain what to make
of this, except that it seems to toggle between a clear-state-
ment rule and nothing at all.[2]

---

[2] To the extent JUSTICE BARRETT suggests any skepticism "com-
monsense principles of communication" might (or might not) advise de-
rives from a "'practical understanding of legislative intent,'" rather than
"external" and "substantive" Article I "values," that poses still further
(and familiar) problems. *Nebraska*, 600 U. S., at 508, 515 (concurring

I am certain of one thing: Our cases hold a clear statement is required to support a claim to an extraordinary delegated power. We required Congress to "speak clearly" in *Utility Air*, 573 U. S., at 324. We demanded "clear congressional authorization" in *NFIB*, 595 U. S., at 118. We did the same in *Nebraska*, 600 U. S., at 506, and in *West Virginia*, 597 U. S., at 732, and we do so again today, *ante,* at 13. Nor do I see cause for being quite so reluctant about acknowledging this. The common law recognized many clear-statement rules. See, *e.g.*, Part I–B, *supra.* Our own cases have applied a host of Constitution-enforcing clear-statement rules as well. We just encountered the federalism clear-statement rule in *Bond*. Add to the list clear-statement rules against laws that might apply retroactively, waive or abrogate sovereign immunity, or create enforceable rights under the Taxing Clause—to name just a few. See, *e.g.*, *Landgraf* v. *USI Film Products*, 511 U. S. 244, 265–268 (1994); *Financial Oversight and Management Bd. for P. R.* v. *Centro De Periodismo Investigativo, Inc.*, 598 U. S. 339, 346–347 (2023); *Medina* v. *Planned Parenthood South Atlantic*, 606 U. S. 357, 383–384, n. 8 (2025). Maybe all these rules could be recast as "common sense"—at least if common sense means taking account of the "external" and

--------

opinion) (quoting *West Virginia* v. *EPA*, 597 U. S. 697, 723 (2022)). Down that road lie all the pitfalls associated with reliance on legislative history and those associated with conflating unenacted legislative intent with the law. Scalia & Garner 397; *post*, p. 1 (JACKSON, J., concurring in part and concurring in judgment). Similar problems attend the notion that the appropriate degree of skepticism due a delegation might turn on what people "expect." *Nebraska*, 600 U. S., at 514, 520 (BARRETT, J., concurring); see also *post*, at 2 (same). JUSTICE BARRETT has offered no evidence about what people "expect" when confronted with different congressional delegations. And to the extent she believes their "expectations" would reflect an appropriate consideration of the whole "'*corpus juris*,' including the Constitution," *post*, at 2, n. 1, that just circles us right back to the "external" and "substantive" Article I "values" she strives so hard to sideline, see *Nebraska*, 600 U. S., at 508 (BARRETT, J., concurring).

"substantive" "values" found in "our constitutional struc-ture." *Nebraska*, 600 U. S., at 508, 515 (BARRETT, J., con-curring). But whatever the label, it hardly requires some "judicial flex," *post*, at 4, to recognize that the "external" constitutional "values" at stake in our major questions cases are no less weighty than those at play in other set-tings where we routinely apply a clear-statement rule.[3]

## III

That brings us to the third camp. My dissenting col-leagues have defended the major questions doctrine in the past, and they do so again today. *Post*, at 31–33 (opinion of KAVANAUGH, J.). They agree that the doctrine is grounded in the Constitution. *Post*, at 32. They agree that the doc-trine requires us to deviate from "'routine'" statutory inter-pretation principles and instead place a "thumb on the scale," one requiring executive officials to identify "'clear'" congressional authorization when they seek to exercise some "major" power. *Post*, at 33. But, my colleagues say, IEEPA provides the clear statement needed to sustain the President's tariffs. *Post*, at 38–45. Alternatively, they sub-mit, we shouldn't apply the major questions doctrine to any statute, like IEEPA, that implicates "foreign affairs." *Post*, at 45–49. And this exception, they add, is particularly war-ranted here because Congress has historically granted the

-----

[3] Notably, past critics of the major questions doctrine have not hesi-tated to apply many of these clear-statement rules. See *Financial Over-sight and Management Bd. for P. R.* v. *Centro De Periodismo Investiga-tivo, Inc.*, 598 U. S. 339, 346–347 (2023) (opinion for the Court by KAGAN, J.); *Loper Bright Enterprises* v. *Raimondo*, 603 U. S. 369, 455–456, n. 1 (2024) (KAGAN, J., dissenting) (collecting examples); *West Virginia*, 597 U. S., at 751, n. 7 (GORSUCH, J., concurring) (same). Nor have they hesi-tated to adopt and apply other clear-statement rules with far less grounding in the Constitution than the major questions doctrine. See, *e.g.*, *Bowe* v. *United States*, 607 U. S. ___, ___–___ (2026) (slip op., at 9–10); *id.*, at ___–___ (GORSUCH, J., dissenting) (slip op., at 12–15); *Boechler* v. *Commissioner*, 596 U. S. 199, 208 (2022).

President large discretion in setting tariffs. *Post*, at 49–53. Once again, the points are thoughtful and merit careful consideration.

## A

My dissenting colleagues begin by taking the major questions doctrine as they find it. They accept that the President's challenged actions are "of major economic and political significance." *Post*, at 33. They accept as well that he must identify "clear" congressional authorization to sustain those actions. *Ibid.* Still, the dissent maintains, IEEPA clearly grants the President the tariff power he asserts.

To arrive at that conclusion, the dissent consults four clues we have sometimes employed in our major questions cases to help assess whether a statute clearly authorizes an asserted power. See *West Virginia*, 597 U. S., at 746 (GORSUCH, J., concurring). The dissent formulates these clues largely as I would. See *post*, at 35–38. But, to my eyes, the dissent engages in a little grade inflation when applying them.

First, is the President seeking to exercise an "unheralded" or "newfound" power based on a "long-extant" statute? *Post*, at 39 (internal quotation marks omitted). The dissent insists that is not the case here because President Nixon imposed a 10 percent tariff on most imports in 1971, and then defended that action in lower courts under a predecessor to IEEPA, the Trading with the Enemy Act (TWEA). *Ibid.* But the words "regulate . . . importation" were added to TWEA in 1941. §301(1)(B), 55 Stat. 839. Congress used the same language in IEEPA in 1977. §203(a)(1)(B), 91 Stat. 1626. And in the 85 years of TWEA's existence with that language (and the 49 years of IEEPA's), that is the only time either statute has been invoked to impose tariffs. *Ante,* at 10–11, 17–18. A single time, and one never tested in this Court. Nor are these statutes seldom used. "Each year since 1990, Presidents have issued

roughly 4.5 executive orders . . . and declared 1.5 new national emergencies citing IEEPA." Congressional Research Service, The International Emergency Economics Powers Act: Origins, Evolution, and Use 20 (Sept. 1, 2025). That is pretty strong evidence the President here seeks to "deploy an old statute" in a novel way. *West Virginia*, 597 U. S., at 747 (GORSUCH, J., concurring).

Second, how has the executive branch interpreted IEEPA in the past? *Post*, at 40–41. The dissent says Presidents have long understood IEEPA to permit them to impose tariffs. *Ibid.* But for support, the dissent again relies on isolated evidence about other statutes. It points to the monetary exactions President Ford ordered under the Trade Expansion Act of 1962. *Post*, at 17, 40. And, once more, it points to President Nixon's invocation of TWEA to support his 1971 tariffs during lower court proceedings (though the dissent brushes aside the fact that President Nixon initially rejected the idea of relying on TWEA, see Brief for Carla Hills et al. as *Amici Curiae* 12–14). Whatever one makes of this history, it hardly reveals the kind of contemporaneous and consistent executive interpretation that might advance the dissent's cause. See *West Virginia*, 597 U. S., at 747 (GORSUCH, J., concurring). To the contrary, the fact that no President until now has invoked IEEPA to impose a duty—even one percent on one product from one country—is telling. *Id.*, at 748.

Third, is there a "mismatch" between the action the executive official seeks to take and his expertise? *Post*, at 41. On this one, I agree with the dissent. If tariffs fall in any executive official's "wheelhouse" (and not Congress's), it's the President's. *Ibid.*; see also *supra*, at 6.

Fourth, is the President "relying on oblique, elliptical, or cryptic language"? *Post*, at 41–42. The dissent says no because "[t]his case does not involve elephants in mouseholes." *Post*, at 41 (internal quotation marks omitted). Put another way, the dissent insists, the provisions of IEEPA

before us are not "ancillary" ones, but are designed to convey significant powers. *Post*, at 43 (internal quotation marks omitted). It's a fair enough point as far as it goes. But our cases ask not just whether a provision is a "mousehole" or "ancillary." They also caution against reading extraordinary powers into "broad or general" statutory language. *West Virginia*, 597 U. S., at 746 (GORSUCH, J., concurring) (internal quotation marks omitted); see also *Sossamon* v. *Texas*, 563 U. S. 277, 291 (2011) ("[C]lear statement rules ensure Congress does not, by broad or general language, legislate on a sensitive topic inadvertently or without due deliberation" (internal quotation marks omitted)). Indeed, and as we have seen, many of our major questions cases have found broad or general terms in significant statutes insufficient to support a claim to an extraordinary or unusual power. See Part I–A, *supra*. And here, the word "regulate" is broad as can be. So broad that it could be read to "captur[e] much of what a government does." *Ante,* at 14.

As I see it, then, three of the four clues the dissent relies on cut against it. It is important to add, as well, that as helpful as these clues can be in helping courts spot when a claimed power is *not* supported by clear statutory authority, they do not represent some exhaustive checklist, nor does satisfying one guarantee a claim will succeed. So, for example, even if an asserted power is in the agency's "wheelhouse," we might rule (and have ruled) against the agency if the power is "unheralded" because the statute has stood for decades without being interpreted to convey the power claimed. See, *e.g.*, *Brown & Williamson*, 529 U. S., at 144, 159–160.

Ultimately, the central question in any major questions case remains whether the executive branch's claim to an extraordinary power *is* supported by clear statutory authority. And, as the principal opinion explains at length, many additional clues beyond those the dissent addresses confirm that the President cannot meet that standard in this case.

These additional clues include the way the key statutory term "regulate" is used elsewhere in the U. S. Code, how Congress has delegated tariff authority in the past, and other neighboring language in IEEPA itself. *Ante*, at 14–15.

Contrary to the dissent's charge, too, the principal opinion's application of the major questions doctrine today in no way amounts to a "magic-words test." *Post*, at 44. Of course, if IEEPA included terms like "tariff" or "duty," that would have sufficed. But, to borrow a phrase from the dissent, "monetary exactions on foreign imports" would have worked just as well. *Post*, at 17. Same goes for "tax on imported goods." Or any similarly clear term or phrase. But IEEPA includes no such language, just a broad term that could cover almost anything a government does. And requiring specific rather than general language is just how clear-statement rules work. See, *e.g.*, *Sossamon*, 563 U. S., at 291.

B

If the President's claim fails under our usual major questions test, the dissent says we should respond by carving out an exception to it for cases (like this one) touching on "foreign affairs." *Post*, at 45.

On this score, I share a limited point of agreement with the dissent. Like the nondelegation doctrine, the major questions doctrine protects Article I's Vesting Clause and, for that reason, the doctrine does not apply where the President is exercising only his own inherent Article II powers. Like the nondelegation doctrine, too, the major questions doctrine may speak with less force where the President and Congress enjoy "overlap[ping] . . . authority." See *Gundy* v. *United States*, 588 U. S. 128, 159 (2019) (GORSUCH, J., dissenting); see also C. Bradley & J. Goldsmith, Foreign Affairs, Nondelegation, and the Major Questions Doctrine, 172 U. Pa. L. Rev. 1743, 1747 (2024) (Bradley & Goldsmith)

(explaining the "supposed foreign affairs exception" to the nondelegation doctrine "is better understood as a qualification that concerns situations in which a statutory authorization relates to an independent presidential power").

Doubtless, cases implicating overlapping powers can arise in the field of foreign affairs. The Constitution, for example, vests in Congress the power to raise and regulate armies, but it also vests in the President the commander-in-chief power. Compare Art. I, §8, cls. 12–14, with Art. II, §2, cl. 1. Similarly, Congress enjoys the power to regulate foreign commerce, but the President has power to negotiate treaties and nominate ambassadors. Compare Art. I, §8, cl. 3, with Art. II, §2, cl. 2. The President may even enjoy some "residual" powers pertaining to foreign affairs under Article II's Vesting Clause endowing him with the "executive Power." See S. Prakash & M. Ramsey, The Executive Power Over Foreign Affairs, 111 Yale L. J. 231, 234 (2001) (Prakash & Ramsey); but see C. Bradley & M. Flaherty, Executive Power Essentialism and Foreign Affairs, 102 Mich. L. Rev. 545, 551–552 (2004). Given all this, it is easy enough to imagine statutes and disputes under them that implicate both congressional and presidential powers where we might have reason to question whether the major questions doctrine applies with its usual force.

The problem for the dissent is that none of this is relevant here. Before us, the President concedes that he does not enjoy independent Article II authority to impose tariffs in peacetime. *Ante,* at 18–19. Nor does the President claim "'concurrent'" constitutional authority to issue his tariffs. *Ante*, at 13 (citing Tr. of Oral Arg. 70–71). Instead, and to his credit, the President admits the power to authorize tariffs in peacetime is constitutionally vested in "Congress alone." *Ante,* at 13 (internal quotation marks omitted). Therefore, the President relies entirely on power derived from Congress, and that means the major questions doctrine applies in the normal way. See Bradley & Goldsmith

1796 ("IEEPA [is] not [an] authorizatio[n] that obviously connect[s] to independent presidential power in ways that would warrant the independent powers qualification").

Because of this problem, the dissent must argue for a much broader "foreign affairs" qualification to the major questions doctrine. Rather than ask whether an independent, constitutionally vested presidential power is implicated, the dissent would have us ask instead whether the President seeks to use the statute in question for a foreign affairs purpose—for example, as a "too[l]" to "incentivize a change in behavior by allies . . . or enemies." *Post*, at 50. When he does, the dissent submits, the major questions doctrine should not apply. And that's true, the dissent continues, even if the power the President asserts has "significant domestic ramifications." *Post*, at 51.

This new exception to the major questions doctrine would have (enormous) consequences hard to reconcile with the Constitution. Article I, §8, vests in Congress many powers that touch on "foreign affairs." Some of those powers were expected to be (and are) the "principal objects of federal legislation." The Federalist No. 53, p. 333 (C. Rossiter ed. 1961) (J. Madison). They include not only the power to impose tariffs, cl. 1, but also the power to establish uniform rules of naturalization, cl. 4, appropriate money for armies, cl. 12, and define and punish offenses against the law of nations, cl. 10. Under the dissent's view, all these legislative powers and more could be passed wholesale to the executive branch in a few loose statutory terms, no matter what domestic ramifications might follow. And, as we have seen, Congress would often find these powers nearly impossible to retrieve. See Part I–C, *supra*.

Consider an example. Imagine Congress adopted a law that arguably could be read to let the President borrow and spend money during peacetime as he sees fit. A law like that would represent an extraordinary delegation of Congress's power both to borrow "on the credit of the United

States," Art. I, §8, cl. 2, and to spend money in support of the "general Welfare," §8, cl. 1, and would carry with it "significant domestic ramifications," *post*, at 51. But if an enterprising executive could also use the law as a "tool" for affecting the behavior of "allies . . . or enemies," the dissent seemingly would have us exempt it from scrutiny under the major questions doctrine.

The dissent's exception is so broad it's hard not to wonder how it fits with some of our existing major questions precedents. In *West Virginia*, the Court applied the major questions doctrine over a dissent expressing concern that doing so would deny the EPA (and therefore the President) the power to respond to "the most pressing environmental challenge of our time"—"[c]limate chang[e]." 597 U. S., at 753 (KAGAN, J., dissenting) (internal quotation marks omitted). A challenge, the dissent continued, that threatened consequences global in scope, including "mass migration events[,] political crises, civil unrest, and even state failure." *Id.*, at 754 (internal quotation marks omitted). Was *West Virginia* a "foreign affairs" case? How about our major questions cases addressing efforts to combat the global pandemic that was COVID–19? See, *e.g.*, *NFIB*, 595 U. S., at 114.[4]

_____

[4] The dissent suggests that trying to identify when an independent Article II authority is in play would prove "jurisprudentially chaotic." *Post*, at 53, n. 23. But as the foregoing discussion illustrates, the dissent's alternative "foreign affairs" test poses its own challenges. And it seems to me only one is firmly rooted in the text of the Constitution. See Bradley & Goldsmith 1747; see also Prakash & Ramsey 233 ("[O]ne would think that the Constitution's text ought to play the preeminent role in discerning the Constitution's allocation of foreign affairs powers"). In this case, too, only one test promises any manner of "chao[s]" because all parties before us readily agree that the Constitution affords the President no independent power to impose peacetime tariffs. See H. Powell, The President's Authority Over Foreign Affairs: An Executive Branch Perspective, 67 Geo. Wash. L. Rev. 527, 549 (1999) ("The President has no independent power directly to regulate [or] tax . . . foreign commerce").

Seeking support for its sweeping new exception, the dissent points to three main precedents. *Post*, at 46–48, 53–57. I do not see how any of them might sustain its view. The first, *Hamdi* v. *Rumsfeld*, 542 U. S. 507 (2004), concerned the 2001 Authorization for Use of Military Force (AUMF), legislation which authorized the President to use "all necessary and appropriate force against those nations, organizations, or persons" responsible for the September 11, 2001, attacks. *Id.*, at 510 (internal quotation marks omitted). The dissent highlights the principal opinion's conclusion that the AUMF allowed the President to detain enemy combatants even though the law did not mention that power expressly. *Id.*, at 510, 516–517 (opinion of O'Connor, J.). And from this, the dissent draws the inference that any statute addressing foreign affairs should be exempt from scrutiny under the major questions doctrine. *Post*, at 54–55. But the dissent overlooks the fact that the principal opinion reached the conclusion it did only because it found detention of enemy combatants to be a traditional "incident to war." 542 U. S., at 518. And once Congress declares war (or, likewise, authorizes the use of military force abroad), that implicates the President's commander-in-chief powers. Put simply, *Hamdi* was a case of overlapping powers. Ours is not.

Second, the dissent invokes *Dames & Moore* v. *Regan*, 453 U. S. 654 (1981). See *post*, at 55–56. At its heart, that case involved an executive order by President Reagan suspending certain claims by U. S. citizens against Iran as part of a settlement involving the release of American hostages held there. 453 U. S., at 675. Just as we do today, *Dames & Moore* held that the "terms of the IEEPA . . . d[id] not authorize" the President's actions. *Ibid.* Even so, the Court proceeded to uphold those actions anyway, and did so based in part on its view (right or wrong) that the President enjoyed some "'independent'" power to "enter into executive agreements" suspending certain claims. *Id.*, at 678, 682–

683. So unlike our case, *Dames & Moore* again involved overlapping powers. Along the way, too, the Court emphasized (repeatedly) the "narrowness" of its decision and that it should not be taken to "lay down" any "general 'guidelines' covering other situations not involved here." *Id.,* at 661; see also *id.,* at 660, 688. To derive from *Dames & Moore* a new general guideline exempting "foreign affairs" cases from the major questions doctrine's reach would thus require us to disregard its own cautionary direction.

Third, the dissent cites *United States* v. *Curtiss-Wright Export Corp.,* 299 U. S. 304 (1936). See *post,* at 46–48. There, the Court did suggest that nondelegation rules in the field of "domestic or internal affairs" should differ from those in the realm of "foreign or external affairs." *Curtiss-Wright,* 299 U. S., at 315. But what should we make of that language? If it means that the nondelegation doctrine (and perhaps, by extension, the major questions doctrine) must account for the President's independent Article II powers, I agree.

But I would hesitate to read more into the decision than that. Consider what was really at issue there. A statute permitted the President to ban the transfer of one class of goods (armaments). *Id.,* at 312. It did so with respect to two countries then engaged in a war (Bolivia and Paraguay). *Ibid.* The President's authority was conditioned on a finding that a ban "'may contribute to the reestablishment of peace between those countries.'" *Ibid.* Before making that finding, too, Congress directed him to consult "'with the governments of other American Republics.'" *Ibid.* All told, then, the statute set forth the policy for the President to pursue. It bounded his authority by limiting his options with respect to a limited class of goods and countries. The statute further conditioned his exercise of those options on a factual finding reached after consultation with other nations. So whatever else might be said about *Curtiss-Wright,* one thing is apparent: In upholding the

President's actions under the law in question, the Court hardly allowed Congress to hand off all of its enumerated powers touching on foreign affairs to the President, the tariff power included.[5]

### C

If its effort to secure a broad foreign affairs exception to the major questions doctrine won't work, the dissent hints at a more limited one specific to tariffs. Such an exception makes sense, the dissent says, because "Presidents have long been granted substantial discretion over tariffs." *Post*, at 52 (internal quotation marks omitted). Indeed, the dissent contends, this tradition traces "back to near the Founding." *Post*, at 59. If the dissent were right about that, one might hesitate before accepting the President's concession that this case does not implicate any inherent Article II authority. But, at least as I read it, history offers the dissent little to work with.

Americans fought the Revolution in no small part because they believed that only their elected representatives (not the King, not even Parliament) possessed authority to tax them. Declaration of Independence ¶19. And, they believed, that held true not just for direct taxes like those in the Stamp Act, but also for many duties on imports, like those found in the Sugar Act. E. Morgan & H. Morgan, The Stamp Act Crisis: Prologue to Revolution 72–74 (1995 ed.); see 1 E. Stanwood, American Tariff Controversies in the Nineteenth Century 60 (1903) (Stanwood); C. Van Tyne,

---

[5] In places, the dissent also argues that the President's inherent Article II authority includes a wartime tariff power. See *post*, at 22–24; see also Brief for Professor Aditya Bamzai as *Amicus Curiae* 3. But this only highlights the dissent's bind. Whatever the full scope of the President's Article II war powers may be (and the briefs before us reveal a healthy debate whether they include the power to impose tariffs), those powers are not implicated here. IEEPA is not a wartime statute, nor does the President claim we are at war with the countries whose goods are subject to the tariffs.

The Causes of the War of Independence 126–136 (1922); J. Otis, The Rights of the British Colonies Asserted and Proved (1764), in The Collected Political Writings of James Otis 119, 161–162 (2015); see also *id.*, at xii (Introduction).

Americans later codified these beliefs in the Constitution. Under the Articles of Confederation, the national government was laden with debt and enjoyed few ways to repay it. To address that problem, the framers afforded the federal government new taxing powers in the Constitution. Art. I, §8, cl. 1. Many thought these powers among "the most important" features of the new federal charter. See, *e.g.*, The Federalist No. 33, at 202–203 (A. Hamilton). But, consistent with their view that only the people's elected representatives could constitutionally tax them, the framers gave Congress alone "access to the pockets of the people." *Id.*, No. 48, at 310 (J. Madison). And to cement that role, the Constitution required that "All Bills for raising Revenue shall originate in the House of Representatives," the body most responsive to the people. Art. I, §7, cl. 1.

For much of the Nation's history, this taxing power was essentially a tariff power. The framers even considered (and eventually rejected) the possibility of giving the federal government the power to tax only through tariffs. The Federalist No. 35, at 211 (A. Hamilton). No surprise, then, that Congress's first exercise of its taxing power was a tariff law. P. Ashley, Modern Tariff History 170–171 (2d ed. 1910). And until the 20th century, tariffs "accounted for between 50 and 90 percent" of the federal government's revenue. J. Dobson, Two Centuries of Tariffs: The Background and Emergence of the United States International Trade Commission 1 (1976).

How did Congress exercise its all-important tariff power? It debated every detail of the first tariff Act. Stanwood 39–71. Ultimately, Congress said, imported malt would incur a charge of 10 cents a bushel. Brown sugar one cent. Loaf sugar three cents. And so on. *Id.*, at 59. The first tariff Act

was set to last for seven years. *Id.*, at 72. It lasted barely one. *Ibid.* Soon, Congress was at it again, laying out another exacting schedule of duties. *Id.*, at 75–76. Throughout much of the 19th century, Congress proceeded similarly, enacting highly detailed tariff schedules one after another. See F. Taussig, The Tariff History of the United States 68–170 (8th ed. 1931).

An early debate over executive involvement in setting tariffs demonstrates just how strongly Congress felt that tariffs were a legislative business. In December 1791, President Washington told Congress that General St. Clair had been defeated in the Northwest Indian War, and the country would have to increase the size of the army. Stanwood 104. That meant the government needed more money. In response, a resolution was offered in the House of Representatives to solicit advice from the Secretary of the Treasury, Alexander Hamilton, on the best way to raise the additional revenue—including through new tariffs. 3 Annals of Congress 437 (1792); Stanwood 105–106. Ultimately, Hamilton's advice was sought, but only after a debate over the constitutionality of even asking a member of the executive branch for advice on raising revenue. *Ibid.*; 3 Annals of Congress 447.

To be sure, on later occasions Congress turned to the executive branch for more help still. But it usually did so to address changing trade practices in foreign countries. And in doing so, Congress set the important policies, with the executive branch responsible for finding facts—like what other countries' trade policies were at any given moment— or filling in the details. So, for example, Congress passed a statute in 1815 to repeal any "discriminating duty of tonnage . . . whenever the President" was "satisfied" that other countries' "discriminating or countervailing duties" had "been abolished." Act of Mar. 3, 1815, ch. 77, 3 Stat. 224; see also, *e.g.*, Act of Jan. 7, 1824, 4 Stat. 2–3.

Given this history, it's no surprise that the dissent relies mostly on statutes and cases after 1890. *Post*, at 59. But even they do little to support its claim. *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394 (1928), for example, involved a law instructing the President to "investigat[e]" the costs of production for American firms and their foreign counterparts and issue tariffs to "equalize" those costs. *Id.*, at 401, 409 (internal quotation marks omitted). The statute the Court faced in *Marshall Field & Co.* v. *Clark*, 143 U. S. 649, 681 (1892), spoke similarly. Even when *Federal Energy Administration* v. *Algonquin SNG, Inc.*, 426 U. S. 548, came along in 1976, the Court upheld President Ford's imposition of monetary exactions on a single class of products under a statute that provided at least some guidance about how he should implement the law. *Id.*, at 559. And whether correctly decided or not, that case lies a far step from this one.

Before us, the President insists he may use IEEPA to equalize foreign and domestic duties—or not. He may use it to negotiate with foreign countries—or not. He may set tariffs at 1 percent or 1,000,000 percent. He may target one nation and one product or every nation and nearly every product. And he may change his mind at any time for nearly any reason. At least as I see it, history dating "back to near the Founding," *post*, at 59, does not support the notion that Presidents have traditionally enjoyed so much power. More nearly, history refutes it.[6]

------

[6] Beyond the major questions hurdle, the dissent faces another, related one: the nondelegation doctrine. There the problems are just as acute. In recent decades, this Court has employed a relatively lax "intelligible principle" test to police delegations. See *FCC* v. *Consumers' Research*, 606 U. S. 656, 673 (2025); cf. *Gundy* v. *United States*, 588 U. S. 128, 157–159 (2019) (GORSUCH, J., dissenting) (arguing for a more traditional test). But recognizing that even the intelligible principle test poses challenges for it, the dissent contends for an even laxer test yet in cases involving "foreign affairs" and tariffs. *Post*, at 57–61. It's an effort that fails for

IV

That leaves one final camp to consider.  JUSTICE THOMAS suggests that Congress may hand over most of its constitutionally vested powers to the President completely and forever.  *Post*, at 2–3 (dissenting opinion).  On his view, the only powers Congress may not delegate are those that involve "rules setting the conditions for deprivations of life, liberty, or property."  *Ibid.*  From this rule, it follows that Congress may give all its tariff powers to the President because "[i]mporting is a matter of privilege."  *Post*, at 10–11.  And, as a result, this case does not implicate any ""separation of powers"" concerns at all.  *Post*, at 3 (quoting *ante,* at 8).

It's a sweeping theory.  One that would require us to reimagine much of our case law addressing Article I's Vesting Clause.  And one that presents difficulties of its own.

First, I do not see how JUSTICE THOMAS's theory resolves all ""separation of powers"" concerns in this case.  *Post*, at 3 (quoting *ante,* at 8).  Suppose for argument's sake that Congress *can* delegate its tariff powers to the President as completely as JUSTICE THOMAS suggests.  Even then, the question remains whether Congress *has* given the President the tariff authority he claims in this case—or whether the President is seeking to exploit questionable statutory language to aggrandize his own power.  See Part I–C, *supra.*  Put another way, JUSTICE THOMAS's nondelegation solution does not automatically solve the major questions problem.  As we have seen, when an executive official claims Congress has delegated to him some extraordinary power, the major questions doctrine requires him to identify clear statutory authority for its exercise—a standard he

_____

reasons we have just seen.  Even if the nondelegation doctrine should apply differently when congressional legislation and executive actions implicate inherent Article II powers, *Gundy*, 588 U. S., at 159, none of that means it should do so where (as here) the President derives whatever authority he has only from Congress.

must satisfy even if Congress is free to pass to him the power he seeks. *Post*, at 2–3. In fact, this Court has previously applied, with our colleague's assent, the major questions doctrine in a case that appears, under his present view, to involve a power that Congress could delegate wholesale to the President. See *Nebraska*, 600 U. S., at 486–488 (involving the power to cancel federal student loan debts, which on JUSTICE THOMAS's account presumably qualifies as a benefit or privilege, not a right to life, liberty, or property). And, just as the major questions doctrine precluded the executive branch's assertion of power in that case, it does so here.

Second, even when it comes to the nondelegation doctrine, JUSTICE THOMAS's theory raises many questions. I appreciate that the doctrine may apply with less force in certain areas, such as when Congress legislates in a way that implicates one of the President's inherent powers. See Part III–B, *supra*; *Gundy*, 588 U. S., at 159 (GORSUCH, J., dissenting). But JUSTICE THOMAS would go much further. On his telling, the doctrine applies only to Congress's true legislative powers, which he says include only those powers addressing the deprivation of life, liberty, or property. As it turns out, only a small subset of Congress's enumerated powers in Article I, §8, fit that bill. See *post*, at 5–6 (listing the powers to punish counterfeiters, tax "internal[ly]," and regulate interstate commerce). Only those few powers are exclusively vested in Congress and subject to review of any kind under the nondelegation doctrine. All "other kinds of power[s]" enumerated in Article I, §8—including the powers to borrow and spend money, declare war, and regulate foreign trade—are not truly legislative and may be delegated at will. *Post*, at 2. So Congress may hand them off to the President completely and he has no need to worry about legal challenges under even this Court's (relatively lax) nondelegation doctrine. No matter, too, that Congress

might find itself permanently unable to retrieve these pow-
ers.  See Part I–C, *supra.*

But if all that's true, what do we make of the Constitu-
tion's text?  Section 1 of Article I vests "[a]ll legislative Pow-
ers herein granted" in Congress and no one else.  Section 8
proceeds to list those powers in detail and without differen-
tiation.  Neither provision speaks of some divide between
true legislative powers touching on "life, liberty, or prop-
erty" that are permanently vested in Congress alone and
"other kinds of power[s]" that may be given away and pos-
sibly lost forever to the President.  *Post*, at 2.

What do we make, too, of what the founders said about
Article I both before and after the Constitution's ratifica-
tion?  They regularly referred to powers in Article I, §8—
even those that do not touch on life, liberty, or property—
as legislative in nature.  At the Constitutional Convention,
early drafts described the powers to regulate "foreign" com-
merce, "raise armies," "equip Fleets," "coi[n] . . . money,"
and "establish post-offices" as "legislative powers."  2 The
Records of the Federal Convention of 1787, pp. 142–144 (M.
Farrand ed. 1966) (Farrand).  James Madison wrote to Con-
gress in 1817 that "[t]he legislative powers vested in Con-
gress are specified and enumerated in the eighth section of
the first article of the Constitution."  8 The Writings of
James Madison 386 (G. Hunt ed. 1908); see also 1 *id.*, at
112, 133, 381 (noting, before the Constitutional Convention,
the "legislative power over captures," and arguing borrow-
ing money is an "exclusive power of Legislation").

Alexander Hamilton spoke similarly.  3 The Works of Al-
exander Hamilton 479 (H. Lodge ed. 1904) (Lodge) (discuss-
ing "[t]he legislative power of borrowing money"); 6 *id.*, at
182 (describing "the legislative power of regulating trade
with foreign nations"); 2 *id.*, at 197, 198 (calling of "the leg-
islative kind" and "of a legislative nature" the powers to
raise money and troops, "establish rules in all cases of cap-
ture by sea or land," "regulate the alloy and value of coin,"

and "make all laws for the government of the army and navy"). So did James Wilson. 1 Collected Works of James Wilson 268 (K. Hall & D. Hall eds. 2007) (describing all the Senate's powers as "legislative powers," with the exception of the powers to try impeachments, concur in treaties, and consent to the appointment of officers, matters addressed outside Art. I, §8).

What do we make as well of early congressional debates? In the Second Congress, for example, the House of Representatives rejected on nondelegation grounds a proposal to give the President a largely unfettered power to establish postal routes, even though doing so hardly would have touched on life, liberty, or property. 3 Annals of Congress 229–242. In the Fifth Congress, four Representatives likewise objected on nondelegation grounds to a bill that authorized the President to raise an army of up to 10,000 men. 8 *id.*, at 1525–1527, 1532, 1535 (remarks of Reps. Nicholas, Gallatin, Baldwin, and McDowell). Though the bill ultimately passed, see Act of May 28, 1798, 1 Stat. 558, it did so apparently because it was deemed not to violate Article I's nondelegation principle—no Member of Congress responded that the principle was wholly inapplicable because the delegated power was not one that involved setting conditions for deprivations of life, liberty, or property. See 8 Annals of Congress 1525–1542.

What are we to do, too, with this Court's nondelegation precedents, which have never turned on JUSTICE THOMAS's view of life, liberty, or property? See *J. W. Hampton, Jr., & Co.*, 276 U. S., at 403, 409 (scrutinizing a delegation to executive officials to set customs duties); *Panama Refining Co.* v. *Ryan*, 293 U. S. 388, 405–406, 422, 433 (1935) (holding unconstitutional a delegation to executive officials to prohibit the transportation of petroleum products in interstate and *foreign* commerce); *National Broadcasting Co.* v. *United States*, 319 U. S. 190, 196, 214–215, 225–226 (1943) (scrutinizing the delegation of authority to regulate the

granting of broadcasting licenses); see also *Sessions* v. *Dimaya*, 584 U. S. 148, 217 (2018) (THOMAS, J., dissenting) ("[I]mpermissible delegations of legislative power violate [the nondelegation] principle, not just delegations that deprive individuals of 'life, liberty, or property'").

Third, even if a distinction between true legislative powers and "other kinds of power[s]" were proper, *post*, at 2, I do not see why the tariff power would fall in the latter category and thus be something Congress could delegate away wholesale, without scrutiny, and forever. JUSTICE THOMAS suggests all that is possible because, at the founding, the tariff power was considered a "'prerogative right'" of the British King. *Post*, at 11 (quoting N. Gras, Early English Customs System 21 (1918)).

That seems doubtful. Tariffs may have been among the King's prerogative powers during the reign of Edward I. See *id.*, at 20–21; see also *post*, at 11, n. 3 (citing P. Einzig, The Control of the Purse: Progress and Decline of Parliament's Financial Control 65 (1959) (discussing the practices "during the Middle Ages")). But even before the year 1400, Parliament had achieved some "victory over the King in the matter of imposing import duties." *Id.*, at 108–109. And after the Glorious Revolution of 1688, as this Court has put it, Parliament "secured supremacy in fiscal matters." *Consumer Financial Protection Bureau* v. *Community Financial Services Assn. of America, Ltd.*, 601 U. S. 416, 428 (2024) (citing 1 W. Blackstone, Commentaries on the Laws of England 306, 333 (1771)). "By the time of the American Revolution, trade regulation was thus a prime topic of *legislative* concern" in Britain. M. McConnell, The President Who Would Not Be King 217 (2020) (emphasis added); see also J. Chitty, Law of the Prerogatives of the Crown 163 (1820) ("[T]he King does not possess any general common law prerogative with respect to foreign commerce").

More importantly still, whatever the views in Britain may have been, American revolutionaries hardly shared

some universal conviction that all manner of tariffs were a matter of the King's prerogative, or even something Parliament, lacking colonial representatives, could freely impose on them. Though in the mid-1760s some colonists distinguished between "'internal'" and "'external' taxation" and "conceded [Parliament's] right to raise revenue through duties on trade," "the inadequacy of [that] much overstrained distinction" soon "became obvious." B. Bailyn, The Ideological Origins of the American Revolution 212–213, 215 (1967). Illustrative of the point, John Dickinson came to "repudiat[e]" the distinction "flatly and formally" in his Letters from a Farmer in Pennsylvania, *id.*, at 215, contending instead that laws aimed at raising revenue, but enacted without representation, were objectionable without "distinction . . . between internal and external taxes," Letters From a Farmer in Pennsylvania 39 (1774). See also *supra*, at 36–37 (recounting colonial objections to the Sugar Act); H. Unger, American Tempest 101 (2011) (observing that the "import duties" in the Townshend Acts helped "incite Americans to rebel"). And, of course, it was duties on foreign tea that triggered the Boston Tea Party. J. Ellis, The Cause 17–18 (2021). Are we really to believe that the patriots that night in Boston Harbor considered the whole of the tariff power some kingly prerogative?

As we have already seen, too, the growing American conviction that the peacetime tariff power is legislative and belongs only to the people's elected representatives was later reflected in both the Constitution and early congressional practice. See Part III–C, *supra.* To that discussion, I would add just this. The Articles of Confederation granted the Confederation Congress authority to make commercial treaties, but no authority to restrain "the *legislative power* of the respective states" to impose "imposts and duties *on foreigners.*" Art. IX (emphasis added). At the Constitutional Convention that followed, where the tariff power was transferred to the federal government, delegates likewise

referred to it as a "legislative power." See, *e.g.*, 3 Farrand 615; 2 *id.*, at 142–143. And, during debates over the Jay Treaty, Hamilton explained that he held no doubt that regulating foreign trade and raising money from it was a "legislative power," if one that could be constrained by treaty. 6 Lodge 182, 189–190, 196. Reflecting the same sentiment that helped fuel the Revolution, he asked: "[W]hat legislative power can be more sacred?" *Id.*, at 196.

\*

For those who think it important for the Nation to impose more tariffs, I understand that today's decision will be disappointing. All I can offer them is that most major decisions affecting the rights and responsibilities of the American people (including the duty to pay taxes and tariffs) are funneled through the legislative process for a reason. Yes, legislating can be hard and take time. And, yes, it can be tempting to bypass Congress when some pressing problem arises. But the deliberative nature of the legislative process was the whole point of its design. Through that process, the Nation can tap the combined wisdom of the people's elected representatives, not just that of one faction or man. There, deliberation tempers impulse, and compromise hammers disagreements into workable solutions. And because laws must earn such broad support to survive the legislative process, they tend to endure, allowing ordinary people to plan their lives in ways they cannot when the rules shift from day to day. In all, the legislative process helps ensure each of us has a stake in the laws that govern us and in the Nation's future. For some today, the weight of those virtues is apparent. For others, it may not seem so obvious. But if history is any guide, the tables will turn and the day will come when those disappointed by today's result will appreciate the legislative process for the bulwark of liberty it is.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 24–1287 and 25–250

————

LEARNING RESOURCES, INC., ET AL., PETITIONERS
24–1287                    *v.*
DONALD J. TRUMP, PRESIDENT OF THE UNITED
STATES, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED
STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA
CIRCUIT


DONALD J. TRUMP, PRESIDENT OF THE UNITED
STATES, ET AL., PETITIONERS
25–250                     *v.*
V.O.S. SELECTIONS, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FEDERAL CIRCUIT

[February 20, 2026]

JUSTICE BARRETT, concurring.

As the principal opinion demonstrates, the most natural reading of the International Emergency Economic Powers Act does not encompass the power to impose tariffs. I write only to address JUSTICE GORSUCH's concurrence regarding the major questions doctrine.

To the extent that JUSTICE GORSUCH attacks the view that "common sense" alone can explain all our major questions decisions, *ante*, at 18–22, he takes down a straw man. I have never espoused that view. Rather, as I explained in my concurrence in *Biden* v. *Nebraska*, 600 U. S. 477, 507 (2023), the major questions doctrine "situates text in context" and is therefore best understood as an ordinary application of textualism. *Id.*, at 511. Textualists—like all those

who use language to communicate—do not interpret words in a vacuum. Instead, we use context, including "[b]ackground legal conventions," "common sense," and "constitutional structure," to ascertain a text's "most natural meaning." *Id.*, at 511–512, 515, 509.

Part of this context, as I have explained, is Article I of the Constitution, which vests Congress with "'[a]ll legislative Powers.'" *Id.*, at 515 (quoting Art. I, §1). Obviously, the Constitution bears on the meaning of a statute enacted pursuant to it. Because Article I grants all legislative powers to Congress, the reasonable interpreter would expect Congress "to make the big-time policy calls itself, rather than pawning them off to another branch." *Nebraska*, 600 U. S., at 515 (BARRETT, J., concurring).[1]

To the extent that JUSTICE GORSUCH also thinks that background legal conventions and constitutional structure inform the most natural reading of a statute, then we may not be very far apart. See *ante*, at 8–12, 14 (concurring opinion). Our only disagreement may be over the level of clarity required before a particular interpretation can be deemed the most natural one. I understand JUSTICE GORSUCH to require Congress always to speak precisely to any major power that it intends to give away. See *ante*, at 12–14, 25–26 (concurring opinion). As I have said before, I think that other, "less obvious" clues can do the trick. See *Nebraska*, 600 U. S., at 514 (BARRETT, J., concurring). I do not see any such clues here; in fact, as the Court explains, the clues we have point in the opposite direction. See, *e.g.*, *ante*, at 8–9 (opinion of ROBERTS, C. J.) (detailing how

———————

[1] Contrary to JUSTICE GORSUCH's suggestion, this approach to the major questions doctrine does not risk "conflating unenacted legislative intent with the law." *Ante*, at 24, n. 2 (concurring opinion). Rather, like textualism more generally, it looks for "a sort of 'objectified' intent—the intent that a reasonable person would gather from the text of the law, placed alongside the remainder of the *corpus juris*," including the Constitution. A. Scalia, A Matter of Interpretation 17 (1997).

Congress has elsewhere delegated the power to impose tariffs); *ante*, at 14–15 (majority opinion) (stressing that the Government "cannot identify any statute in which the power to regulate includes the power to tax").

At times, though, JUSTICE GORSUCH suggests that the purpose of the major questions doctrine is something other than to ascertain the most natural reading of a statute. For example, he writes that the doctrine serves to prevent "highly resourceful members of the executive branch" from "assum[ing] new power for themselves" because "men are not angels." *Ante*, at 16 (concurring opinion); see *West Virginia* v. *EPA*, 597 U. S. 697, 735 (2022) (GORSUCH, J., concurring) (describing doctrine as a "clear-statement rul[e]" that "operates to protect foundational constitutional guarantees"); *National Federation of Independent Business* v. *OSHA*, 595 U. S. 109, 124–126 (2022) (GORSUCH, J., concurring) (similar). But if the Constitution permits Congress to give the Executive a particular power, who are we to get in the way? Does the Judiciary really protect the Constitution by impeding the constitutional action of another branch? If JUSTICE GORSUCH thinks that we should forgo the most natural reading of a statute because it is preferable for Congress, rather than the President, to make big decisions, that way lies "a lot of trouble" for the textualist. A. Scalia, A Matter of Interpretation 28 (1997) (Scalia).

Strong-form substantive canons—canons instructing a judge to adopt "an inferior-but-tenable reading"—veer beyond interpretation and into policymaking. *Nebraska*, 600 U. S., at 509 (BARRETT, J., concurring). And while the policy may be desirable or even constitutionally inspired, judges should hesitate to impose disciplining rules on Congress. See *ibid.*, n. 2 (explaining that such "prophylactic constraints" are "in tension with the Constitution's structure"). As Justice Scalia lamented, "whether these dice-loading rules are bad or good, there is also the question of where the courts get the authority to impose them. Can we

really just decree that we will interpret the laws that Congress passes to mean less or more than what they fairly say?" Scalia 28–29.

Granted, strong-form canons exist elsewhere in the law. See *Nebraska*, 600 U. S., at 508–509 (BARRETT, J., concurring). I do not propose to abandon these canons, nor have I taken the position that adopting them necessarily exceeds the judicial power. *Id.*, at 509, n. 2. But I am skeptical about adding new ones to the mix. *Ibid.* And while the major questions doctrine has an impressive pedigree as an interpretive principle, this Court has not (yet, anyway) embraced it as a strong-form rule that imposes a "'clarity tax'" on Congress. *Id.*, at 508.

JUSTICE GORSUCH seems to disagree, pointing to a few late 19th- and early 20th-century cases.[2] See *ante*, at 12–14 (concurring opinion). But these cases, like our modern ones, are consistent with my context-based approach: They focus on ascertaining, not shaping, what the statute in dispute communicates. See, *e.g.*, *ICC* v. *Cincinnati, N. O. & T. P. R. Co.*, 167 U. S. 479, 511 (1897) (concluding that Congress "did not intend" to give interstate commission power to set railroad rates); *Siler* v. *Louisville & Nashville R. Co.*, 213 U. S. 175, 196 (1909) (reasoning that "the legislature never intended to and did not in fact" give a state commission power to set maximum railroad rates). I would not treat this evidence as precedent for a judicial flex. JUSTICE GORSUCH proposes to do something new. The innovation is in significant tension with textualism, so I do not support the project.

––––––––––

[2] He also points to state cases and longstanding corporate law principles. *Ante*, at 8–13 (concurring opinion). While those sources support the existence of a background legal convention that informs a statute's most natural meaning, they are not evidence that this Court—which is bound by the constraints of Article III—has adopted a true clear-statement rule.

# SUPREME COURT OF THE UNITED STATES

———

Nos. 24–1287 and 25–250

———

LEARNING RESOURCES, INC., ET AL., PETITIONERS
24–1287                    *v.*
DONALD J. TRUMP, PRESIDENT OF THE UNITED
STATES, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT


DONALD J. TRUMP, PRESIDENT OF THE UNITED
STATES, ET AL., PETITIONERS
25–250                    *v.*
V.O.S. SELECTIONS, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FEDERAL CIRCUIT

[February 20, 2026]

JUSTICE KAGAN, with whom JUSTICE SOTOMAYOR and
JUSTICE JACKSON join, concurring in part and concurring in
the judgment.

The Court holds today that the International Emergency
Economic Powers Act (IEEPA) does not authorize the Pres-
ident to impose tariffs. I agree with that conclusion, as I do
with the bulk of the principal opinion's reasoning. But be-
cause I think the ordinary tools of statutory interpretation
amply support today's result, I do not join the part of that
opinion invoking the so-called major-questions doctrine.

The question that part asks, similar to the one posed in
other "'major questions' cases," is whether the President
can identify "clear congressional authorization" for his ac-
tion—here, to impose tariffs under IEEPA. *Ante,* at 7, 13,
20. The demand is for a clear statement—something more

explicit or specific than the statutory basis that would ordinarily suffice to support executive action. See, *e.g.*, *West Virginia* v. *EPA*, 597 U. S. 697, 721–724, 732 (2022); *Biden* v. *Nebraska*, 600 U. S. 477, 505–506 (2023). The reason for that requirement, according to today's opinion, is that the Executive has claimed an "extraordinary" power—one never asserted before and having large-scale "economic and political significance." *Ante,* at 7, 11; see *ante*, at 7–11.

I objected, in the principal cases cited, to the demand for a special brand of legislative clarity. See *West Virginia*, 597 U. S., at 764–784 (KAGAN, J., dissenting); *Nebraska*, 600 U. S., at 542–550 (KAGAN, J., dissenting). In my view, the Court used its clear-authorization rule in those cases to negate expansive delegations Congress had approved. I explained there that the proper way to interpret a delegation provision is through the standard rules of statutory construction. See *West Virginia*, 597 U. S., at 765–766 (KAGAN, J., dissenting). That means, most concisely stated, reading text in context. More expansively put, it means examining a delegation provision's language, assessing that provision's place in the broader statutory scheme, and applying a "modicum of common sense" about how Congress typically delegates. *Id.*, at 764 (KAGAN, J., dissenting); see *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 133 (2000). The last of those inquiries includes consideration of whether Congress ever has before, or likely would, delegate the power the Executive asserts—a matter also of import in applying the major-questions doctrine. See *ante,* at 8–10; *Nebraska*, 600 U. S., at 512–514, 517–519 (BARRETT, J., concurring); *id.*, at 546, n. 3 (KAGAN, J., dissenting). In the past, though, I have thought that the Court used that doctrine to override—rather than help discover—the best reading of delegation statutes. See *West Virginia*, 597 U. S., at 756 (KAGAN, J., dissenting); *Nebraska*, 600 U. S., at 543 (KAGAN, J., dissenting).

This case presents more nearly the opposite situation: The use of a clear-statement rule here is unnecessary because ordinary principles of statutory interpretation lead to the same result.[1] It is not just that the Government's arguments fail to satisfy an especially strict test; it is that they fail to satisfy the normal one. Even without a clear-statement rule in the picture, the conclusion follows: IEEPA does not authorize the President to impose tariffs. And indeed, the principal opinion's reasoning well explains why. The rest of this opinion draws on that analysis (I hope without too much rehashing) to demonstrate what I view as the fundamental point: Usual text-in-context interpretation dooms the tariffs the President has imposed. The crucial provision of IEEPA, when viewed in light of the broader statutory scheme and with a practical awareness of how Congress delegates tariff authority, does not give the President the power he wants.

Most important, IEEPA's key phrase—the one the Government relies on—says nothing about imposing tariffs or

---

[1] JUSTICE GORSUCH claims not to understand this statement, insisting that I now must be applying the major-questions doctrine, and his own version of it to boot. See *ante*, at 17 (concurring opinion) ("My concurring colleagues all but endorse it today"); *ante*, at 2, 7, 18 (similar). Given how strong his apparent desire for converts, see *ante*, at 2–26, I almost regret to inform him that I am not one. But that is the fact of the matter. I proceed in this case just as I did in *West Virginia* and *Nebraska*: I consider a delegation provision's language, broaden the scope to take in the statutory setting, and apply some common sense about how Congress normally delegates. See *West Virginia* v. *EPA*, 597 U. S. 697, 756–766 (2022) (KAGAN, J., dissenting); *Biden* v. *Nebraska*, 600 U. S. 477, 534–542 (2023) (KAGAN, J., dissenting). Contrary to JUSTICE GORSUCH's suggestion, see *ante*, at 3–7, that conventional method of interpretation will not always favor (or always disfavor) executive officials, given the variety of delegation schemes Congress adopts. I'll let JUSTICE GORSUCH relitigate on his own our old debates about other statutes, unrelated to the one before us. What matters here is only that IEEPA's delegation refutes the Executive's assertion of authority to levy tariffs, without any help from the major-questions doctrine.

taxes.  That text authorizes the President, upon finding a
foreign threat and declaring an emergency, to "regulate"
the "importation" of foreign goods.    50 U. S. C.
§1702(a)(1)(B).  And the meaning of "regulate," both in com-
mon parlance and as Congress uses the word, does not en-
compass taxing.  See *ante,* at 14–15.  To "regulate," accord-
ing to the Government's preferred definition, means to "fix,
establish or control; to adjust by rule, method, or estab-
lished mode; to direct by rule or restriction; to subject to
governing principles or laws."  Brief for Federal Parties 24
(quoting Black's Law Dictionary 1156 (5th ed. 1979)).  Noth-
ing in that definition naturally refers to levying taxes.  Nor
does Congress ever use the word "regulate" in that way.
Hundreds of provisions in the U. S. Code give agencies the
authority to "regulate" one thing or another.  Yet the Gov-
ernment cannot identify a single one that is understood to
grant taxing power.  See Tr. of Oral Arg. 30.  When Con-
gress wants to delegate that power, it uses a whole different
vocabulary—terms like "duty," "tariff," or "surcharge,"
which do not appear in IEEPA.  See *ante,* at 8 (citing repre-
sentative statutes); see also *ante,* at 19 (discussing, in par-
ticular, 19 U. S. C. §1862 (1970 ed.)).  And likewise, when
Congress means to cover *both* regulatory and taxing pow-
ers, it refers to each separately.  See *ante*, at 15 (also citing
statutes).  Of course, Congress knows that taxes can be used
for regulatory ends: They can be a means of controlling or
adjusting behavior.  But Congress still follows the path this
Court long ago marked out, and the one most consonant
with ordinary meaning, of treating the power to "regulate"
trade as "entirely distinct" from the power to "levy taxes."
*Gibbons* v. *Ogden*, 9 Wheat. 1, 201–202 (1824); see *ante,* at
15.  So in granting only the former, IEEPA excludes the lat-
ter: The President has the ability to regulate, but not to im-
pose taxes on, imports.

   The surrounding statutory language confirms the point.
As the principal opinion explains, "regulate" is one of 9

verbs listed in IEEPA's delegation provision. See *ante,* at 15. (The others are "investigate," "block," "direct," "compel," "nullify," "void," "prevent," and "prohibit." §1702(a)(1)(B).) Those verbs are followed by 11 objects, each describing a distinct sort of transaction involving foreign property—not just "importation," but also "acquisition," "use," "transfer," and so forth. *Ibid.* Combine the verbs and objects in all possible ways, and the statute authorizes 99 actions a President can take to address a foreign threat. And exactly none of the other 98 involves raising revenues. Rather, each enables the President to impose penalties, restrictions, or controls on foreign commerce. See *ante,* at 15. So when the phrase "regulate . . . importation" is invoked to impose quantity or quality limits on bringing foreign goods into the country—for example, by setting quotas or requiring quarantines—the phrase fits well with its 98 neighbors. Just like the rest, it provides a way to constrain or alter various foreign transactions. But when that phrase is invoked to impose tariffs? Then it becomes the odd man out—the only one of 99 permission slips to involve "the core congressional power of the purse." *Ante,* at 8; see *ante,* at 5–6. So even if (contra both conventional and congressional usage) the word "regulate" might refer to taxation in some other (hitherto undiscovered) statutory context, it would not do so in IEEPA.[2]

Likewise, Congress's consistent practice in delegating tariff power refutes the Government's position. As the

_____

[2] The legislative history of IEEPA offers yet more proof that Congress did not authorize taxation. The Senate Report, in its description of the statute, reduces the 99 authorized actions to the following: the power "to control or freeze property transactions where a foreign interest is involved." S. Rep. No. 95–466, p. 5 (1977). The House Report similarly describes the delegation provision as "authoriz[ing] the President" to "regulate or freeze any property in which any foreign country or a national thereof has any interest." H. R. Rep. No. 95–459, p. 15 (1977). Neither of those descriptions at all suggests that Congress intended to cede its taxing power.

principal opinion details, Title 19 of the U. S. Code includes multiple provisions granting the President authority to levy tariffs. See *ante,* at 8–9. But in each and every instance, Congress has not only used specific language (*e.g.*, "duty" or "surcharge"), see *supra*, at 4, but also imposed tight restraints on the power given. It has capped the tariff's rate (*e.g.*, 15%); or limited the tariff's duration (*e.g.*, 150 days); or established strict procedural conditions before the tariff can take effect (*e.g.*, investigations, public hearings, and reports); or all of the above. See *ante,* at 8–9. What Congress has never done in a tariff provision is what the Government claims it did here—conferred power on the President to impose a tariff of any amount, for any time, on only his own say-so. And construing IEEPA to give that unparalleled authority would effectively erase all the carefully confined tariff provisions in Title 19. For any President could then escape the rigors of those laws—could put in place, say, a non-time-limited 100% tariff on all foreign products—by the simple expedient of identifying a foreign threat. That gutting of Title 19's tariff scheme is not what Congress, when delegating power to "regulate" imports, could have meant to accomplish.

Nor has any President until now understood IEEPA to authorize imposing tariffs. Between 1977 (when IEEPA was enacted) and 2024, eight Presidents had the chance to make use of IEEPA's delegation of power. And all chose the same course. They invoked the statute's "regulate importation" provision for a variety of non-tariff purposes. See *ante,* at 10. But they looked elsewhere—to Title 19's provisions— for tariff authority. See *ante,* at 10–11. In other words, each President read the statutes as Congress wrote them, with IEEPA enabling him to regulate imports and Title 19 enabling him—in confined situations—to tax those foreign

goods. None, as far as anyone has suggested, even considered doing otherwise.[3]

For all those reasons, straight-up statutory construction resolves this case for me; I need no major-questions thumb on the interpretive scales. IEEPA gives the President significant authority over transactions involving foreign property, including the importation of goods. But in that generous delegation, one power is conspicuously missing. Nothing in IEEPA's text, nor anything in its context, enables the President to unilaterally impose tariffs. And needless to say, without statutory authority, the President's tariffs cannot stand. See *ante,* at 5–6.

———————

[3] Presidents followed the same practice, with one quasi-exception, under IEEPA's predecessor statute, the Trading with the Enemy Act (TWEA). Beginning in 1941, TWEA authorized the President, as IEEPA does now, to "regulate . . . importation." 12 U. S. C. §95a(1)(B) (1940 ed., Supp. I). During the next three decades, six Presidents used that delegation for only non-tariff ends, while relying on Title 19 to levy tariffs. In 1971, when President Nixon imposed tariffs in response to a balance-of-payments deficit, he continued in that tradition by invoking two statutes (the Tariff Act of 1930 and Trade Expansion Act of 1962) found in Title 19. See Presidential Proclamation No. 4074, 3 CFR 60 (1971–1975 Comp.). But in defending his act against a legal challenge, the Department of Justice argued that even if the two cited statutes did not authorize the tariffs, TWEA would do so. That after-the-fact claim of authority was upheld in the Court of Customs and Patent Appeals. See *United States* v. *Yoshida Int'l, Inc.*, 526 F. 2d 560, 572, 577–578 (CCPA 1975); *ante,* at 17. The principal opinion well explains why that single lower court decision about TWEA has no bearing on IEEPA's meaning. See *ante,* at 17–18, and n. 5.

# SUPREME COURT OF THE UNITED STATES

---

Nos. 24–1287 and 25–250

---

LEARNING RESOURCES, INC., ET AL., PETITIONERS
24–1287　　　　　　　　　*v.*
DONALD J. TRUMP, PRESIDENT OF THE UNITED
STATES, ET AL.

ON WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED
STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA
CIRCUIT

DONALD J. TRUMP, PRESIDENT OF THE UNITED
STATES, ET AL., PETITIONERS
25–250　　　　　　　　　*v.*
V.O.S. SELECTIONS, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FEDERAL CIRCUIT

[February 20, 2026]

JUSTICE JACKSON, concurring in part and concurring in
the judgment.

I agree with the Court's conclusion that the International
Emergency Economic Powers Act (IEEPA) does not provide
the President with the power to tariff. Three of my col-
leagues have reached this result via the major questions
doctrine, see *ante,* at 7–13 (opinion of ROBERTS, C. J.)—a
framing that asks, in essence, whether Congress "would
*likely* have intended" to delegate the authority to tariff to
the President through IEEPA. *West Virginia* v. *EPA*, 597
U. S. 697, 730 (2022) (emphasis added); see also *id.*, at 722–
723. While probing Congress's intent is the right inquiry,
my colleagues speculate needlessly. In my view, the Court

can, and should, consult a statute's legislative history to de-
termine what Congress actually intended the statute to do.

As Congress undertakes the legislative process, congres-
sional committees in the Senate and House often generate
official reports that describe Congress's aims for the legis-
lation. See R. Katzmann, Judging Statutes 19–20 (2014)
(Katzmann). Indeed, there is evidence that lawmakers
themselves pay more attention to these reports than a stat-
ute's text to understand the statute's purpose and meaning.
A. Gluck & L. Bressman, Statutory Interpretation From the
Inside—An Empirical Study of Congressional Drafting,
Delegation, and the Canons: Part I, 65 Stan. L. Rev. 901,
965–966, 968–969 (2013); see also Katzmann 37–38. Thus,
in contrast to the principal dissent's rejection of Committee
Reports as a means of ascertaining a statute's meaning,
*post*, at 16, n. 11 (opinion of KAVANAUGH, J.), I think these
Senate and House Reports are among the best evidence of
what Congress sought to accomplish with its enactments.
See Gluck, 65 Stan. L. Rev., at 965, 977–978, 989.

In the cases now before us, that evidence shows that Con-
gress did not intend for IEEPA to authorize the Executive
to impose tariffs. Accord, *ante,* at 5, n. 2 (KAGAN, J., con-
curring in part and concurring in judgment). Instead, Con-
gress intended to delegate to the President the power to
freeze and control foreign property transactions.

Four pieces of the relevant legislative record support this
conclusion. The first two are the House and Senate Reports
that accompanied the 1941 amendment to IEEPA's prede-
cessor statute, the Trading with the Enemy Act (TWEA).
First enacted in 1917, TWEA authorized the President to
control foreign property during wartime. But some of
TWEA's sections delegating this authority had lapsed, and
"there [was] doubt as to the effectiveness of other sections."
H. R. Rep. No. 1507, 77th Cong., 1st Sess., 2 (1941). Accord-
ingly, Congress amended TWEA in 1941, adding the sub-
section that includes the "regulate . . . importation"

language on which the President relies today.  First War Powers Act, 55 Stat. 839–840.  The Reports explained Congress's primary purpose for the 1941 amendment: shoring up the President's ability to control foreign-owned property by maintaining and strengthening the "existing system of foreign property control (commonly known as freezing control)."  H. R. Rep. No. 1507, at 2–3; see also S. Rep. No. 911, 77th Cong., 1st Sess., 2 (1941).[1]

When Congress enacted IEEPA in 1977, limiting the circumstances under which the President could exercise his emergency authorities, it kept the "regulate . . . importation" language from TWEA.  §203(a)(1)(B), 91 Stat. 1626.  The other two relevant pieces of legislative history—the Senate and House Reports that accompanied IEEPA—demonstrate that Congress's intent regarding the scope of this statutory language remained the same.  As the Senate Report explained, Congress's sole objective for the "regulate . . . importation" subsection was to grant the President the emergency authority "to control or freeze property transactions where a foreign interest is involved."  S. Rep. No. 95–466, p. 5 (1977).  The House Report likewise described IEEPA as empowering the President to "regulate or freeze any property in which any foreign country or a national thereof has any interest."  H. R. Rep. No. 95–459, p. 15 (1977).

With this evidence of Congress's objective, interpreting the text of IEEPA becomes an easy task.  Each of the listed verbs—"investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent

---

[1] In addition to maintaining the President's "freezing control" authority, Congress also sought to authorize the President to *seize* foreign property and use it to serve the interests of the United States.  H. R. Rep. No. 1507, at 3.  To this end, the 1941 amendment provided that foreign-owned property "shall vest . . . in such agency or person as may be designated . . . by the President."  55 Stat. 840.  Congress did not include this vesting language in IEEPA.

or prohibit," 50 U. S. C. §1702(a)(1)(B)—provides a means by which the President can freeze or control foreign property transactions. See *ante,* at 4–5, and n. 2 (opinion of KAGAN, J.). Tariffs are different in kind. They are a tax on imports; a means of generating revenue from transactions between private parties. See *ante,* at 6 (majority opinion). Because tariffs are not a means by which the President can freeze or control foreign assets, interpreting IEEPA to authorize tariffs would require the Court to override Congress's expressed purpose for including the "regulate . . . importation" language in the statute.

\*     \*     \*

Like THE CHIEF JUSTICE's opinion, the principal dissent declines the help of legislative history. See *post,* at 16, n. 11 (opinion of KAVANAUGH, J.). The dissent concludes that IEEPA and TWEA are "best understood" as authorizing tariffs, and that any other interpretation would "not make much sense." *Post*, at 24–25, 29.[2] But why would it matter which interpretation *we* think is "best" when Congress has already told us? The legislative history here plainly establishes that Congress understood and intended IEEPA and TWEA to authorize a wholly different type of power: the power to freeze foreign-owned property. And the proper role of the Court is to give effect to Congress's intent, not our own instincts. See *United States* v. *American Trucking Assns., Inc.*, 310 U. S. 534, 542 (1940).

In short, in these cases, the legislative history provides helpful evidence of "what Congress was trying to do" in IEEPA. Katzmann 38. Given that evidence, we need not speculate or, worse, step into Congress's shoes and

_____

[2] This reasoning appears to follow the Court's relatively recent practice of picking what it deems the best reading of a statute without consideration of Congress's intent. See, *e.g.*, *Stanley* v. *City of Sanford*, 606 U. S. 46, 51–54 (2025); accord, *id.*, at 96–97, and n. 12 (JACKSON, J., dissenting).

Opinion of JACKSON, J.

formulate our own views about what powers would be best to delegate to the President for use during an emergency. See *ibid.*; J. Hurst, Dealing With Statutes 33 (1982). When Congress tells us why it has included certain language in a statute, the limited role of the courts in our democratic system of government—as interpreters, not lawmakers—demands that we give effect to the will of the people.

# SUPREME COURT OF THE UNITED STATES

---

Nos. 24–1287 and 25–250

---

LEARNING RESOURCES, INC., ET AL., PETITIONERS
24–1287                    *v.*
DONALD J. TRUMP, PRESIDENT OF THE UNITED
STATES, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT


DONALD J. TRUMP, PRESIDENT OF THE UNITED
STATES, ET AL., PETITIONERS
25–250                    *v.*
V.O.S. SELECTIONS, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FEDERAL CIRCUIT

[February 20, 2026]

JUSTICE THOMAS, dissenting.

I join JUSTICE KAVANAUGH's principal dissent in full. As
he explains, the Court's decision today cannot be justified
as a matter of statutory interpretation. Congress author-
ized the President to "regulate . . . importation." 50 U. S. C.
§1702(a)(1)(B). Throughout American history, the author-
ity to "regulate importation" has been understood to include
the authority to impose duties on imports. *Post*, at 9–13,
22–29 (KAVANAUGH, J., dissenting). The meaning of that
phrase was beyond doubt by the time that Congress enacted
this statute, shortly after President Nixon's highly publi-
cized duties on imports were upheld based on identical lan-
guage. *Post*, at 14–22. The statute that the President relied
on therefore authorized him to impose the duties on imports

at issue in these cases.  JUSTICE KAVANAUGH makes clear that the Court errs in concluding otherwise.

I write separately to explain why the statute at issue here is consistent with the separation of powers as an original matter.  The Constitution's separation of powers forbids Congress from delegating core legislative power to the President.  This principle, known as the nondelegation doctrine, is rooted in the Constitution's Legislative Vesting Clause and Due Process Clause.  Art. I, §1; Amdt. 5.  Both Clauses forbid Congress from delegating core legislative power, which is the power to make substantive rules setting the conditions for deprivations of life, liberty, or property.  Neither Clause prohibits Congress from delegating other kinds of power.  Because the Constitution assigns Congress many powers that do not implicate the nondelegation doctrine, Congress may delegate the exercise of many powers to the President.  Congress has done so repeatedly since the founding, with this Court's blessing.

The power to impose duties on imports can be delegated.[1] At the founding, that power was regarded as one of many

---

[1] I refer to charges on imported goods as "duties," not "tariffs" or "taxes."  When the government charged money for importing goods, that charge was historically called a custom or impost, each of which was a kind of "duty."  See N. Webster, A Compendious Dictionary of the English Language 75, 152 (1806); Art. I, §10, cl. 2.  The word "tariff" primarily referred to the schedule or table listing such duties, not the duties themselves.  Webster, Compendious Dictionary, at 305.  The word "tax," although sometimes used loosely to refer to all kinds of monetary charges, more often "exclude[d]" duties on imports.  R. Natelson, What the Constitution Means by "Duties, Imposts, and Excises"—and "Taxes" (Direct or Otherwise), 66 Case W. Res. L. Rev. 297, 306 (2015).

In fact, although Colonial Americans "staunchly contested efforts by Parliament to 'tax' them," they often "conceded the authority of the British government to regulate commerce through financial exactions," including "prohibitory tariffs."  *Ibid.*  In the most "widely read" and "universally approved" response to the Stamp Act, E. Morgan & H. Morgan, The Stamp Act Crisis 71 (1953), Daniel Dulany wrote: "A Right to impose an internal Tax on the Colonies, without their Consent for the single

powers over foreign commerce that could be delegated to the President. Power over foreign commerce was not within the core legislative power, and engaging in foreign commerce was regarded as a privilege rather than a right. Early Congresses often delegated to the President power to regulate foreign commerce, including through duties on imports. As I suggested over a decade ago, the nondelegation doctrine does not apply to "a delegation of power to make rules governing private conduct in the area of foreign trade," including rules imposing duties on imports. *Department of Transportation* v. *Association of American Railroads*, 575 U. S. 43, 80–81, n. 5 (2015) (opinion concurring in judgment). Therefore, to the extent that the Court relies on "'separation of powers principles'" to rule against the President, *ante,* at 8 (opinion of ROBERTS, C. J.), it is mistaken.

I

The nondelegation doctrine is rooted in both the Legislative Vesting Clause and the Due Process Clause. The doctrine ensures that "[t]he Legislative [Branch] cannot transfer the Power of Making Laws to any other hands." J. Locke, Two Treatises of Government §141, p. 380 (P. Laslett ed. 1964) (Locke) (emphasis deleted). Importantly,

---

Purpose of Revenue, is denied; a Right to regulate their Trade without their Consent is admitted. The Imposition of a Duty, may, in some Instances, be the proper Regulation." Considerations on the Propriety of Imposing Taxes in the British Colonies 34 (2d ed. 1765) (emphasis deleted). Likewise, Benjamin Franklin famously conceded Britain's "right 'of laying duties to regulate commerce,'" but rejected its power to "'lay internal taxes.'" B. Bailyn, The Ideological Origins of the American Revolution 214 (1967); see also *id.*, at 212 (explaining that colonists denied Britain "all right to tax the colonies," but "conceded to it the right to raise revenue through duties on trade"); E. Nelson, The Royalist Revolution 32 (2014); C. Becker, The Declaration of Independence: A Study in the History of Political Ideas 90 (1922).

however, the nondelegation doctrine applies only to Congress's core legislative power, not to all of its powers.

## A

The Legislative Vesting Clause grants Congress alone the federal legislative power. It requires that "[a]ll legislative Powers" granted to the Federal Government "shall be vested in a Congress of the United States." Art. I, §1. It follows that those federal legislative powers cannot be exercised by anyone else, including the President. See *Association of American Railroads*, 575 U. S., at 74 (opinion of THOMAS, J.).

"Legislative power" for purposes of the Vesting Clause means the power to make substantive rules setting the conditions for deprivations of life, liberty, or property. I have described this power as the "core legislative power" to distinguish it from other powers that the Constitution grants Congress. *Id.*, at 80. Core legislative power includes only the power to make "law" in the "Blackstonian sense of generally applicable rules of private conduct," the violation of which results in the deprivation of "core private rights." *Id.*, at 73, 76. These core private rights are the natural rights to life, liberty, and property. See 1 W. Blackstone, Commentaries on the Laws of England 123–136 (1765) (Blackstone); C. Nelson, Adjudication in the Political Branches, 107 Colum. L. Rev. 559, 566–567 (2007).

The nondelegation doctrine is also rooted in the Due Process Clause. That Clause prohibits the Federal Government from depriving any person of "life, liberty, or property, without due process of law." Amdt. 5. The Founders modeled it on chapter 39 of the Magna Carta, which prohibited the deprivation of a free man's private rights "except by the lawful judgment of his peers and by the law of the land." A. Howard, Magna Carta: Text and Commentary 45 (rev. ed. 1998); see *Obergefell* v. *Hodges*, 576 U. S. 644, 723 (2015) (THOMAS, J., dissenting). By the founding, the Magna

Carta was understood to mean that "no subject would be deprived of a private right—that is, a right of life, liberty, or property—except in accordance with 'the law of the land,' which consisted only of statutory and common law." *Association of American Railroads*, 575 U. S., at 72 (opinion of THOMAS, J.) (citing N. Chapman & M. McConnell, Due Process as Separation of Powers, 121 Yale L. J. 1672, 1688 (2012)).

A rule made by someone other than the legislature, such as the King, was not "'the law of the land.'" *Association of American Railroads*, 575 U. S., at 72 (opinion of THOMAS, J.). Chief Justice Coke famously held invalid the King's proclamation prohibiting new buildings in London because the King could not "create any offence" "without Parliament." *Case of Proclamations*, 12 Co. Rep. 74, 74–75, 77 Eng. Rep. 1352, 1353 (K. B. 1611); see *Association of American Railroads*, 575 U. S., at 72 (opinion of THOMAS, J.) (explaining that this principle was associated with chapter 39 of the Magna Carta). When the Founders transplanted the same principle into the Due Process Clause, they ensured that when the government wanted to deprive people of the familiar core private rights of "life, liberty, and property," it could not do so "on the basis of a rule (or a will) not enacted by the legislature." *Id.*, at 75–76.

B

Neither the Legislative Vesting Clause nor the Due Process Clause forbids Congress from delegating its other powers. As this Court put it two centuries ago, although Congress cannot delegate powers that are "strictly and exclusively legislative," it can "certainly delegate" others. *Wayman* v. *Southard*, 10 Wheat. 1, 42–43 (1825) (opinion for the Court by Marshall, C. J.).

Many of Congress's powers fall within the core legislative power subject to the nondelegation doctrine. For example, the Constitution gives Congress the power to regulate

commerce among the States. Art. I, §8, cl. 3. Congress can thus make substantive rules for interstate trade—such as by restricting drug shipments across state lines—punishable with fines or imprisonment. Cf. *Gonzales* v. *Raich*, 545 U. S. 1, 58 (2005) (THOMAS, J., dissenting). Likewise, the Constitution gives Congress many other powers that implicate life, liberty, and property, including the power to provide for the punishment of counterfeiting, Art. I, §8, cl. 6; the power to provide for the punishment of treason, Art. III, §3, cl. 2; and the power to impose internal taxes, Art. I, §8, cl. 1; Amdt. 16. These powers cannot be delegated, as I have repeatedly explained. See, *e.g.*, *Association of American Railroads*, 575 U. S., at 77 (opinion of THOMAS, J.); *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 487 (2001) (THOMAS, J., concurring). They cannot be delegated even if Congress delegates them unambiguously. Cf. *ante*, at 8 (opinion of ROBERTS, C. J.).

Congress also has many powers that are not subject to the nondelegation doctrine. "We now think of the powers listed in Article I, Section 8 as quintessentially legislative powers, but many of them were actual, former, or asserted powers of the Crown, which the drafters decided to allocate to the legislative branch." M. McConnell, The President Who Would Not Be King 274 (2020) (McConnell); accord, *Zivotofsky* v. *Kerry*, 576 U. S. 1, 36 (2015) (THOMAS, J., concurring in judgment in part and dissenting in part). These include the powers to raise and support armies, to fix the standards of weights and measures, to grant copyrights, to dispose of federal property, and, as discussed below, to regulate foreign commerce. Art. I, §8; Art. IV, §3. None of these powers involves setting the rules for the deprivation of core private rights. Blackstone called them "prerogative" powers, and sometimes "executive." See 1 Blackstone 242, 245, 255–262, 264–265, 276, 279; 2 *id.*, at 407, 410 (1766); 1 W. Crosskey, Politics and the Constitution in the History of the United States 416, 421–425 (1953); McConnell 274–

275. By one count, 13 of the 29 powers given to Congress in Article I were powers that "Blackstone described as 'executive' powers." 1 Crosskey, Politics and the Constitution, at 428.

For most of American history, the nondelegation doctrine was understood not to apply to these powers. Contra, *ante,* at 42–46 (GORSUCH, J., concurring). "The early congresses felt free to delegate certain powers to President Washington in broad terms." McConnell 333. Thus, the Constitution gives Congress the power to support armies, Art. I, §8, cl. 12, but Congress in 1789 delegated to the President the power to establish regulations for benefits to veterans wounded in the Revolutionary War. See Act of Sept. 29, 1789, ch. 24, 1 Stat. 95. The Constitution gives Congress the power to grant patents, Art. I, §8, cl. 8, but Congress in 1790 delegated to executive officials the power to grant patents in their discretion. See Act of Apr. 10, 1790, ch. 7, §1, 1 Stat. 109–110. The Constitution gives Congress the power to borrow money, Art. I, §8, cl. 2, but Congress in 1790 delegated to the President the power to borrow up to $12 million on behalf of the United States in his discretion. See Act of Aug. 4, 1790, §2, 1 Stat. 139. The Constitution gives Congress the power to raise armies, Art. I, §8, cl. 12, but Congress in 1791 delegated to the President the power to raise an army of 2,000 troops in his discretion. See Act of Mar. 3, 1791, §8, 1 Stat. 223. And, as I explain further below, see *infra*, at 13–15, the Constitution gives Congress the power to regulate foreign commerce, Art. I, §8, cl. 3, but early Congresses often delegated to the President the power to regulate foreign commerce. See, *e.g.*, Act of July 22, 1790, ch. 33, 1 Stat. 137; Act of June 4, 1794, ch. 41, 1 Stat. 372.

These early delegations had one thing in common: They did not implicate the Legislative Vesting Clause or the Due Process Clause. "None of these statutes disturbed natural rights or intruded into the core of the legislative power." McConnell 333; cf. A. Bamzai, Comment, Delegation and

Interpretive Discretion: *Gundy*, *Kisor*, and the Formation and Future of Administrative Law, 133 Harv. L. Rev. 164, 178 (2019). They therefore did not violate the nondelegation doctrine.

The Constitutional Convention seemed to agree with this understanding of delegation. Contra, *ante*, at 42 (GORSUCH, J., concurring). James Madison proposed an amendment clarifying that the President had the power "'to execute such other powers'" as were "'delegated by the national Legislature,'" so long as the delegated powers were """not Legislative nor Judiciary in their nature."'" 1 Records of the Federal Convention of 1787, p. 67 (M. Farrand ed. 1966). Thus, in Madison's view, some of Congress's powers were "not Legislative" and could be "delegated" to the President. *Ibid.* Madison's proposal was rejected after others argued that it was unnecessary. *Ibid.* Madison agreed that the purpose of the proposed amendment was only to "prevent doubts and misconstructions." *Ibid.* Nobody disputed that Madison stated the correct scope of the nondelegation doctrine. *Ibid.*; see also McConnell 332 ("[W]e can infer [from Madison's motion] that the framers understood that Congress would be able to delegate its royal prerogative powers back to the President").[2]

––––––––––

[2] Thus, although many used the word "legislative" in the broader sense to describe powers that should initially belong to the legislature, *ante,* at 42–43 (GORSUCH, J., concurring), the Founders likely understood the Legislative Vesting Clause to refer more narrowly to "core legislative power," *Department of Transportation* v. *Association of American Railroads*, 575 U. S. 43, 80 (2015) (THOMAS, J., concurring in judgment). That understanding accorded with the views of separation-of-powers theorists of the time, who distinguished the three core functions of government from the institutions that would exercise them in any given polity. S. Prakash & M. Ramsey, Foreign Affairs and the Jeffersonian Executive, 89 Minn. L. Rev 1591, 1612–1617 (2005); see 1 B. de Montesquieu, The Spirit of Laws 151–153 (T. Nugent transl., rev. ed. 1899). For nondelegation purposes, therefore, "[t]he key is to distinguish between strictly legislative authority—the power to make rules binding on persons or

## II

As a matter of original understanding, historical practice, and judicial precedent, the power to impose duties on imports is not within the core legislative power. Congress can therefore delegate the exercise of this power to the President.

### A

Neither of the two constitutional foundations for the nondelegation doctrine forbids Congress from delegating to the President the power to impose duties on imports.

#### 1

The Legislative Vesting Clause provides no basis for applying the nondelegation doctrine to the power to impose duties on imports.

"The 'power over external affairs [is] in origin and essential character different from that over internal affairs.'" *Haaland* v. *Brackeen*, 599 U. S. 255, 356 (2023) (THOMAS, J., dissenting) (quoting *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 319 (1936)). Although internal affairs are governed by the domestic law of one sovereign, external affairs implicate the relationship between sovereigns, which is subject to the law of nations. See Locke §§145–148, at 383–384; 1 Blackstone 264; 4 *id.*, at 66–68 (1769); E. de Vattel, The Law of Nations 161–163, 281–289 (J. Chitty ed. 1852) (Vattel). External affairs, then, are not susceptible to being "directed by antecedent, standing, positive Laws" made by one nation. Locke §147, at 384. When a person goes abroad, he must resort to the political branches (and ultimately the military)—rather than the judiciary—for protection, can indebt the executive to foreign nations for his personal misconduct, and can trigger a foreign conflict. See Vattel 161–163, 281–289; 2 F. Wharton,

———————

property within the nation—and other powers assigned to Congress." McConnell 327.

Digest of International Law §222, pp. 575–576 (2d ed. 1887); see also *id.*, §§189, 213–221, at 432–445, 539–575.

The power to regulate external affairs was accordingly not viewed as within the core legislative power at the founding. See *Zivotofsky*, 576 U. S., at 35–37 (opinion of THOMAS, J.). Blackstone described powers over "intercourse with foreign nations" as "prerogative" powers naturally belonging to the King. 1 Blackstone 245; see *id.*, at 232. Locke agreed that this power "must be lodged" with the "executive." *Zivotofsky*, 576 U. S., at 35 (opinion of THOMAS, J.) (citing Locke §148). Baron de Montesquieu classified all powers "in respect to things dependent on the law of nations" as part of "the executive power." 1 The Spirit of Laws 151 (T. Nugent transl., rev. ed. 1899). The "legislative" power, by contrast, "applied only within the realm." McConnell 214.

The power to regulate external affairs included power over foreign commerce. At the founding, the "external executive power" included "'the transactions of the state with any other independent state.'" *Zivotofsky*, 576 U. S., at 36 (opinion of THOMAS, J.). In Great Britain, the King had no unilateral legislative power, McConnell 107, but he had much unilateral power over foreign commerce. His power over foreign commerce included the power to "govern foreign trade," *id.*, at 216, and to "prohibit any of his subjects from leaving the realm," 1 Blackstone 261; accord, *East India Co.* v. *Sandys*, Skin. 223, 223–224, 90 Eng. Rep. 103 (K. B. 1684) (describing the "inherent prerogative in the Crown, that none should trade with foreigners without the King's licence"). Thomas Rutherforth's Institutes of Natural Law—"a treatise routinely cited by the Founders," *Zivotofsky*, 576 U. S., at 36 (opinion of THOMAS, J.)—explained that the "external executive power" included "the power of adjusting the rights of a nation in respect of . . . trade." 2 Institutes of Natural Law 55–56 (1756); accord, Locke §146, at 383. The power to impose duties on imports was a conventional method for governing foreign trade. It originated

as a "prerogative right" of the King, N. Gras, Early English Customs System 21 (1918).[3]

### 2

The Due Process Clause likewise provides no basis for applying the nondelegation doctrine to the power to impose duties on imports. The Due Process Clause protects "rights," not "privileges." *Gutierrez* v. *Saenz*, 606 U. S. 305, 331 (2025) (THOMAS, J., dissenting). Importing is a matter of privilege.

The government can charge money for privileges without depriving a person of property for due-process purposes. The government charges people money every day for a wide range of activities, such as to enter a government park, mail an envelope, apply for a copyright, or file a lawsuit. Because a person has no core private right to engage in these activities, the government is not subject to due-process restraints in setting such charges. The due-process question is not whether a government action "'raise[s] revenue,'" *ante,* at 6 (majority opinion), but whether it implicates core private rights. *Supra*, at 3–4. Thus, when Congress delegates power to make "regulations" on federal land, the Secretary of Agriculture can set a "charge" for the "privilege of grazing sheep" on that land without thereby "exercis[ing] the legislative power." *United States* v. *Grimaud*, 220 U. S. 506, 522–523 (1911); see also Bamzai, 133 Harv. L. Rev., at 180–182; contra, *ante,* at 8 (opinion of ROBERTS, C. J.). Congress has, consistent with due process, delegated the power to set charges for a wide range of privileges. See 16 U. S. C. §6802 (delegating the power to set fees for entrance to and

---

[3] See also P. Einzig, The Control of the Purse: Progress and Decline of Parliament's Financial Control 65 (1959) ("[T]he origin of the term 'customs' is that it had been the ancient customary practice of the Crown to levy charges on imports and exports on its own authority"). Parliament took some of that prerogative power away, but delegated it back in broad terms to the King, see *id.*, at 65–70, who was still agreed to have no legislative power, McConnell 107–110.

use of federal recreation areas); 17 U. S. C. §1316 (delegating the power to "by regulation set reasonable fees" for applications); 39 U. S. C. §3622 (delegating the power to set postal rates); 28 U. S. C. §1911 ("The Supreme Court may fix the fees to be charged by its clerk").

A person had no core private right to import goods at the founding. On the Founders' understanding, statutes allowing "importation of goods from abroad were thought to create mere privileges rather than core private rights." Nelson, 107 Colum. L. Rev., at 580. Foreign commerce was governed by the law of nations, which is a law of "sovereigns," not of "private individuals." Vattel 285. "[A]ny attempt to introduce foreign goods" without the "expressed allowances" of the sovereign was "a violation of its sovereignty." *Cross* v. *Harrison*, 16 How. 164, 196 (1854). "Every state" had "a right to prohibit the entrance of *foreign merchandises*," including through the imposition of duties on imports. Vattel §§90, 99, at 38, 43. Because "no one had a vested right to import" any "goods from abroad," the imposition of "tariffs" as a condition for importing those goods did not implicate the Due Process Clause any more than when the government charges money for other privileges. Nelson, 107 Colum. L. Rev., at 580.

\*          \*          \*

The power to impose duties on imports thus does not implicate either of the constitutional foundations for the non-delegation doctrine. Hence, even the strongest critics of delegation, myself included, have recognized that regulations of foreign commerce might not be subject to ordinary non-delegation limitations. See *FCC* v. *Consumers' Research*, 606 U. S. 656, 742, n. 19 (2025) (GORSUCH, J., dissenting) ("[I]t may be . . . that tariffs and domestic taxes present different contexts when it comes to the problem of delegation"); accord, *Association of American Railroads*, 575 U. S., at 80, and n. 5 (opinion of THOMAS, J.). So long as Congress

complies with other constitutional limitations, it can dele-
gate this power.

## B

Historical practice and precedent confirm that Congress
can delegate the power to impose duties on imports.

### 1

Since the 1790s, Congress has consistently delegated to
the President power over foreign commerce, including the
power to impose duties on imports. "'Practically every vol-
ume of the United States Statutes'" contains broad delega-
tions to the President in the area of foreign commerce. *Id.*,
at 80, n. 5 (quoting *Curtiss-Wright Export Corp.*, 299 U. S.,
at 324).

The First Congress gave the President the power to "pre-
scribe" "rules and regulations" that would "gover[n]" any
person licensed to trade with Indians. 1 Stat. 137. Trade
with Indians was regarded as "a matter of external rela-
tions." McConnell 333. In delegating this power, Congress
did not specify or limit what kinds of regulations the Presi-
dent could impose. Act of July 22, 1790, 1 Stat. 137–138.
Pursuant to that broad delegation, the President restricted
trading "[d]istilled [s]pirits," required each trader to "give
intelligence" to the Government, and subdelegated to his
superintendents the power to "assign the limits within
which each trader shall trade." 61 Timothy Pickering Pa-
pers, Massachusetts Historical Society 4 (Aug. 28, 1790);
see also Letter from G. Washington to H. Knox (Aug. 13,
1790), in 6 Papers of George Washington 244–245 (D.
Twohig ed. 1996). Any person who violated the President's
regulations would owe $1,000 "payable to the President." 1
Stat. 137.

Succeeding early Congresses delegated many more pow-
ers over foreign commerce to the President. In 1794, Con-
gress delegated to the President the power to "lay an

embargo on all ships and vessels in the ports of the United States," including ships belonging to Americans, unless Congress was in session. Act of June 4, 1794, 1 Stat. 372. It authorized the President to make "such regulations as the circumstances of the case may require" in exercising that delegated power. *Ibid.* Congress allowed the President to impose the embargo as "in his opinion, the public safety shall so require." *Ibid.* In 1795, Congress delegated to the President the power to "permit the exportation of arms, cannon and military stores, the law prohibiting the exportation of the same to the contrary notwithstanding." Act of Mar. 3, 1795, ch. 53, 1 Stat. 444. In 1798, Congress delegated to the President the power to discontinue "prohibitions and restraints" on commerce with France. Act of June 13, 1798, 1 Stat. 565–566; see also, *e.g.*, Act of Mar. 3, 1817, ch. 39, 3 Stat. 361–362 (delegating to the President the power to discontinue a ban on importation of plaster of Paris). In 1799, Congress delegated to the President the authority to discontinue and to reimpose "restraints and prohibitions" on commerce with France when he "deem[ed] it expedient and consistent with the interest of the United States." Act of Feb. 9, 1799, 1 Stat. 615. And, in 1800, Congress delegated to the President the power to remove a ban on trade with France, and to "re-establish" certain "restraints and prohibitions" when he "deem[ed] it expedient." Act of Feb. 27, 1800, 2 Stat. 9–10.[4]

Congress likewise delegated to the President the power to set duties on imports. In 1815, Congress delegated to the President the power to lower reciprocal duties when he was "satisfied" that other nations' trade practices no longer operated "to the disadvantage of the United States." Act of Mar. 3, 1815, ch. 77, 3 Stat. 224. In 1824, Congress

---

[4] JUSTICE GORSUCH's interpretation of two "early congressional debates," *ante*, at 43 (concurring opinion), is thus difficult to reconcile with what early Congresses actually did.

delegated to the President the power to lower and to reimpose duties in response to foreign nations' trade practices. See Act of Jan. 7, 1824, 4 Stat. 2–3. Throughout the early decades of the Republic, Congress continued to delegate to the President similar powers over duties on imports on a regular basis. See, *e.g.*, Act of May 24, 1828, ch. 111, 4 Stat. 308; Act of May 31, 1830, ch. 219, 4 Stat. 425; Act of July 13, 1832, ch. 207, 4 Stat. 578–579. Presidents frequently changed the rates of duties on imports as to various foreign nations pursuant to these delegations.[5]

### 2

This Court has consistently upheld Congress's delegation of power over foreign commerce, including the power to impose duties on imports.

The Court has long conveyed to Congress that it may "invest the President with large discretion in matters arising out of the execution of statutes relating to trade and commerce with other nations." *Marshall Field & Co.* v. *Clark*, 143 U. S. 649, 691 (1892). Since shortly after the founding, the Court has rejected challenges to delegations of power over foreign commerce. See *Cargo of Brig Aurora* v. *United*

--------

[5] See, *e.g.*, July 24, 1818, Proclamation of President J. Monroe, in 2 Messages and Papers of the Presidents 606–607 (J. Richardson ed. 1897) (eliminating duties on "goods, wares, and merchandise imported into the United States" as to the Free Hanseatic city of Bremen); see also, *e.g.*, Aug. 1, 1818, Proclamation of President J. Monroe, in 2 *id.*, at 607; May 4, 1820, Proclamation of President J. Monroe, in 2 *id.*, at 642; Aug. 20, 1821, Proclamation of President J. Monroe, in 2 *id.*, at 665–666; Nov. 22, 1821, Proclamation of President J. Monroe, in 2 *id.*, at 666–667; June 7, 1827, Proclamation of President J. Quincy Adams, in 2 *id.*, at 942–943; July 1, 1828, Proclamation of President J. Quincy Adams, in 2 *id.*, at 970–971; May 11, 1829, Proclamation of President A. Jackson, in 3 *id.*, at 1003; June 3, 1829, Proclamation of President A. Jackson, in 3 *id.*, at 1004–1005; Apr. 28, 1835, Proclamation of President A. Jackson, in 3 *id.*, at 1365–1366; Sept. 1, 1836, Proclamation of President A. Jackson, in 3 *id.*, at 1452–1453; June 14, 1837, Proclamation of President M. Van Buren, in 4 *id.*, at 1539.

*States*, 7 Cranch 382, 386, 387–389 (1813). Even when a "challenged delegation, if it were confined to internal affairs, would be invalid," the Court has upheld the delegation. *Curtiss-Wright Export Corp.*, 299 U. S., at 315, 322. There is a "fundamental" difference, the Court has explained, between "foreign or external affairs" and "domestic or internal affairs." *Id.*, at 315. Thus, "Congress may of course delegate very large grants of its power over foreign commerce to the President," *Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.*, 333 U. S. 103, 109 (1948), including when it comes to imposing "duties" on imports, *Curtiss-Wright Export Corp.*, 299 U. S., at 325, n. 2.

When Congress has delegated to the President the power to impose duties on imports, this Court has upheld those delegations. In *Clark*, 143 U. S. 649, the Court upheld Congress's delegation to the President of the power to impose duties on nations whose importation policies "he may deem to be reciprocally unequal and unreasonable." *Id.*, at 680. It explained that Congress had "frequently, from the organization of the government to the present time," conferred powers over "trade and commerce" to "the President." *Id.*, at 683. In *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394 (1928), the Court upheld a delegation to the President to impose duties as necessary up to statutorily limited rates to make them reciprocal. *Id.*, at 401, 409. And, in *Federal Energy Administration* v. *Algonquin SNG, Inc.*, 426 U. S. 548 (1976), the Court upheld a delegation of the power to impose a universal duty on imported oil. *Id.*, at 555, 558–560.[6]

————————

[6] The Court has even suggested that the President has inherent peacetime authority to impose duties on imports. After the Mexican-American War ended, executive officials imposed duties on imports at a California port within the United States before Congress had "passed an act to extend the collection of tonnage and import duties to the ports of California." *Cross* v. *Harrison*, 16 How. 164, 190 (1854); see also *id.*, at 192, 194–196. The executive officials unilaterally extended Congress's earlier

Although these cases involved duties on imports, the Court nowhere suggested that a different nondelegation rule applied because the duty was a "tax" or "raise[d] revenue." *Ante*, at 6 (majority opinion) (internal quotation marks omitted).[7]

## III

Congress's delegation here was constitutional. The statute at issue in these cases, the International Emergency Economic Powers Act, delegates to the President a wide range of powers over foreign commerce. IEEPA gives the President, on conditions satisfied here, the power to "regulate" foreign commerce, including "importation" of foreign property. 50 U. S. C. §1702(a)(1)(B).

IEEPA's delegation of power to impose duties on imports complies with the nondelegation doctrine. Congress delegated to the President a version of the same power that it has delegated to him in many statutes since the early days of the Republic. See *supra*, at 13–17. Congress limited that delegation to foreign commerce. See §1702(a)(1)(B); see also §1701. In delegating the power to impose duties on imports, it gave the President no core legislative power to make substantive rules setting the conditions for deprivations of life, liberty, or property. Its delegation therefore complied with the constitutional separation of powers and is consistent with centuries of practice and precedent. It did not need to exercise that power itself and did not need to delegate it "unambiguously"—even though, as JUSTICE

_____

authorized duties to new ports. *Id.*, at 193. Although the Court's reasoning was somewhat opaque, the Court upheld the executive officials' unilateral peacetime duties in part because nobody has a right to "introduce foreign goods" except with the sovereign's "expressed allowances." *Id.*, at 196–197.

[7] In fact, less than a year ago, the Court explicitly rejected "a special nondelegation rule for revenue-raising legislation." *FCC* v. *Consumers' Research*, 606 U. S. 656, 674 (2025).

KAVANAUGH explains, it did.  See *post*, at 38–45 (dissenting opinion).

The principal opinion bases its decision on the major questions doctrine.  *Ante*, at 7–13 (opinion of ROBERTS, C. J.).  In some cases, the Court has used the major questions doctrine as a canon of statutory interpretation because delegations of major powers are unlikely to be subtle.  See, *e.g.*, *Whitman,* 531 U. S., at 468; see *ante,* at 8 (opinion of ROBERTS, C. J.); see also *Biden* v. *Nebraska*, 600 U. S. 477, 501–503 (2023).  In other cases, the Court has used it to avoid what would have been originally understood as an unconstitutional delegation of legislative power.  See, *e.g.*, *West Virginia* v. *EPA*, 597 U. S. 697, 723 (2022); *ante,* at 8 (opinion of ROBERTS, C. J.).  In today's cases, neither the statutory text nor the Constitution provide a basis for ruling against the President.  I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 24–1287 and 25–250

———————

LEARNING RESOURCES, INC., ET AL., PETITIONERS
24–1287                    *v.*
DONALD J. TRUMP, PRESIDENT OF THE UNITED
STATES, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

DONALD J. TRUMP, PRESIDENT OF THE UNITED
STATES, ET AL., PETITIONERS
25–250                    *v.*
V.O.S. SELECTIONS, INC., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FEDERAL CIRCUIT

[February 20, 2026]

JUSTICE KAVANAUGH, with whom JUSTICE THOMAS and JUSTICE ALITO join, dissenting.

Acting pursuant to his statutory authority to "regulate . . . importation" under the 1977 International Emergency Economic Powers Act, or IEEPA, the President has imposed tariffs on imports of foreign goods from various countries. The tariffs have generated vigorous policy debates. Those policy debates are not for the Federal Judiciary to resolve. Rather, the Judiciary's more limited role is to neutrally interpret and apply the law. The sole legal question here is whether, under IEEPA, tariffs are a means to "regulate . . . importation." Statutory text, history, and precedent demonstrate that the answer is clearly yes: Like quotas and embargoes, tariffs are a traditional and common tool to regulate importation.

Since early in U. S. history, Congress has regularly authorized the President to impose tariffs on imports of foreign goods.  Presidents have often used that authority to obtain leverage with foreign nations, help American manufacturers and workers compete on a more level playing field, and generate revenue for the United States.  Numerous laws such as the Trade Expansion Act of 1962 and the Trade Act of 1974 continue to authorize the President to place tariffs on foreign imports in a variety of circumstances, and Presidents have often done so.  In recent years, Presidents George W. Bush, Obama, and Biden have all imposed tariffs on foreign imports under those statutory authorities.

President Trump has similarly imposed tariffs, and has done so here under IEEPA.  During declared national emergencies, IEEPA broadly authorizes the President to regulate international economic transactions.  Most relevant for this case, during those national emergencies, IEEPA grants the President the power to "regulate . . . importation" of foreign goods.

In early 2025, President Trump declared two national emergencies pursuant to the National Emergencies Act.  See 50 U. S. C. §1621(a).  One emergency concerned drug trafficking into the United States.  The other emergency involved trade imbalances with foreign nations that have harmed American manufacturers and workers.

To help address those emergencies, the President drew upon his authority in IEEPA to "regulate . . . importation," and he imposed tariffs on imports from various countries.

The plaintiffs argue and the Court concludes that the President lacks authority under IEEPA to impose tariffs.  I disagree.  In accord with Judge Taranto's careful and persuasive opinion in the Federal Circuit, I would conclude that the President's power under IEEPA to "regulate . . . importation" encompasses tariffs. As a matter of ordinary meaning, including dictionary definitions and historical

usage, the broad power to "regulate . . . importation" includes the traditional and common means to do so—in particular, quotas, embargoes, and tariffs.

History and precedent confirm that conclusion. In 1971, President Nixon imposed 10 percent tariffs on almost all foreign imports. He levied the tariffs under IEEPA's predecessor statute, the Trading with the Enemy Act, which similarly authorized the President to "regulate . . . importation." The Nixon tariffs were upheld in court.

Moreover, in 1976, a year before IEEPA was enacted, this Court unanimously ruled that a similarly worded statute authorizing the President to "adjust the imports" permitted President Ford to impose monetary exactions on foreign oil imports. See *Federal Energy Administration* v. *Algonquin SNG, Inc.*, 426 U. S. 548 (1976) (*Algonquin*).

For both the Nixon tariffs and the Ford tariffs upheld by this Court in *Algonquin*, the relevant statutory provisions did not specifically refer to "tariffs" or "duties," but instead more broadly authorized the President to "regulate . . . importation" or to "adjust the imports." Therefore, when IEEPA was enacted in 1977 in the wake of the Nixon and Ford tariffs and the *Algonquin* decision, Congress and the public plainly would have understood that the power to "regulate . . . importation" included tariffs. If Congress wanted to exclude tariffs from IEEPA, it surely would not have enacted the same broad "regulate . . . importation" language that had just been used to justify major American tariffs on foreign imports.

Importantly, IEEPA's authorization for the President to impose tariffs did not grant the President any new substantive power. Since the Founding, numerous statutes have authorized—and still do authorize—the President to impose tariffs and other foreign import restrictions. IEEPA merely allows the President to impose tariffs somewhat more efficiently to deal with foreign threats during national emergencies.

Context and common sense buttress that interpretation of IEEPA.  The plaintiffs and the Court acknowledge that IEEPA authorizes the President to impose quotas or embargoes on foreign imports—meaning that a President could completely block some or all imports.  But they say that IEEPA does not authorize the President to employ the lesser power of tariffs, which simply condition imports on a payment.  As they interpret the statute, the President could, for example, block all imports from China but cannot order even a $1 tariff on goods imported from China.

That approach does not make much sense.  Properly read, IEEPA does not draw such an odd distinction between quotas and embargoes on the one hand and tariffs on the other.  Rather, it empowers the President to regulate imports during national emergencies with the tools Presidents have traditionally and commonly used, including quotas, embargoes, and tariffs.

The Court today nonetheless concludes otherwise and holds that IEEPA does not authorize the President to impose tariffs to deal with the declared drug trafficking and trade deficit emergencies.  But the Court's decision is splintered.  In today's six-Justice majority, three Justices (JUSTICE SOTOMAYOR, JUSTICE KAGAN, and JUSTICE JACKSON) interpret IEEPA not to authorize tariffs as a matter of ordinary statutory interpretation.  I disagree for the reasons noted above and elaborated on at length in this opinion.

Three other Justices (THE CHIEF JUSTICE, JUSTICE GORSUCH, and JUSTICE BARRETT) lean on the major questions canon of statutory interpretation to resolve this case.  That important canon requires "clear congressional authorization" for an executive action of major economic and political significance, particularly when the Executive exercises an "unheralded" power.  *West Virginia* v. *EPA*, 597 U. S. 697, 722–723 (2022) (quotation marks omitted).

In my view, as I will explain, the major questions canon does not control here for two alternative and independent reasons.

First, the statutory text, history, and precedent constitute "clear congressional authorization" for the President to impose tariffs under IEEPA. In particular, throughout American history, Presidents have commonly imposed tariffs as a means to "regulate . . . importation." So tariffs were not an "unheralded" power when Congress enacted IEEPA in 1977 and authorized the President to "regulate . . . importation" of foreign goods. Therefore, the major questions doctrine is satisfied here. Cf. *Biden* v. *Missouri*, 595 U. S. 87 (2022) (*per curiam*).

Second, in any event, the Court has *never* before applied the major questions doctrine in the foreign affairs context, including foreign trade. Rather, as Justice Robert Jackson summarized and remains true, this Court has always recognized the "'unwisdom of requiring Congress in this field of governmental power to lay down narrowly definite standards by which the President is to be governed.'" *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 636, n. 2 (1952) (concurring opinion) (quoting *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 321–322 (1936)). In foreign affairs cases, courts read the statute as written and do not employ the major questions doctrine as a thumb on the scale against the President.

Although I firmly disagree with the Court's holding today, the decision might not substantially constrain a President's ability to order tariffs going forward. That is because numerous other federal statutes authorize the President to impose tariffs and might justify most (if not all) of the tariffs at issue in this case—albeit perhaps with a few additional procedural steps that IEEPA, as an emergency statute, does not require. Those statutes include, for example, the Trade Expansion Act of 1962 (Section 232); the Trade Act of 1974 (Sections 122, 201, and

301); and the Tariff Act of 1930 (Section 338). In essence, the Court today concludes that the President checked the wrong statutory box by relying on IEEPA rather than another statute to impose these tariffs.

In the meantime, however, the interim effects of the Court's decision could be substantial. The United States may be required to refund billions of dollars to importers who paid the IEEPA tariffs, even though some importers may have already passed on costs to consumers or others. As was acknowledged at oral argument, the refund process is likely to be a "mess." Tr. of Oral Arg. 153–155. In addition, according to the Government, the IEEPA tariffs have helped facilitate trade deals worth trillions of dollars—including with foreign nations from China to the United Kingdom to Japan, and more. The Court's decision could generate uncertainty regarding those trade arrangements.

In any event, the only issue before the Court today is one of law. In light of the statutory text, longstanding historical practice, and relevant Supreme Court precedents, I would conclude that IEEPA authorizes the President to "regulate . . . importation" by imposing tariffs on foreign imports during declared national emergencies. I therefore respectfully dissent.[1]

## I

Before turning to the specifics of IEEPA's text, history, and precedent, I briefly review several fundamental constitutional principles about the roles of the three branches of the U. S. Government with respect to this case.

*First*, the plaintiffs and their *amici*, echoed by the Court, rhetorically emphasize that Article I, Section 8, of the Constitution assigns Congress, not the President, authority

---

[1] In this dissent, when I refer to "THE CHIEF JUSTICE's opinion," I am referring to the parts of THE CHIEF JUSTICE's opinion that speak for only three Justices—namely, Parts II–A–2 and III.

over tariffs. *Ante,* at 5. That rhetoric is a red herring in this case because no one disputes the point. Everyone, including the President, agrees that Congress possesses constitutional authority over tariffs.

The important principle here, as everyone also acknowledges, is that Congress may in turn authorize the President to impose tariffs. Cf. *FCC* v. *Consumers' Research*, 606 U. S. 656, 673–675 (2025); *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394, 409–410 (1928). Indeed, since the beginning of the Republic, Congress has regularly empowered the President to order tariffs and other foreign import restrictions under various circumstances. As noted above, many current federal laws continue to grant the President expansive tariff authority, including the Trade Expansion Act of 1962 (Section 232); the Trade Act of 1974 (Sections 122, 201, and 301); and the Tariff Act of 1930 (Section 338). Neither the plaintiffs nor the Court has suggested that the numerous laws granting tariff power to the President violate the Constitution's separation of powers.

*Second,* and relatedly, the President does not claim unilateral authority to impose IEEPA tariffs without congressional authorization or over a congressional prohibition. On the contrary, the President's argument recognizes that, in exercising his statutory tariff power under IEEPA, he must act within the scope of Congress's authorizations and abide by Congress's limitations. And the Executive has further acknowledged that the Judiciary maintains the final word in justiciable cases on whether Congress has authorized the President to impose those tariffs under IEEPA. See *Trump* v. *CASA, Inc.*, 606 U. S. 831, 859–860, n. 18 (2025); cf. *Marbury* v. *Madison*, 1 Cranch 137, 177–178 (1803).

The President here contends only that Congress, by enacting IEEPA in 1977, authorized the President to impose tariffs on foreign imports in declared national

emergencies. To use the familiar vernacular of Justice Robert Jackson in *Youngstown*, the President argues that this case falls into category one, where the President is acting "pursuant to an express or implied authorization of Congress." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 635 (1952) (concurring opinion). The President has not here asserted authority to impose IEEPA tariffs in a peacetime emergency in a *Youngstown* category two or three scenario. *Id.*, at 637–638.[2]

*Third*, Congress possesses a variety of tools to limit the President's tariffs—directly via new legislation or, perhaps more readily, by not approving annual appropriations necessary for the Executive Branch to continue to implement the tariffs. See *Biden* v. *Nebraska*, 600 U. S. 477, 505 (2023) ("Among Congress's most important authorities is its control of the purse").

Importantly, the House, the Senate, and the President annually approve most appropriations. As a result, each House of Congress and the President independently possesses *de facto* veto power over particular appropriations.[3]

Of course, many different appropriations items are usually considered and packaged together, so the negotiations can be complex. But the point stands: Congress is not a helpless bystander when it comes to the President's exercise of tariff authority under IEEPA. Cf. Ike Skelton National Defense Authorization Act for Fiscal Year 2011, 124 Stat. 4351–4352 (barring Executive from

─────────

[2] Category two applies when "the President acts in absence of either a congressional grant or denial of authority." *Youngstown,* 343 U. S., at 637 (Jackson, J., concurring). Category three occurs when "the President takes measures incompatible with the expressed or implied will of Congress." *Ibid.*

[3] Two technical points for clarity: Given current Senate filibuster rules, a determined *minority* of the Senate could block an appropriation. Also, even over a Presidential veto, two-thirds of both Houses could together approve certain appropriations.

using funds to transfer detainees from Guantanamo into United States); Boland Amendment, 98 Stat. 1935–1936 (1984) (barring certain Executive Branch agencies from providing aid to Contras in Nicaragua).

In Congress, moreover, everything is related to everything else, as the saying goes. Members and Committees of Congress possess substantial tools of leverage over the Executive Branch. Cf. The Federalist No. 51, p. 322 (C. Rossiter ed. 1961) (J. Madison). Congress could, for example, wield its authority over oversight, legislation, confirmations, or appropriations to pressure the President to reduce or eliminate some or all of the IEEPA tariffs.

In light of Congress's appropriations authority and its other robust powers, it is not correct to suggest—as THE CHIEF JUSTICE's opinion today elliptically does, *ante*, at 9— that two-thirds majorities of both Houses of Congress would need to pass new legislation over a Presidential veto in order to limit these IEEPA tariffs or, more generally, to restrict the President's use of IEEPA to impose tariffs.

## II

This case presents one straightforward question of statutory interpretation: Does Congress's explicit grant of authority in IEEPA for the President to "regulate . . . importation" of foreign goods in declared national emergencies authorize the President to impose tariffs? The answer is a clear yes.[4]

_____

[4] The relevant statutory provision provides in full:

"At the times and to the extent specified in section 1701 of this title, *the President may*, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise—

.          .          .          .          .

"(B) investigate, block during the pendency of an investigation, *regulate*, direct and compel, nullify, void, prevent or prohibit, any

A

I begin as always with the statutory text.

In 1941, a few days after Pearl Harbor, Congress first enacted the relevant language, "regulate . . . importation," in an amendment to the 1917 Trading with the Enemy Act, known as TWEA. 55 Stat. 839; 40 Stat. 411. After that 1941 amendment, TWEA authorized the President to "regulate . . . importation" both during wartime and during peacetime national emergencies.

Then, in 1977, Congress split TWEA into two separate statutes. As relevant here, Congress amended TWEA to authorize the President to "regulate . . . importation" during wartime only. 91 Stat. 1625. And Congress enacted a separate statute, IEEPA, that granted the President the power to "regulate . . . importation" during peacetime national emergencies. *Id.*, at 1626.

The relevant IEEPA text authorized the President to "regulate . . . importation" "by means of instructions, licenses, *or otherwise.*" *Ibid.*; 50 U. S. C. §1702(a)(1) (emphasis added). As the term "otherwise" indicates, the broadly worded statute did not exclude tariffs or dictate any specific means of regulating importation.[5]

At the time of TWEA's amendment in 1941 and IEEPA's enactment in 1977, the ordinary dictionary meaning of "regulate" was to "control," to "adjust by rule," or to "subject

_____

acquisition, holding, withholding, use, transfer, withdrawal, transportation, *importation* or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U. S. C. §1702(a)(1) (emphasis added).

[5] Congress no doubt appreciated that quotas, embargoes, tariffs, and the like can be powerful tools for regulating foreign commerce. Congress calibrated the statute by exempting various categories of goods, meaning that those categories of goods are not subject to tariffs under IEEPA. §1702(b).

to governing principles or laws." Black's Law Dictionary 1156 (5th ed. 1979); see also Black's Law Dictionary 1519 (3d ed. 1933) (same); Webster's Third New International Dictionary 1913 (1976) (defining "regulate" as "to govern or direct according to rule" and "to bring under the control of law or constituted authority"); American Heritage Dictionary 1096 (1969) ("[t]o control or direct according to a rule"; "[t]o adjust in conformity to a specification or requirement").

Imposing tariffs on imports is clearly a way of controlling imports (Black's); governing or directing imports according to rule (Webster's, American Heritage); adjusting imports by rule, method, or established mode (Black's, American Heritage); or more generally subjecting imports to governing principles or laws (Black's). So the dictionary definitions amply demonstrate that tariffs are a means to "regulate . . . importation" of foreign imports.[6]

Consistent with those dictionary definitions and statutory references, tariffs historically have been—and still are—a common means for the United States to regulate importation of foreign goods. See, *e.g.*, Section 338 of the Tariff Act of 1930, 46 Stat. 704–706 (19 U. S. C. §1338); Section 232 of the Trade Expansion Act of 1962, 76 Stat. 877 (19 U. S. C. §1862); Title II of the Trade Act of 1974, 88 Stat. 2011 (19 U. S. C. §2251 *et seq.*); Title III of the Trade Act of 1974, 88 Stat. 2041 (19 U. S. C. §2411 *et seq.*).[7]

---

[6] As other statutory authorities textually confirm, moreover, Congress has long understood tariffs to be a tool for regulating imports. For example, Section 350 of the Tariff Act of 1930 refers to "duties and other import restrictions." 19 U. S. C. §§1351(a)(1)(B), (c). And Section 122 of the Trade Act of 1974 uses the phrase "restrict imports" to cover duties. §2132(a). Both statutes take it as a given, therefore, that tariffs are a means of regulating imports.

[7] As the parties and the Court use the terms, "tariffs" and "duties" are synonymous.

In determining the ordinary meaning of "regulate . . . importation," the meaning of the related phrase "regulate commerce" is also instructive. That phrase has long been interpreted to encompass tariffs. Since the Founding, the Constitution's assignment to Congress of the broad power to "regulate" foreign commerce has been understood to include tariffs on foreign imports. See Art. I, §8. As Chief Justice Marshall explained, the "right to *regulate* commerce, *even by the imposition of duties*, was not controverted." *Gibbons* v. *Ogden*, 9 Wheat. 1, 202 (1824) (emphasis added). So too Justice Story: The "power to *regulate* commerce *includes the power of laying duties* to countervail the regulations and restrictions of foreign nations." 2 J. Story, Commentaries on the Constitution of the United States 530 (1833) (emphasis added). And still more Story: To "lay duties" is a "common means of executing the power" to "*regulate* commerce." *Id.*, at 531 (emphasis added). James Madison likewise stated that it cannot "be inferred" that the "power to *regulate* trade does not involve a power to tax it." Letter from J. Madison to J. Cabell, Sept. 18, 1828, in 9 Writings of James Madison 326 (G. Hunt ed. 1910) (emphasis added).

Marshall, Story, and Madison make for a formidable trio. And this Court has long echoed the Marshall-Story-Madison understanding that tariffs "*regulate*" foreign commerce. The "laying of a duty on imports, although an exercise of the taxing power, is also an exercise of the power to *regulate foreign commerce*." *McGoldrick* v. *Gulf Oil Corp.*, 309 U. S. 414, 428 (1940) (emphasis added). And again: Even though "the taxing power is a distinct power and embraces the power to lay duties, it does not follow that duties may not be imposed in the exercise of the power to *regulate commerce*. The contrary is well established."

*Board of Trustees of Univ. of Ill.* v. *United States*, 289 U. S. 48, 58 (1933) (emphasis added).[8]

The plaintiffs and the Court today seize on the word "regulate" in isolation, and say that it does not encompass the power to tariff. *Ante*, at 14–16. But the relevant statutory phrase is "regulate . . . importation." And we must look to the meaning of the phrase as a whole, as our precedents dictate. See *FCC* v. *AT&T Inc.*, 562 U. S. 397, 406 (2011) ("[T]wo words together may assume a more particular meaning than those words in isolation"). As I have explained, since the Founding, tariffs on foreign imports have been a common means of regulating foreign commerce, including imports. Notably, under the Court's reading of the word "regulate," Marshall, Story, and Madison all erred by concluding that the power to "regulate" foreign commerce includes the power to impose tariffs on foreign imports. That seems dubious.

If the Federal Government's constitutional power to "regulate" foreign commerce includes tariffs (as this Court has repeatedly said), and if the power to "regulate . . . importation" is the power to regulate foreign commerce with respect to imports (as it plainly is), then IEEPA's authorization for the President to "regulate . . . importation" clearly encompasses tariffs. Historical usage and that textual syllogism further buttress the dictionary definitions and help establish that tariffs are a means to regulate importation.[9]

───────────

[8] Importantly, those historical sources also fully demonstrate that the Foreign Commerce Clause, not just the Taxing Clause, authorizes tariffs on foreign imports. See *Board of Trustees of Univ. of Ill.*, 289 U. S., at 58.

[9] The plaintiffs and the Court offer a double-bankshot argument that "regulate . . . importation" cannot include monetary exactions because IEEPA also authorizes the President to "regulate . . . exportation," and imposing duties on exports would violate the Constitution. *Ante,* at 15. But as the Government thoroughly explains, when a statute contains a

B

Perhaps even more significantly, when IEEPA was enacted in 1977, Congress and the public clearly would have understood that the phrase "regulate . . . importation" encompassed tariffs. We know as much not only because of the dictionary definitions and the traditional understanding of tariffs as a tool to regulate foreign imports. We also know as much because of tariffs imposed by two Presidents and approved by federal courts, including the Supreme Court, in the years shortly before IEEPA's 1977 enactment.

*First*, in 1971, President Nixon imposed 10 percent tariffs across the board on virtually all imports from every country in the world. Presidential Proclamation No. 4074, 3 CFR 60–61 (1971–1975 Comp.). Those tariffs were justified under IEEPA's predecessor statute, the Trading with the Enemy Act, or TWEA.[10] Like IEEPA now, TWEA at that time authorized the President to "regulate . . . importation" during national emergencies, as well as wartime. And like IEEPA now, TWEA did not specifically use the words "tariff" or "duty."

---

long string of verbs and nouns, each term should be understood in context. The relevant section of IEEPA contains 9 verbs and 11 objects, for a total of 99 combinations. We do not need to construe each word of the statute to ensure that it is perfectly aligned in all 99 pairings. See Reply Brief 17; *Robers* v. *United States*, 572 U. S. 639, 643–644 (2014); *Department of Agriculture Rural Development Rural Housing Service* v. *Kirtz*, 601 U. S. 42, 61 (2024) (We may not "disregard the statute's clear terms" simply because there may be "a valid constitutional defense" to some applications).

[10] President Nixon did not explicitly cite the "regulate . . . importation" language of TWEA when imposing those worldwide tariffs. But that merely reflected a diplomatic nicety given the title of the "Trading with the Enemy Act" and the desire to avoid publicly suggesting that allies were enemies. Once in court, the President openly invoked the "regulate . . . importation" language of TWEA as justification for the tariffs. See *United States* v. *Yoshida Int'l, Inc.*, 526 F. 2d 560, 569–571 (CCPA 1975).

The Nixon tariffs did not fly below the radar. On the contrary, President Nixon announced the worldwide 10 percent tariffs in a primetime address to the Nation on August 15, 1971. He imposed the tariffs as a tool "to make certain that American products will not be at a disadvantage" and that "the product of American labor will be more competitive." Public Papers of the Presidents, Richard Nixon, Aug. 15, 1971, p. 889. President Nixon sought to remove "the unfair edge that some of our foreign competition has," and he declared that when "the unfair treatment is ended, the import tax will end." *Ibid.*

The Nixon tariffs applied to almost all imports of foreign goods into the United States. And the tariffs had no time limit. To be sure, they did not end up lasting forever. But President Nixon terminated them only because the tariffs (as intended) induced major American trading partners to negotiate new agreements. Presidential Proclamation No. 4098, 3 CFR 94 (1971–1975 Comp.).

The Nixon tariffs garnered substantial national and international attention, and were generally popular in Congress. Predictably, however, the tariffs sparked litigation challenges. In 1975, the Court of Customs and Patent Appeals, the predecessor to the Federal Circuit, upheld the Nixon tariffs as a lawful exercise of the President's authority to "regulate . . . importation" under TWEA. *United States* v. *Yoshida Int'l, Inc.*, 526 F. 2d 560, 576, 583–584. The losing plaintiffs did not seek further review in this Court.

Two years later in 1977, when Congress divided TWEA into two, Congress retained that same "regulate . . . importation" language in both laws—in TWEA for wartime and in IEEPA for peacetime national emergencies. In doing so, Members of Congress were plainly aware—after all, how could they not be—that the "regulate . . . importation" language had recently been invoked by the President and interpreted by the courts to encompass tariffs. Indeed, the

House Committee Report noted that the relevant "regulate . . . importation" provision in TWEA "came into play when, on August 15, 1971, President Nixon declared a national emergency with respect to the balance-of-payments crisis and under that emergency imposed a surcharge on imports." H. R. Rep. No. 95–459, p. 5 (1977). The Report further referenced the appeals court's holding in *Yoshida* that TWEA "authorized imposition of duties" because of "the existence of the national emergency." H. R. Rep. No. 95–459, at 5.[11]

The Nixon tariffs persuasively demonstrate that Members of Congress and the public would have understood the phrase "regulate . . . importation" to include tariffs when IEEPA was enacted in 1977. If Congress wanted to exclude tariffs from IEEPA's scope, why would it enact the exact statutory language from TWEA that had just been invoked by the President and interpreted by the courts to cover tariffs? Neither the plaintiffs nor the Court today offers a good answer to that question. Understandably so, because there is no good answer.

The Court tries to dodge the force of the Nixon tariffs by observing that one appeals court's interpretation of "regulate . . . importation" to uphold President Nixon's tariffs does not suffice to describe that interpretation as "well-settled" when IEEPA was enacted in 1977. *Ante*, at 17–18. Fair enough. But that is not the right question. The question is what Members of Congress and the public would have understood "regulate . . . importation" to mean when Congress enacted IEEPA in 1977. See *New Prime Inc.* v. *Oliveira*, 586 U. S. 105, 113 (2019). Given the significant and well-known Nixon tariffs, it is entirely implausible to

---

[11] I cite the Committee Report not for determining the meaning of IEEPA, but rather to help show as an historical and factual matter that Members of Congress were aware of both the Nixon tariffs and the appeals court decision upholding those tariffs as a tool to "regulate . . . importation."

think that Congress's 1977 re-enactment of the phrase "regulate . . . importation" in IEEPA was somehow meant or understood to exclude tariffs.[12]

*Second*, if one holds any lingering doubts about Congress's and the public's understanding of the power to "regulate . . . importation" as of 1977, a second episode shortly before IEEPA's enactment should answer them.

In 1975, President Ford imposed significant monetary exactions on foreign imports of oil. Presidential Proclamation No. 4341, 3 CFR 433 (1971–1975 Comp.). He acted under Section 232 of the Trade Expansion Act of 1962. Like TWEA and IEEPA, the relevant provision of Section 232 did not use the word "tariff" or "duty." Rather, Section 232 broadly authorized the President to "adjust the imports" of a product, 19 U. S. C. §1862(b) (1970 ed.)— language akin to the "regulate . . . importation" language in IEEPA and TWEA.

In contrast to the Nixon tariffs, the Ford tariffs on oil imports generated some pushback in Congress. And a group of utility companies and States quickly sued, arguing that the relevant statutory phrase "adjust the imports" did not authorize monetary exactions such as tariffs.

Over a dissent, the D. C. Circuit agreed with the plaintiffs challenging the Ford tariffs. Much like the Court's decision today, the D. C. Circuit in the Ford matter concluded that Congress must explicitly authorize monetary exactions and that the applicable statutory phrase, "adjust the imports," did not do so. *Algonquin SNG,*

---

[12] THE CHIEF JUSTICE's opinion also tries to dismiss President Nixon's tariffs as being of "limited amount, duration, and scope." *Ante*, at 10, n. 3. That claim appears incorrect on all three points, as Judge Taranto carefully explained in his Federal Circuit opinion. 149 F. 4th 1312, 1367–1369 (2025) (dissenting opinion). President Nixon imposed 10 percent tariffs on virtually all imports from every country in the world for an unspecified duration. See Presidential Proclamation No. 4074, 3 CFR 60–61 (1971–1975 Comp.).

*Inc.* v. *Federal Energy Admin.*, 518 F. 2d 1051, 1055 (CADC 1975).

In 1976, the Ford tariffs case came to the Supreme Court. In this Court, the plaintiffs pressed nearly identical arguments (and rhetorical flourishes) as those advanced by the plaintiffs and repeated by the Court in today's case.

The plaintiffs argued that the Ford-imposed monetary exactions involved "the broadest exercise of the tariff power in the history of the American Republic," reminiscent of "George III's stamp tax." Tr. of Oral Arg. in *Federal Energy Administration* v. *Algonquin SNG, Inc.*, O. T. 1975, No. 75–382, p. 26. They contended that the statute's authorization for the President to "adjust the imports" did not allow for such monetary exactions because the statute did "not mention the tariff on its face." *Ibid*. They asserted that this Court had "never implied a tax, never in the history of this Court from language which does not explicitly provide for tax, and here there is no such language, there is no language that mentions a measure of tax nor a method of calculation of tax. There is no such thing." *Id*., at 33. They echoed the D. C. Circuit's holding that reading the phrase "adjust the imports" to encompass tariffs would be "an anomalous departure" from "the consistently explicit, well-defined manner in which Congress has delegated control over foreign trade and tariffs." *Algonquin*, 518 F. 2d, at 1055. And they claimed that interpreting the statute to include fees "undermines the whole tariff structure of the United States." Tr. of Oral Arg. in *Algonquin*, at 26.

Importantly, the *Algonquin* plaintiffs acknowledged (as do the plaintiffs and the Court in today's case) that the statutory language "adjust the imports" would allow the President to impose quotas and embargoes on foreign imports. See Brief for Respondents in *Algonquin,* No. 75–382, pp. 26–27, and n. 30. So a President could completely block all imports or limit their quantity. But according to the plaintiffs, Congress's "adjust the imports" language

precluded the President from exercising the lesser power of imposing monetary exactions such as tariffs.

The Supreme Court decided the Ford tariffs case in 1976. The Court unanimously reversed the D. C. Circuit and flatly rejected the plaintiffs' arguments. The Court held that the statutory phrase "adjust the imports"—even though it did not include terms such as "tariff," "tax," "duty," or "fee"—granted President Ford the authority to impose not only quotas and embargoes, but also monetary exactions on foreign imports. *Federal Energy Administration* v. *Algonquin SNG, Inc.*, 426 U. S. 548, 561 (1976).

The Court analyzed the statutory text and found "no support in the language of the statute" for the plaintiffs' argument that "adjust the imports" should "be read to encompass only quantitative methods—*i.e.*, quotas—as opposed to monetary methods—*i.e.*, license fees—of effecting such adjustments." *Ibid*. The Court further explained: "Unless one assumes, and we do not, that quotas will always be a feasible method of dealing directly with national security threats posed by the circumstances under which imports are entering the country, limiting the President to the use of quotas would effectively and artificially prohibit him from directly dealing with some of the very problems against which §232(b) is directed." *Id.*, at 561–562 (quotation marks omitted).

In short, according to the unanimous *Algonquin* Court, the statutory text, structure, and logic of Section 232 definitively established that the President's authority to "adjust the imports" encompassed not only quotas and embargoes, but also monetary exactions such as tariffs and fees.

Today's case should follow *a fortiori* from *Algonquin.* No meaningful daylight exists between the statutory phrase "adjust the imports" in Section 232 at issue in *Algonquin* and the phrase "regulate . . . importation" in IEEPA at

issue here.  The plaintiffs and the Court in this case do not even try to distinguish "adjust the imports" from "regulate . . . importation."  Nor could they.  Recall that the dictionary definition of "regulate" includes "*adjust* by rule."  Black's Law Dictionary, at 1156 (5th ed. 1979) (emphasis added).  To adjust imports is to regulate imports.  Indeed, if anything, the phrase "regulate . . . importation" is broader in scope than the phrase "adjust the imports."

So if Section 232's "adjust the imports" includes tariffs—as this Court unanimously concluded in *Algonquin* in 1976 just a year before IEEPA—how can IEEPA's "regulate . . . importation" not include tariffs?

*Algonquin*'s importance for today's case rests not merely on its status as a unanimous on-point Supreme Court statutory precedent—although it is surely significant for that reason as well.  The case is especially consequential for present purposes because it helps show the ordinary public and congressional understanding of "regulate . . . importation" in 1977 when Congress enacted IEEPA.

To be clear, the question here is not what individual Members of Congress might have subjectively intended in 1977.  The question is the ordinary meaning and understanding of the words that Congress used.  Given that the phrase "adjust the imports"—again, in a statutory provision that did not use specific words such as "tariff" or "duty"—was unanimously held by this Court in 1976 to include tariffs, and given that President Nixon had similarly relied on his statutory authority to "regulate . . . importation" to impose 10 percent tariffs on virtually all imports from all countries, could a rational citizen or Member of Congress in 1977 have understood "regulate . . . importation" in IEEPA not to encompass tariffs?  I think not.  Any citizens or Members of Congress in 1977 who somehow thought that the "regulate . . . importation" language in IEEPA excluded tariffs would have had their heads in the sand.

KAVANAUGH, J., dissenting

　　The Court today tries its best to distinguish *Algonquin* on the ground that Section 232 included "sweeping" language authorizing the President to take "such action" that "he deems necessary," whereas IEEPA does not. *Ante*, at 19. But the *Algonquin* Court did not rely on that language and instead focused on whether the phrase "adjust the imports" included monetary exactions. See 426 U. S., at 561. Moreover, IEEPA itself broadly authorizes the President to "regulate . . . importation" "by means of instructions, licenses, *or otherwise*" in order to "deal with" an "unusual and extraordinary" foreign "threat" to the "national security, foreign policy, or economy of the United States." 50 U. S. C. §§1701(a), 1702(a)(1)(B) (emphasis added). That language is similarly expansive, authorizing the President to employ various tools to "regulate . . . importation." In short, just as the phrase "adjust the imports" includes tariffs, as *Algonquin* held, so too the phrase "regulate . . . importation" includes tariffs.[13]

　　The Court also attempts to brush aside *Algonquin* by citing an entirely different provision of the Trade Expansion Act—one that was not at issue in *Algonquin*—that expressly refers to a "duty." *Ante*, at 19. But the *Algonquin* Court did not rely on—or even mention—that provision when concluding that the statutory phrase "adjust the imports" includes tariffs. For good reason. That provision, which states that "[n]o action shall be taken" to "decrease or eliminate" an existing "duty or other import restriction," 19 U. S. C. §1862(a) (1970 ed.), concerns only the power to reduce existing tariffs and plainly does not bear on a President's power to *impose* tariffs under Section 232.

---

　　[13] In addition, IEEPA expressly authorizes the President to require licenses. And to obtain a license, a business may need to pay license fees that can be equivalent to tariffs. See §1702(a)(1).

To sum up on the Nixon and Ford tariffs: When enacting IEEPA in 1977, Congress employed the exact language recently invoked by President Nixon to justify 10 percent worldwide tariffs. And IEEPA came fast on the heels of this Court's unanimous 1976 decision in *Algonquin*, which held that substantially similar "adjust the imports" language authorized President Ford's tariffs on oil imports. Importantly, moreover, the statutory provisions authorizing the Nixon and Ford tariffs did not use specific words such as "tariff" or "duty."

The Nixon and Ford tariffs, this Court's decision in *Algonquin*, and the ordinary and historical understanding of tariffs as a means of regulating imports together render it all but impossible to conclude that Congress in 1977 implicitly excluded tariffs when retaining TWEA's "regulate . . . importation" language in IEEPA. If Congress in 1977 wanted to exclude tariffs from the President's IEEPA toolkit, either it would have not retained the phrase "regulate . . . importation," or it would otherwise have made clear in IEEPA that the power to impose tariffs was excluded. Congress did neither.

## C

Two additional historical points strongly reinforce that analysis of text and precedent and further demonstrate that "regulate . . . importation" in IEEPA encompasses tariffs.

*First*, U. S. history from the 1800s through IEEPA's 1977 enactment illustrates how the statute came to incorporate the President's long-recognized authority to impose tariffs during wartime and then also during peacetime national emergencies.

Long before the initial 1917 enactment of the Trading with the Enemy Act, which was IEEPA's predecessor, the President possessed inherent wartime authority to prohibit commercial relations with enemy nations. That inherent

authority included the power to impose tariffs on foreign imports.

For example, during the Mexican-American War in the 1840s, President Polk permitted only limited trade with Mexico, subject to tariffs. Some Members of Congress publicly questioned whether the President possessed that tariff authority. In response, President Polk justified the tariffs on the ground that "the military right to exclude commerce altogether from the ports of the enemy in our military occupation included the minor right of admitting it under prescribed conditions." J. Polk, To the House of Representatives of the United States (Jan. 2, 1849), in 6 Compilation of the Messages and Papers of the Presidents 2522, 2523 (J. Richardson ed. 1897).

In 1854, the Supreme Court agreed with President Polk's view, stating: "No one can doubt" that the President, as "commander-in-chief of our naval force," possessed the authority to "regulate import duties." *Cross* v. *Harrison*, 16 How. 164, 189–190.

In 1862, President Lincoln partially lifted an existing blockade against the Confederate States during the Civil War. Like President Polk, he then permitted limited trade, subject to a monetary fee. A group of cotton sellers later sued, arguing that the fee "was essentially a tax and not authorized by any act of Congress, which alone had the power to impose taxes." *Hamilton* v. *Dillin*, 21 Wall. 73, 81 (1875). The Supreme Court rejected that argument, holding that there was "no question" that requiring a monetary fee to trade with the Confederate States was part of "the war power of the United States government." *Id.*, at 86–87. The existence of war meant "a suspension of commercial intercourse between the opposing sections of the country," so if "such a course of dealing were to be permitted at all, it would necessarily be upon such conditions as the government chose to prescribe." *Id.*, at 87.

And in 1898, during the Spanish-American War, President McKinley imposed duties "upon the occupation of any forts and places in the Philippine Islands." *Lincoln* v. *United States*, 197 U. S. 419, 428 (1905) (quotation marks omitted). This Court subsequently recognized those McKinley duties as a lawful wartime measure. *Id.*, at 427–428.

Why does that wartime history matter? Because when Congress first enacted the Trading with the Enemy Act in 1917 during World War I, it statutorily codified some of the President's longstanding inherent wartime powers over foreign trade, which included the power to tariff. See Trading with the Enemy Act, ch. 106, 40 Stat. 411; see also Brief for Professor Aditya Bamzai as *Amicus Curiae* 16–19, 26–27. For the duration of World War I, TWEA authorized the President, when he found "the public safety so requires," to make it unlawful "to import into the United States" from any "named" country certain goods "except at such time or times, and under such regulations or orders, and subject to such limitations and exceptions as the President shall prescribe." §11, 40 Stat. 422–423.

In 1933, during the Great Depression and five days after President Franklin Roosevelt took office, Congress expanded TWEA to apply not only in wartime, but also during a "national emergency" declared by the President. 48 Stat. 1.

Eight years later, in 1941, a few days after Pearl Harbor, Congress again amended TWEA's language by more succinctly providing that the President may "regulate" certain transactions, including "importation," under TWEA during war or "any other period of national emergency declared by the President." 55 Stat. 839.

So as of 1941—and from then to 1977—TWEA expressly authorized the President to "regulate . . . importation" both during wartime and during peacetime national emergencies. Historically, Presidents had regulated

importation by imposing tariffs, as the Polk, Lincoln, and McKinley tariffs illustrated. So TWEA from 1941 to 1977 was best understood to authorize tariffs. See Brief for Professor Aditya Bamzai as *Amicus Curiae* 27–28.

During that period, as I have discussed at length above, President Nixon in 1971 imposed 10 percent tariffs on almost all imports of foreign goods and relied on TWEA's "regulate . . . importation" language to justify them. Those tariffs were upheld in court.

Then, in 1977, Congress amended TWEA and divided it into two statutes. TWEA retained the President's power to "regulate . . . importation," but only during wartime. The newly enacted second law, IEEPA, also retained the power to "regulate . . . importation," and it would apply during periods of declared national emergencies. As this Court has previously recognized, IEEPA was "directly drawn" from TWEA, and the relevant authorities are essentially the same. *Dames & Moore* v. *Regan*, 453 U. S. 654, 671, 672–673 (1981).

Therefore, IEEPA's specific language—"regulate . . . importation"—was not new statutory text when Congress enacted IEEPA in 1977. Far from it. Beginning in 1941, TWEA had already authorized the President to "regulate . . . importation" of foreign goods in wartime and national emergencies. And the earlier Polk, Lincoln, and McKinley examples, as well as the later Nixon example, demonstrated that the power to "regulate . . . importation" historically encompassed tariffs as well as quotas and embargoes.

The plaintiffs and the Court today assert that wartime precedents do not govern peacetime. But Congress modeled IEEPA on TWEA precisely so that the President could continue to exercise certain wartime authorities such as quotas, embargoes, and tariffs during peacetime national emergencies as well. Congress first explicitly extended that wartime power to national emergencies in 1933, during the

Franklin Roosevelt Administration. Cf. *New State Ice Co.* v. *Liebmann*, 285 U. S. 262, 306 (1932) (Brandeis, J., dissenting) (The Great Depression was "an emergency more serious than war"). And Congress has continued to authorize the President to exercise that power in both wartime and peacetime emergencies.

In short, Congress in 1977 enacted the same "regulate . . . importation" language that had long been understood to encompass tariffs.

*Second*, contrary to the tenor of the plaintiffs' and the Court's arguments here, it would not have been at all unusual or surprising for Congress, when enacting IEEPA in 1977, to authorize the President to impose tariffs. Since the early days of the Republic, Congress has regularly granted the President the power to regulate foreign trade, including via tariffs.

A few examples: In 1810, Congress authorized the President to prohibit imports from Great Britain or France if either nation violated the neutral commerce of the United States. *Cargo of Brig Aurora* v. *United States*, 7 Cranch 382, 382–384, 388 (1813); 2 Stat. 606.

In 1890, Congress granted the President the power to impose import duties in response to duties imposed by other countries on American exports. *Marshall Field & Co.* v. *Clark*, 143 U. S. 649, 680–681 (1892); 26 Stat. 612.

In 1922, Congress empowered the President to levy import duties under certain conditions. *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394, 400–402 (1928); 42 Stat. 941.

In 1930, Congress enacted Section 338 of the Tariff Act, which authorizes the President to impose tariffs when he finds that "any foreign country places any burden or disadvantage upon the commerce of the United States." 19 U. S. C. §1338(d); 46 Stat. 705.

In 1962, Congress authorized the President in Section 232 of the Trade Expansion Act to "adjust the imports" of a

foreign good that threatens to impair national security. §1862(c)(1)(A); 76 Stat. 877.

In 1974, under Section 201 of the Trade Act, Congress granted the President the power to "take all appropriate and feasible action within his power," including imposing a "duty" on imports that, according to the U. S. International Trade Commission, have caused or threatened "serious injury" to a domestic industry. §§2251(a), 2253(a)(1)(A), (3)(A); 88 Stat. 2014–2015.

So too, Section 301 authorizes the President to direct the U. S. Trade Representative to "impose duties" on countries engaging in unfair trade practices. §§2411(a), (c)(1)(B); 88 Stat. 2041–2042.

And Section 122 of the Act grants the President the power to impose a "temporary import surcharge" to "deal with large and serious United States balance-of-payment deficits." §2132(a)(1)(A); 88 Stat. 1987–1988.

Those many statutes definitively establish that Congress, since near the Founding, has delegated to the President broad power to impose tariffs on foreign imports. See also *ante,* at 13–15 (THOMAS, J., dissenting). So it would hardly have been unusual or surprising for Congress to have granted tariff power to the President during wartime and peacetime national emergencies, as it did in TWEA and IEEPA.

To be sure, given those other statutes that authorize the President to impose tariffs on foreign imports, one might reasonably ask: Why did the President need distinct tariff authority under IEEPA during peacetime emergencies—or, for that matter, under TWEA during wartime?

The basic answer is that IEEPA is an emergency statute that allows the President to impose tariffs somewhat more quickly, as would be expected in a declared national emergency. Similarly, in wartime, TWEA allows the President to impose tariffs more rapidly.

But critically, TWEA and IEEPA do not authorize the President to exercise some new substantive power. Rather, they authorize the President to exercise a commonly granted power—tariffs—more efficiently than under the many ordinary tariff statutes.

The plaintiffs and the Court assert that interpreting IEEPA to authorize tariffs would in effect evade specific limits on tariffs in certain other tariff statutes. But as Judge Taranto explained in the Federal Circuit, Congress in IEEPA understandably afforded the President more flexibility to act during declared emergencies, just as Congress had done in TWEA for wartime since 1917. See 149 F. 4th 1312, 1363–1366 (2025) (dissenting opinion).

Moreover, IEEPA is not a blank check. IEEPA contains its own limits, including the requirement that the tariffs deal with an unusual and extraordinary foreign threat, 50 U. S. C. §1701(b); a default 1-year limit on emergencies, §1622(d); an enumerated list of exceptions, §1702(b); and comprehensive congressional reporting requirements, §1703. And as noted above, each House of Congress possesses a variety of tools to revoke, limit, or influence a President's IEEPA or TWEA tariffs.

Relatedly, it is also not surprising that the many ordinary tariff statutes expressly refer to "tariffs," "duties," and the like, while IEEPA and TWEA do not. As Judge Taranto astutely explained, "Congress in those statutes was overwhelmingly focused on tariff issues," whereas "Congress in IEEPA (as in TWEA) was focused on the subject of emergencies and giving plainly broad emergency authority regarding foreign property." 149 F. 4th, at 1364 (dissenting opinion).

In sum, in authorizing the President to "regulate . . . importation," IEEPA embodies an "eyes-open congressional grant of broad emergency authority in this foreign-affairs realm, which unsurprisingly extends beyond authorities available under non-emergency laws, and Congress

confirmed the understood breadth by tying IEEPA's authority to particularly demanding procedural requirements for keeping Congress informed." *Id.*, at 1348.

## D

Finally, all of that text, history, and precedent is further reinforced by two compelling pieces of context.

*First*, interpreting IEEPA to exclude tariffs creates nonsensical textual and practical anomalies. The plaintiffs and the Court do not dispute that the President can act in declared emergencies under IEEPA to impose quotas or even total embargoes on all imports from a given country. But the President supposedly cannot take the far more modest step of conditioning those imports on payment of a tariff or duty.

Textually, however, if quotas and embargoes are a means to regulate importation, how are tariffs not a means to regulate importation? Nothing in the text supports such an illogical distinction.

And it does not make much sense to think that IEEPA allows the President in a declared national emergency to, for example, shut off all or most imports from China, but not to impose even a $1 tariff on imports from China. As Judge Taranto forcefully pointed out in the Federal Circuit, tariffs are "just a less extreme, more flexible tool for pursuing the same objective of controlling the amount or price of imports that, after all, could be barred altogether." 149 F. 4th, at 1363 (dissenting opinion). All of that explains why this Court in *Algonquin* definitively rejected such a strange slice-and-dice approach to the President's statutory power to "adjust" imports. If quotas and embargoes are authorized, so are tariffs.

In short, whether through prohibiting imports via embargoes or regulating the quantity of imports through quotas or regulating the price of imports with tariffs, Congress granted the President flexibility in declared

national emergencies to take various actions affecting imports of foreign goods. The plaintiffs and the Court have no coherent textual or commonsensical explanation for why a rational Congress would, in such a momentous and carefully considered statute as IEEPA, grant the President the power to impose quotas and embargoes, but not tariffs, on foreign imports during emergencies.

*Second*, IEEPA was not debated and passed in a vacuum in 1977—it was enacted around the same time that Congress significantly *constrained* executive power in multiple ways in the wake of Watergate and Vietnam. The list of major new statutory restrictions on Presidential power enacted in the 1970s is long and extraordinary, with lasting effects to the present day.[14]

And Congress, during that comprehensive examination and recalibration of government power, did not overlook TWEA and the President's emergency authorities. Led by Senators Church and Mathias, Congress carefully studied the President's emergency authorities, including TWEA. Then, in 1976 and 1977, Congress enacted a variety of legislation to tighten up the President's emergency powers, including by passing a new National Emergencies Act that cabined the President's authority to declare emergencies by setting forth various procedural requirements.

Yet when enacting IEEPA in 1977, Congress continued to grant the President the power to "regulate . . . importation"

_____

[14] See, *e.g.*, Ethics in Government Act of 1978, 92 Stat. 1824, reenacted at 5 U. S. C. §13101 *et seq.*; Inspector General Act of 1978, 92 Stat. 1101, reenacted at 5 U. S. C. §401 *et seq.*; Presidential Records Act of 1978, 92 Stat. 2523, as amended, 44 U. S. C. §2201 *et seq.*; Federal Advisory Committee Act, 86 Stat. 770, as amended, 5 U. S. C. §1001 *et seq.*; Foreign Intelligence Surveillance Act of 1978, 92 Stat. 1783, as amended, 50 U. S. C. §1801 *et seq.*; Congressional Budget and Impoundment Control Act of 1974, 88 Stat. 297, as amended, 2 U. S. C. §621 *et seq.*; 1974 Amendments to the Freedom of Information Act, 88 Stat. 1561, as amended, 5 U. S. C. §552; War Powers Resolution, 87 Stat. 555, 50 U. S. C. §1541 *et seq.*

in declared national emergencies—a power that the President had possessed since 1941 under TWEA and that had recently been invoked by President Nixon to justify his 1971 tariffs. In IEEPA (and TWEA) in 1977, Congress consciously balanced concerns about expansive exercises of emergency powers against the necessity of equipping the President with tools to address exigencies that are difficult if not impossible to foresee. That broader congressional context—general skepticism and scaling back of executive power combined with re-enactment of the familiar "regulate . . . importation" language in IEEPA—strongly indicates that Congress said what it meant and meant what it said when it enacted IEEPA and continued to authorize the President to "regulate . . . importation" during national emergencies.

## III

In an ordinary statutory interpretation case, I am confident that a majority of this Court would flatly reject the plaintiffs' exceedingly weak statutory arguments and would hold that IEEPA's authorization for the President to "regulate . . . importation" during national emergencies includes the power to impose tariffs.

Notably, the Court today does not claim that the phrase "regulate . . . importation" on its own excludes tariffs as a matter of ordinary statutory meaning. Only three Members of the Court, JUSTICE SOTOMAYOR, JUSTICE KAGAN, and JUSTICE JACKSON, do so.

THE CHIEF JUSTICE's opinion in Part II–A–2, which is joined only by JUSTICE GORSUCH and JUSTICE BARRETT, instead relies on the major questions doctrine. The major questions doctrine is an important canon of statutory interpretation that the Court has applied in a number of significant cases over the last 45 years. See *Industrial Union Dept., AFL–CIO* v. *American Petroleum Institute*, 448 U. S. 607, 645 (1980) (plurality opinion).

Justice Scalia articulated the canonical statement of the major questions doctrine: "We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Utility Air Regulatory Group* v. *EPA*, 573 U. S. 302, 324 (2014) (quoting *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 160 (2000)); see also *Alabama Assn. of Realtors* v. *Department of Health and Human Servs.*, 594 U. S. 758, 764 (2021) (*per curiam*); *National Federation of Independent Business* v. *OSHA*, 595 U. S. 109, 117 (2022) (*per curiam*); *Biden* v. *Nebraska*, 600 U. S. 477, 507 (2023); cf. *West Virginia* v. *EPA*, 597 U. S. 697, 723 (2022).

Stated otherwise, in cases where the Executive Branch takes an action of major economic and political significance, it must "point to 'clear congressional authorization' for the power it claims." *Ibid.* (quoting *Utility Air*, 573 U. S., at 324).

The requirement of "*clear* congressional authorization" for executive actions of major economic and political significance is "grounded in two overlapping and reinforcing presumptions: (i) a separation of powers-based presumption against the delegation of major lawmaking authority from Congress to the Executive Branch, and (ii) a presumption that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *United States Telecom Assn.* v. *FCC*, 855 F. 3d 381, 419 (CADC 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc) (citation omitted). As this Court later recounted in *West Virginia*, "both separation of powers principles and a practical understanding of legislative intent make us reluctant to read into ambiguous statutory text the delegation claimed to be lurking there." 597 U. S.,

at 723 (quotation marks omitted).[15]  The doctrine guards "against unintentional, oblique, or otherwise unlikely delegations of the legislative power."  *NFIB*, 595 U. S., at 125 (GORSUCH, J., concurring).[16]

I agree that this case involves an executive action of major economic and political significance—which is typically the trigger for requiring "clear congressional authorization."  But in my respectful view, THE CHIEF JUSTICE's opinion's application of the major questions doctrine in this case is incorrect for two alternative and independent reasons.  First, the statutory text, history, and precedent constitute "clear congressional authorization" for the President to impose tariffs as a means to "regulate . . . importation."  Second, and in the alternative, the major questions doctrine does not apply in the foreign affairs context.  In the foreign affairs realm, courts recognize that Congress often deliberately grants flexibility and discretion to the President to pursue America's interests.  In that context, courts therefore engage in "routine" textualist statutory interpretation—reading the text as written—and do not employ the major questions doctrine as a thumb on the scale against the President.  *West Virginia*, 597 U. S., at 724.

_____

[15] The major questions doctrine has also been analogized to, among other things, the mischief rule, the absurdity doctrine, common sense, and context.  See, *e.g.*, S. Bray, The Mischief Rule, 109 Geo. L. J. 967, 1011 (2021) (doctrine "has an essential similarity with the mischief rule"); *Biden* v. *Nebraska*, 600 U. S. 477, 511 (2023) (BARRETT, J., concurring) (context, common sense).

[16] I have long been, and fully remain, a strong proponent of the major questions doctrine.  See *United States Telecom*, 855 F. 3d, at 418–426 (opinion of Kavanaugh, J.); *Loving* v. *IRS*, 742 F. 3d 1013, 1021 (CADC 2014); *Coalition for Responsible Regulation, Inc.* v. *EPA*, No. 9–1322 (CADC, Dec. 20, 2012), pp. 9–10 (Kavanaugh, J., dissenting from denial of rehearing en banc).

A

1

Because the major questions doctrine demands "clear congressional authorization," this Court has repeatedly recognized that the doctrine is "distinct" from "routine statutory interpretation." *West Virginia*, 597 U. S., at 724 (quotation marks omitted).   Importantly, therefore, the doctrine applies—and makes a meaningful difference—only in cases where the Executive's "reading of a statute" "would, under more ordinary circumstances, be upheld." *Ibid.* (quotation marks omitted); see also *id.*, at 740, 742, n. 3 (GORSUCH, J., concurring); M. Sohoni, The Major Questions Quartet, 136 Harv. L. Rev. 262, 272–276 (2022).

To properly set up the inquiry:  A major questions issue arises when: (i) the Executive relies on the text of a generally worded statute to exercise a specific power of major economic and political significance; (ii) the generally worded statute does not *explicitly* mention the specific major power, but (iii) the asserted major power falls within the generally worded text of the statute such that the Executive's assertion of that power "would, under more ordinary circumstances, be upheld," *West Virginia*, 597 U. S., at 724 (majority opinion) (quotation marks omitted).[17]

The question then is whether the generally worded statute supplies "clear congressional authorization" for the Executive to exercise that specific—but not explicitly mentioned—major power.   Here, for example, does the generally worded statutory authorization for the President to "regulate . . . importation" clearly authorize the President to impose tariffs?

---

[17]Of course, if the major power does not fall within the generally worded text as a matter of ordinary statutory interpretation, the major questions doctrine is not implicated or necessary to apply because the Government's statutory argument fails to begin with.

The requirement of "clear congressional authorization" is easy enough to state.  But how do we apply it?  How do we decide in a particular case whether a generally worded statute actually constitutes "clear congressional authorization" for a major power that otherwise falls within the general terms?

For starters, and critically, the Court has repeatedly emphasized that the major questions doctrine is not a magic words requirement.  In other words, the doctrine does not require an explicit reference to the specific major power itself.  As the Court's cases amply demonstrate, the major questions doctrine does not "forc[e] Congress to delegate in highly specific terms."  *Biden* v. *Nebraska*, 600 U. S., at 516 (BARRETT, J., concurring) (quotation marks omitted).

Rather than require magic words (such as the words "tariff" or "duty" here), the Court's cases have focused on four somewhat overlapping factors or considerations in order to assess whether a generally worded statute constitutes "clear congressional authorization" for the specific major power.[18]

*First*, the major questions doctrine's most prominent work has been to ensure that the Executive cannot suddenly seize on an old and generally worded statute to exercise a power of great economic and political significance when that power would not reasonably have been understood at the time of enactment to fall within that generally worded statute.  See *West Virginia*, 597 U. S., at 720–735; *Brown & Williamson*, 529 U. S., at 159–161.  As the Court has said:  "When an agency claims to discover in a long-extant statute an unheralded power to regulate a

—————

[18] Both JUSTICE GORSUCH and JUSTICE BARRETT have likewise read the Court's precedents to identify those same four factors, as they explained in their incisive separate opinions in *West Virginia* v. *EPA* and *Biden* v. *Nebraska*, respectively.  See 597 U. S. 697, 746–749 (2022) (GORSUCH, J., concurring) (referring to the four "telling clues"); 600 U. S., at 517–520 (BARRETT, J., concurring); see also *ante,* at 27 (GORSUCH, J., concurring).

significant portion of the American economy, we typically greet its announcement with a measure of skepticism." *Utility Air*, 573 U. S., at 324 (citation and quotation marks omitted); *West Virginia*, 597 U. S., at 748 (GORSUCH, J., concurring).

The doctrine thus precludes an agency's attempt to effectuate "a fundamental revision of the statute." *MCI Telecommunications Corp.* v. *American Telephone & Telegraph Co.*, 512 U. S. 218, 231 (1994). Stated otherwise, an "agency's attempt to deploy an old statute focused on one problem to solve a new and different problem" may be "a warning sign that it is acting without clear congressional authority." *West Virginia*, 597 U. S., at 747 (GORSUCH, J., concurring). The Court's skepticism about major executive action in those scenarios has been heightened when Congress has "conspicuously and repeatedly declined to enact" legislation that would have authorized the executive action in question. *Id.*, at 724 (majority opinion).

A prototypical example occurred when OSHA, in order to justify a nationwide COVID–19 vaccine mandate for workers, relied "on a statutory provision that was adopted 40 years before the pandemic and that focused on conditions specific to the workplace." *Id.*, at 747 (GORSUCH, J., concurring). Another example arose when EPA invoked "newfound authority to regulate" emissions from "millions of small sources—including retail stores, offices, apartment buildings, shopping centers, schools, and churches." *Utility Air*, 573 U. S., at 328. Yet another happened when the CDC tried to impose an eviction moratorium for rental housing through an "unprecedented" assertion of its authority to regulate public health. *Alabama Assn. of Realtors*, 594 U. S., at 765.

*Second*, courts examine the "agency's past interpretations of the relevant statute." *West Virginia*, 597 U. S., at 747 (GORSUCH, J., concurring). The Executive's "track record can be particularly probative" in the major

questions context. *Biden* v. *Nebraska*, 600 U. S., at 519 (BARRETT, J., concurring).

A "contemporaneous and long-held Executive Branch interpretation of a statute is entitled to some weight." *West Virginia*, 597 U. S., at 747 (GORSUCH, J., concurring) (quotation marks omitted). Just "as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." *Id.*, at 725 (majority opinion) (quotation marks omitted).

The *NFIB* Court therefore found it critical that "OSHA, in its half century of existence, has never before adopted a broad public health regulation of this kind" under the statute that the agency sought to invoke as authority for the vaccine mandate. 595 U. S., at 119. Likewise, in *Brown & Williamson*, the FDA had "repeatedly and consistently assert[ed] that it lacks jurisdiction under the FDCA to regulate tobacco products." 529 U. S., at 156. And in *West Virginia*, EPA had not "previously interpreted the relevant provision to confer on it such vast authority" to transform American industry. 597 U. S., at 749 (GORSUCH, J., concurring).

*Third*, courts assess whether "there is a mismatch between an agency's challenged action and its congressionally assigned mission and expertise," *id.,* at 748 (GORSUCH, J., concurring)—in other words, whether an agency is trying to regulate "outside its wheelhouse," *Biden* v. *Nebraska*, 600 U. S., at 518 (BARRETT, J., concurring).

In the *NFIB* case, OSHA, which is empowered to "set *workplace* safety standards, not broad public health measures," mandated COVID–19 vaccines. 595 U. S., at 117. In *Alabama Assn. of Realtors*, the CDC—a public health agency—attempted to regulate housing. 594 U. S., at 763–765. In *Gonzales* v. *Oregon*, the Attorney General

sought to assert authority over the drugs used in physician-assisted suicide.  546 U. S. 243, 267–268 (2006).

All of those cases involved serious mismatches between the agency's usual regulatory activities and its asserted major power.

*Fourth*, the Court looks at whether the relevant statutory language used to justify the Executive's exercise of a major power is "oblique," "elliptical," or "cryptic."  *West Virginia*, 597 U. S., at 746–747 (GORSUCH, J., concurring) (alterations and quotation marks omitted).  As the Court has often said, Congress does not "hide elephants" in statutory "mouseholes."  *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 468 (2001).

In *MCI Telecommunications Corp.*, for example, the Court refused to allow the FCC to eliminate rate regulation and fundamentally overhaul the telecommunications industry based on a "subtle" provision that merely permitted the FCC to "modify" rate-filing requirements.  512 U. S., at 231 (quotation marks omitted).  In *Brown & Williamson*, the Court rejected the FDA's attempt to regulate the tobacco industry based on a "cryptic" statutory provision that referred to "safety."  529 U. S., at 160 (quotation marks omitted).  In *Gonzales*, the Court said that Congress would not have granted the Attorney General the power to regulate physician-assisted suicide through "oblique" statutory language.  546 U. S., at 267.  And in *West Virginia*, the Court found it unlikely that Congress would have granted major power to reshape the energy industry in a "previously little-used backwater" of the statute.  597 U. S., at 730.

2

So in this case we must apply those four factors in order to determine whether Congress, when it afforded the President the power to "regulate . . . importation," clearly authorized the President to impose tariffs.  As I see it, those

factors show that Congress clearly authorized tariffs in IEEPA when it empowered the President to "regulate . . . importation."

*First*, unlike the OSHA vaccine mandate in *NFIB* or the greenhouse gas regulation in *Utility Air*, for example, the President here is not exercising an "unheralded" or "newfound authority" based on a "long-extant" statute— that is, exercising a power that was unanticipated or unforeseen when Congress enacted IEEPA's "regulate . . . importation" language in 1977.

On the contrary, as was fully explained above, the tariff authority exercised here is not remotely "unheralded." To recap: Any citizen or Member of Congress who paid the least bit of attention in 1977 would have readily understood that the President's authority to "regulate . . . importation" encompassed the power to tariff. There are the dictionary definitions and the historical usage and practice. And among other things, just a few years before IEEPA, that "regulate . . . importation" language was invoked by President Nixon and judicially approved to sustain his 10 percent worldwide tariffs. President Ford then implemented significant tariffs using substantially similar "adjust the imports" statutory language, and this Court unanimously upheld President Ford's tariffs in *Algonquin*.

So IEEPA's grant of authority to the President to impose tariffs in order to regulate importation is not "unheralded" or "newfound." That authority was plain as day in 1977.[19]

---

[19] The Court downplays the significance of the prominent Nixon and Ford tariffs. *Ante,* at 17–19 (majority opinion); *ante,* at 27–28, 39 (GORSUCH, J., concurring). But the Nixon and Ford examples, as well as *Algonquin*, are critical for a proper and full understanding of the meaning of "regulate . . . importation" when Congress enacted IEEPA in 1977. We cannot ignore or diminish that history. THE CHIEF JUSTICE's opinion and JUSTICE GORSUCH's concurrence also say that no President since 1977 has invoked IEEPA to impose tariffs. *Ante,* at 10 (opinion of ROBERTS, C. J.); *ante,* at 27–28 (GORSUCH, J., concurring). But since

*Second*, the President is not interpreting the "regulate . . . importation" language in IEEPA differently from how past Presidents have interpreted it. At least as far as the briefing and arguments in this case have disclosed, no Presidential Administration since the enactment of the "regulate . . . importation" language in TWEA in 1941 or since its re-enactment in IEEPA in 1977 has interpreted the statute to exclude the power to impose tariffs. Moreover, before IEEPA's enactment, President Nixon imposed tariffs based on the same "regulate . . . importation" language. And in 1975, President Ford invoked authority to "adjust the imports" in order to similarly impose monetary exactions. In addition—if more is needed—Marshall, Story, Madison, and this Court have all long recognized that the power to regulate foreign commerce includes tariffs.

The current President's reading of IEEPA follows from and is entirely consistent with those past interpretations—making his position nothing like, for example, FDA's when it changed its longstanding position that it lacked the authority to regulate cigarettes, *Brown & Williamson,* 529 U. S., at 159–160, or OSHA's when it implemented a vaccine requirement even though it had "never before adopted a broad public health regulation of this kind," *NFIB*, 595 U. S., at 119.

When, as here, "established practice," *West Virginia*, 597 U. S., at 725 (quotation marks omitted), and the Executive's "track record," *Biden* v. *Nebraska*, 600 U. S., at 519

_____

1977, Presidents have imposed numerous tariffs under non-emergency tariff statutes—including Section 232, which like IEEPA also does not explicitly reference tariffs or taxes. The fact that recent Presidents have not often had occasion under the National Emergencies Act to declare national emergencies in which tariffs would help "deal with" the specific emergency at issue does not mean that Presidents have now lost the authority exercised by President Nixon to impose tariffs. IEEPA was not designed as a use-it-or-lose-it source of emergency authority.

(BARRETT, J., concurring), convincingly show that the general statutory language has long been understood to cover the specific power asserted by the Executive, that record should all but resolve the matter for major questions purposes.

*Third*, there is no mismatch:  The power to tariff falls squarely within the President's wheelhouse.  From the Founding, as THE CHIEF JUSTICE's opinion today acknowledges, numerous other statutes have afforded—and still do afford—the President broad power to impose tariffs.  *Ante,* at 8–9.  This case is entirely different, therefore, from our prior major questions cases, where, for example, the CDC attempted to impose an eviction moratorium, *Alabama Assn. of Realtors*, 594 U. S., at 763–765; OSHA sought to implement a nationwide vaccine mandate, *NFIB*, 595 U. S., at 117–120; the FDA tried to regulate cigarettes, *Brown & Williamson*, 529 U. S., at 159–161; and the Attorney General attempted to regulate physician-assisted suicide, *Gonzales*, 546 U. S., at 267–268.

Presidents imposing tariffs—whether pursuant to inherent wartime authority, pursuant to TWEA and IEEPA's "regulate . . . importation" language, pursuant to Section 232's "adjust the imports" text, or pursuant to the many other tariff statutory authorities—is hardly an unusual occurrence in our Nation's history or in recent times.  For example, Presidents George W. Bush, Obama, and Biden all imposed tariffs pursuant to congressional authorization.  There is no mismatch between the tariff power and the President's "mission and expertise."  *West Virginia*, 597 U. S., at 748 (GORSUCH, J., concurring).

*Fourth*, the President is not relying on oblique, elliptical, or cryptic language.  This case does not involve "elephants in mouseholes."  *Whitman*, 531 U. S., at 468.  This case instead involves an elephant (tariffs) in a statutory elephant hole (the power to "regulate . . . importation" to deal with foreign threats in national emergencies).  IEEPA

was a major and thoroughly studied statute carefully crafted to grant the President a suite of powerful tools, including to "regulate . . . importation," and thereby allow him to respond swiftly to national emergencies and to help America respond to crises. Since its enactment, Presidents have invoked IEEPA more than 70 times to deal with emergencies and threats from the September 11, 2001, al Qaeda attacks to Iran to North Korea, and many others. See Congressional Research Service, The International Emergency Economic Powers Act: Origins, Evolution, and Use 18–32 (2025).

By 1977, moreover, it was well-known that tariffs on foreign imports—along with even more powerful tools such as quotas and embargoes—were a common way to "regulate . . . importation." IEEPA thus bears zero resemblance to the paradigmatic "previously little-used backwater" statutory provision that cannot support significant executive actions. *West Virginia*, 597 U. S., at 730.

All of that makes this case dramatically different from—really, the opposite of—the major questions cases where the Court has ruled against the Government. The text, the history, the context, and the precedent all point strongly to the conclusion that as of 1977, tariffs were a well-recognized means of regulating importation, like quotas and embargoes.

As Judge Taranto persuasively summarized, this case bears none of the hallmarks of past major questions cases where the Court found a lack of clear congressional authorization for the Government's asserted major power. IEEPA's "facial breadth in an emergency context makes the straightforward application of the statute's words hardly unheralded, and if a more specific herald is needed, it is present in the [Nixon] 1971 proclamation, *Yoshida CCPA*, and subsequent congressional adoption of the relevant language in 1977." 149 F. 4th 1312, 1376 (CA Fed. 2025) (dissenting opinion) (citations omitted). IEEPA seeks "to

provide flexibility in the tools available to the President to address the unusual and extraordinary threats specified in a declared national emergency.  This is not an 'ancillary,' 'little used backwater' provision, or a delegation outside the recipient's wheelhouse."  *Ibid.* (citation omitted).

This Court's recent decision in *Biden* v. *Missouri*, 595 U. S. 87 (2022) (*per curiam*), strongly supports the President's position here.  That case involved a challenge to President Biden's COVID–19 vaccine requirement for millions of healthcare workers.  The executive action there, too, was undoubtedly major.  But the Court *upheld* the Government's vaccine mandate based on a general statutory authorization for HHS to impose safety requirements for healthcare facilities—notwithstanding the lack of explicit statutory reference to vaccines.  *Id.*, at 90–96.  In doing so, the Court emphasized that state vaccination requirements were common for healthcare workers and that the Federal Government regularly required healthcare workers to take various safety precautions.  *Id.*, at 94–95.  Notably, the Court upheld the vaccine mandate even though (as the dissenters pointed out) the *Federal* Government had not traditionally imposed such vaccine requirements on healthcare workers.  See *id.*, at 104 (THOMAS, J., dissenting).

The clarity of the congressional authorization in today's case is far stronger than in *Biden* v. *Missouri*.  The Nixon and Ford tariffs, the *Algonquin* decision, and the President's longstanding authority to regulate trade and impose tariffs establish—much more comprehensively and clearly than in *Biden* v. *Missouri*—that the President is not claiming some "unheralded power" that represents a "transformative expansion" of his authority.  *Utility Air*, 573 U. S., at 324.

Because the Court upheld the Executive's exercise of a major power in *Biden* v. *Missouri*, it follows that the Court

today should likewise uphold the President's assertion of a major power here. Like cases should be treated alike.

In response to all of that, THE CHIEF JUSTICE's opinion clings to its primary argument in this case—that a statute must use the word "tariff" or "duty" or "tax" or the like to authorize tariffs on foreign imports. But this Court has repeatedly emphasized that the major questions doctrine is not a magic words requirement. THE CHIEF JUSTICE's opinion identifies no case that has demanded such specificity. And in *Algonquin*, this Court unanimously and squarely rejected the same argument that the statutory provision must specifically mention "tariffs" or "duties" or "taxes" for the President to impose tariffs on foreign imports. Under THE CHIEF JUSTICE's opinion, the Nixon and Ford tariffs would also have been unlawful. So too might other tariffs imposed under the longstanding Section 232 tariff statute, which broadly authorizes the President to "adjust the imports" of a foreign good without mentioning "tariffs" or "taxes." And so would tariffs imposed in wartime under TWEA's authority to "regulate . . . importation."[20]

THE CHIEF JUSTICE's opinion's approach to the major questions doctrine is a magic-words test under another name—in contravention of our precedents that make clear that Congress need not use magic words or "highly specific"

---

[20] Under the Court's decision today, the President's authority to impose tariffs under TWEA during wartime is presumably now gone given that TWEA has the same "regulate . . . importation" language, 50 U. S. C. §4305(b)(1)(B)—unless the Court thinks that the statutory text somehow means one thing in TWEA and another in IEEPA, which would be historically inaccurate and textually unsupportable. One might think that the Court's opinion would also mean that tariffs cannot be imposed under Section 232, which authorizes the President to "adjust the imports." After all, that statutory provision likewise does not refer to "tariffs," duties," "taxes," "fees," or the like. But in *Algonquin*, the Court read Section 232 to authorize tariffs. I assume that the Court today does not intend to overrule *Algonquin*.

terms. *Biden* v. *Nebraska*, 600 U. S., at 516 (BARRETT, J., concurring) (quotation marks omitted).[21]

In previous cases, the Court has looked at the four factors to determine whether there is "clear congressional authorization" precisely because the major questions canon has no magic words requirement. If magic words or the equivalent were necessary, that would be the only factor. And the Court would not need the four factors that the Court has consistently applied.[22]

In sum, under the major questions doctrine as the Court has applied it, this should be a straightforward case. Congress supplied clear authorization for the President to impose tariffs under IEEPA.

## B

### 1

Second, there is an alternative and independent reason why the major questions doctrine does not apply here: This is a foreign affairs case.

A plethora of statutes in the U. S. Code grant the Executive the power to act in foreign affairs. And most of the important actions that "presidents take today, including in foreign affairs, rest at least in part on statutory

---

[21] Taken at face value, moreover, the Court's major questions analysis would presumably also preclude Presidents from imposing quotas under IEEPA. Quotas are justified under the same "regulate . . . importation" language. How could the Court distinguish quotas from tariffs for major questions purposes? After all, quotas can be of even greater economic and political significance than tariffs.

[22] In his concurrence, JUSTICE GORSUCH opines that the phrase "monetary exactions on foreign imports" would constitute clear congressional authorization, but that the phrase "regulate . . . importation" does not. *Ante,* at 30. But if the phrase "regulate . . . importation" has historically and commonly encompassed "monetary exactions on foreign imports"—as it has—and if the four major questions factors taken together support the Executive—as they do—then I cannot agree with the line that JUSTICE GORSUCH is drawing between those two formulations.

authorization." C. Bradley & J. Goldsmith, Foreign Affairs, Nondelegation, and the Major Questions Doctrine, 172 U. Pa. L. Rev. 1743, 1745 (2024).

Yet this Court has *never* before applied the major questions doctrine—or anything resembling it—to a foreign affairs statute. I would not make this case the first.

Rather, in the foreign affairs context, this Court has interpreted statutes as written, with respect for the primacy of Congress's and the President's roles in foreign affairs and without using the major questions doctrine as a thumb on the scale against the President. See, *e.g.*, *Department of Navy* v. *Egan*, 484 U. S. 518, 529–530 (1988). That deeply rooted textualist approach to interpreting foreign affairs statutes is nothing new. What is new and rather extraordinary is the approach embodied in THE CHIEF JUSTICE's opinion for three Justices, which would extend the major questions doctrine into the foreign affairs realm for the first time.

Recall that the major questions doctrine is based on two overlapping foundations: "separation of powers principles and a practical understanding of legislative intent." *West Virginia*, 597 U. S., at 723.

With respect to separation of powers, the major questions doctrine serves to reinforce the nondelegation doctrine. But in the foreign affairs realm, the Court has recognized that Congress often broadly delegates authority to the Executive. From the Founding, numerous foreign affairs statutes "authorizing action by the President in respect of subjects affecting foreign relations" either "leave the exercise of the power to his unrestricted judgment, or provide a standard far more general than that which has always been considered requisite with regard to domestic affairs." *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 324 (1936); *Department of Transportation* v. *Association of American Railroads*, 575 U. S. 43, 80, n. 5 (2015) (THOMAS, J., concurring in judgment). The reason

for those broad delegations is simple and obvious: If "success" for America's foreign affairs "aims" is to be "achieved, congressional legislation . . . must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved." *Curtiss-Wright*, 299 U. S., at 320. Stated otherwise, "Congress—in giving the Executive authority over matters of foreign affairs—must of necessity paint with a brush broader than that it customarily wields in domestic areas." *Zemel* v. *Rusk*, 381 U. S. 1, 17 (1965).

As Justice Robert Jackson summarized, the Court's nondelegation cases—consistent with the "unbroken legislative practice which has prevailed almost from the inception of the national government," *Curtiss-Wright*, 299 U. S., at 322—have "recognized internal and external affairs as being in separate categories, and held that the strict limitation upon congressional delegations of power to the President over internal affairs does not apply with respect to delegations of power in external affairs." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 636, n. 2 (1952) (concurring opinion); see *Curtiss-Wright*, 299 U. S., at 319–322; *Panama Refining Co.* v. *Ryan*, 293 U. S. 388, 422 (1935).

As Justice Jackson further noted, the Court's precedents recognize the "'unwisdom of requiring Congress in this field of governmental power to lay down narrowly definite standards by which the President is to be governed.'" *Youngstown*, 343 U. S., at 636, n. 2 (concurring opinion) (quoting *Curtiss-Wright*, 299 U. S., at 321–322).

If the major questions doctrine is designed in part to protect nondelegation principles, but the nondelegation doctrine does not play a substantial role in foreign affairs cases (as the Court has held), then it follows that courts should not employ the major questions doctrine to put a thumb on the scale against the President when interpreting

foreign affairs statutes.  Rather, as Justice Robert Jackson stated, courts should interpret those statutes as written.

Relatedly, to the extent that the major questions doctrine is designed to reflect a "practical understanding of legislative intent," *West Virginia*, 597 U. S., at 723, the doctrine appropriately plays no role in "national security or foreign policy contexts, because the canon does not reflect ordinary congressional intent in those areas."  *FCC* v. *Consumers' Research*, 606 U. S. 656, 706 (2025) (KAVANAUGH, J., concurring).  In the foreign affairs realm, Congress "has good reason to—and intends to—authorize many executive branch actions related to foreign affairs in broad or general terms."  Bradley & Goldsmith, 172 U. Pa. L. Rev., at 1793.

Congress ordinarily seeks "to give the President substantial authority and flexibility to protect America and the American people."  *Consumers' Research*, 606 U. S., at 706–707 (KAVANAUGH, J., concurring).  After all, the President exercises the "vast share of responsibility for the conduct of our foreign relations."  *American Ins. Assn.* v. *Garamendi*, 539 U. S. 396, 414 (2003) (quotation marks omitted).  So Congress "often" gives the President "a degree of discretion."  *Curtiss-Wright*, 299 U. S., at 320.  That "unbroken legislative practice" from the Founding means that courts interpreting statutes in the foreign affairs field should assume that Congress meant what it said.  *Id.*, at 322.

Stated otherwise, "if the major questions doctrine turns on a contextual inquiry into likely congressional intent, it is likely for a variety of reasons to have less purchase in the foreign affairs area."  Bradley & Goldsmith, 172 U. Pa. L. Rev., at 1790.

To be clear, Congress of course maintains the ultimate power over how broadly or narrowly to write statutes in the foreign policy and national security contexts.  For example, Congress can write foreign affairs statutes narrowly.

Indeed, even for wartime powers, Congress rarely gives the President a "blank check." *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 536 (2004) (plurality opinion). And when Congress writes a narrow foreign affairs statute, this Court has enforced those statutory limits as written. Cf. *Hamdan* v. *Rumsfeld*, 548 U. S. 557, 593–595 (2006); *id.*, at 638–639 (Kennedy, J., concurring in part).

Moreover, when it does legislate more broadly, Congress sometimes claws back the statutory authorization by rescinding or amending overbroad statutes, or by restricting previously granted Presidential power through the leverage it possesses over appropriations, new legislation, or confirmations. See, *e.g.*, Foreign Intelligence Surveillance Act of 1978, 92 Stat. 1783; Military Commissions Act of 2006, 120 Stat. 2600, as amended, 10 U. S. C. §948a *et seq.*; Case-Church Amendment, Pub. L. 93–50, §307, 87 Stat. 129. Either House of Congress alone, through the appropriations process, can insist on certain limits as a condition of approving funding. At the end of the day, given the appropriations power, Congress holds the cards.

In short, in the foreign affairs context, this Court has *never* before super-imposed the major questions doctrine (or any similar canon or principle) onto ordinary statutory interpretation to place a thumb on the scale against the President. Rather, the Court interprets the relevant statutes according to their text, with respect for Congress's and the President's central roles in the foreign policy and national security fields.

2

This tariffs case plainly falls into the foreign affairs category. IEEPA "directly and expressly relate[s] to foreign affairs." Bradley & Goldsmith, 172 U. Pa. L. Rev., at 1796. And like quotas and embargoes, tariffs regulate the goods

that are imported into the country from foreign nations. The tariffs do not apply to goods produced in America.

Moreover, tariffs on foreign imports are significant tools of foreign policy and national security, whether imposed under IEEPA, TWEA, Section 232, Section 122, Section 201, Section 301, or Section 338. They are often used to "advance foreign policy goals, or as negotiating leverage in trade negotiations." Congressional Research Service, U. S. Tariff Policy: Overview 1 (2025). Like other economic tools, tariffs can "serve as a 'bargaining chip' to be used by the President when dealing with a hostile country," *Dames & Moore* v. *Regan*, 453 U. S. 654, 673 (1981)—or to incentivize a change in behavior by allies, partners, or enemies. Cf. *Association of American Railroads*, 575 U. S., at 80 (opinion of THOMAS, J.) (embargo statute "involved the external relations of the United States"); *Gundy* v. *United States*, 588 U. S. 128, 170–171 (2019) (GORSUCH, J., dissenting).

With respect to foreign trade specifically, Congress often "invest[s] the President with large discretion in matters arising out of the execution of statutes relating to trade and commerce with other nations." *Marshall Field & Co.* v. *Clark*, 143 U. S. 649, 691 (1892). Since the Founding, that longstanding practice has included tariff statutes: Congress has granted the President expansive power over tariffs and foreign trade. *Ante,* at 13–17 (THOMAS, J., dissenting). And this Court has uniformly rejected challenges to tariffs imposed by Presidents under those statutory authorities. *E.g.*, *Federal Energy Administration* v. *Algonquin SNG, Inc.*, 426 U. S. 548, 558–560 (1976); *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394, 409 (1928); *Marshall Field*, 143 U. S., at 690–694; *Cargo of Brig Aurora* v. *United States*, 7 Cranch 382, 386–388 (1813).

As Professors Bradley and Goldsmith well summarized, there is a "settled practice of about a century of the executive branch exercising emergency powers in many important contexts pursuant to the broadly worded IEEPA

and its predecessor, the Trading with the Enemy Act. And there is an even longer practice, dating to the Founding, of presidents exercising trade-related sanctions authority pursuant to broadly worded statutes. Notably, the Court has already suggested in both of these contexts that one should expect Congress to, in effect, paint with a broad brush." 172 U. Pa. L. Rev., at 1796–1797.

As with tariffs on foreign imports historically, the IEEPA tariffs on foreign imports at issue in this case implicate foreign affairs. According to the Government, the President has leveraged the IEEPA tariffs into trade deals with major trading partners including China, the United Kingdom, and Japan, among other countries. The Government says that the tariffs have helped make certain foreign markets more accessible to American businesses and have contributed to trade deals with foreign nations worth trillions of dollars.

Moreover, consistent with history and the traditional uses of tariffs, the President "is exercising his IEEPA authority in connection with highly sensitive negotiations he is conducting to end the conflict between the Russian Federation and Ukraine." Decl. of M. Rubio in No. 25–1812 (CA Fed., Aug. 29, 2025), p. 3. To that end, on August 6, 2025, the President imposed tariffs on India for "directly or indirectly importing Russian Federation oil." Exec. Order No. 14329, 90 Fed. Reg. 38701 (2025). And on February 6, 2026, the President reduced the tariffs on India because, according to the Government, India had "committed to stop directly or indirectly importing Russian Federation oil." Exec. Order No. 14384, 91 Fed. Reg. 6501 (2026).

To be sure, most foreign affairs and national security actions—whether war, international agreements, trade deals, or tariffs—lead to significant domestic ramifications within the United States. And this case is no exception. Nonetheless, in the foreign affairs field, courts interpret statutes as written, with appropriate respect to Congress and the President and without a major questions doctrine

weight on the scale against the President. See *Youngstown*, 343 U. S., at 636, n. 2 (Jackson, J., concurring).

Lest there be any remaining doubt that the major questions doctrine does not apply to tariffs on foreign imports, recall again this Court's decision in *Algonquin*. That case involved significant tariffs imposed by President Ford on oil imports. The relevant statute granted the President the authority to "adjust the imports." 19 U. S. C. §1862(b) (1970 ed.). The Court upheld the tariffs by interpreting the statute as written. Neither the major questions doctrine—nor anything resembling that doctrine—played a role in that case.

In short, "Presidential actions pursuant to broad congressional authorizations related to foreign affairs often have long historical pedigrees that can in various ways inform congressional intent to approve the actions in question. To the extent that this is so in particular instances, *the major questions doctrine's clear authorization requirement does not apply*." Bradley & Goldsmith, 172 U. Pa. L. Rev., at 1794 (emphasis added).

So it is here: Presidents "have long been granted substantial discretion over tariffs." *Id.*, at 1759, n. 90. This Court has never before applied the major questions doctrine to a statute authorizing the President to take action with respect to foreign affairs in general or tariffs in particular. And it should not do so today.

THE CHIEF JUSTICE's opinion's reliance on the major questions doctrine in this foreign affairs case is a first—a novel and unprecedented use of the major questions doctrine to invalidate Presidential action taken pursuant to congressional authorization in the foreign affairs area. I firmly disagree with that use of the major questions doctrine here. In the foreign affairs context, including tariffs, the longstanding rule is simple: Interpret the

statute as written, not with a thumb on the scale against the President.[23]

### 3

Related precedent further demonstrates that the major questions doctrine has not traditionally applied in the national security or foreign policy contexts. Consider two prominent examples.

*First*, in *Hamdi* v. *Rumsfeld*, 542 U. S. 507, this Court considered the 2001 Authorization for Use of Military Force, which Congress passed and President George W. Bush signed on September 18, 2001, in the wake of the al Qaeda attacks on the United States. The law broadly

---

[23] In his thoughtful concurrence, JUSTICE GORSUCH agrees that the major questions doctrine often does not apply to foreign affairs statutes, but in his view it does not apply only when the President also has inherent or independent Article II power. *Ante*, at 30–31. THE CHIEF JUSTICE's opinion for three Justices also gestures at that position. See *ante,* at 12–13. I see some analytical and practical problems with that approach.

First, as JUSTICE GORSUCH elsewhere notes, the major questions doctrine serves in part to reinforce nondelegation principles. Yet as I have explained, the Court's nondelegation cases from the Founding to the present—including numerous cases involving tariffs—have "recognized internal and external affairs as being in separate categories, and held that the strict limitation upon congressional delegations of power to the President over internal affairs does not apply with respect to delegations of power in external affairs." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 636, n. 2 (1952) (Jackson, J., concurring); see also *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 319–322 (1936); *Panama Refining Co.* v. *Ryan*, 293 U. S. 388, 422 (1935). In those cases, the Court has not further subdivided the foreign affairs power in the manner that JUSTICE GORSUCH now suggests.

Second, terms such as "inherent" or "independent" in this context continue to be "used, often interchangeably and without fixed or ascertainable meanings." *Youngstown*, 343 U. S., at 647 (Jackson, J., concurring); see also *id*., at 637. So it would be both novel and jurisprudentially chaotic to try to now create a new approach tying the applicability of the major questions canon in the foreign affairs context to such uncertain triggers.

empowered the President to use "all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks" that occurred on September 11, 2001. Authorization for Use of Military Force, 115 Stat. 224 (Sept. 18, 2001).

In *Hamdi*, the Government militarily detained in the United States an American citizen who had taken up arms with the Taliban. 542 U. S., at 510–511. The plaintiff Hamdi argued, among other things, that the AUMF generally authorized the use of force but did not specifically authorize military detention, at least detention of American-citizen enemy combatants in the United States. See *id.*, at 515–517. He contended that his military detention was therefore illegal.

In the principal opinion by Justice O'Connor, the Court rejected Hamdi's statutory argument, explaining that it was "of no moment that the AUMF does not use specific language of detention." *Id.*, at 519. Rather, because "detention to prevent a combatant's return to the battlefield is a fundamental incident of waging war, in permitting the use of 'necessary and appropriate force,' Congress has clearly and unmistakably authorized detention in the narrow circumstances considered here." *Ibid.*

Consider the similarities between *Hamdi* and this case. Both involve major questions of foreign affairs. *Hamdi* involved U. S. military detention of an American citizen in America, pursuant to a generally worded authorization for use of military force. This case involves tariffs on foreign goods imported into America pursuant to a generally worded authorization to regulate importation. Detention is a traditional incident of the President's delegated power to wage war. See *id.*, at 518. Tariffs are a traditional incident of the President's delegated power to regulate imports and foreign commerce. In *Hamdi*, the Court said that as a matter of history, practice, and precedent, the AUMF's

general authorization for the use of military force clearly encompassed detention of enemy combatants. *Id.*, at 518–522. Here, as a matter of history, practice, and precedent, IEEPA's general authorization for regulation of importation likewise clearly encompasses tariffs on foreign imports.

*Second,* in 1981 in *Dames & Moore*, 453 U. S. 654, the Court did not apply the major questions doctrine, even though the Court had recently applied that principle in a significant domestic policy case. Cf. *Industrial Union Dept., AFL–CIO* v. *American Petroleum Institute*, 448 U. S. 607 (1980) (plurality opinion).

The *Dames & Moore* case arose in the wake of the Iran hostage crisis where Iran held more than 50 American hostages at the U. S. Embassy in Iran for more than 14 months. As one part of the ultimate settlement of the hostage crisis with Iran, President Reagan suspended claims by U. S. nationals against Iran that were pending in American courts. *Dames & Moore*, 453 U. S., at 666. The President did so under IEEPA and the Hostage Act. *Id.*, at 675.

There can be little doubt that the question of suspending American citizens' claims against Iran was one of major economic and political significance. And the Court further recognized that the case touched "fundamentally upon the manner in which our Republic is to be governed." *Id.*, at 659. Yet the Court did not require "clear congressional authorization" for the President's exercise of that authority to suspend the Americans' claims against Iran.

On the contrary, the Court openly acknowledged that the relevant statutes—IEEPA and the Hostage Act—did not provide clear or "specific authorization" for the President to suspend those claims. *Id.*, at 677. The Court nonetheless concluded that the "general tenor of Congress' legislation in this area"—combined with Congress's longstanding acquiescence to the President's practice of settling claims—

supported the President's suspension of those claims. *Id*., at 678. Congress's "general tenor" and acquiescence are of course far less than the "clear congressional authorization" that THE CHIEF JUSTICE's opinion today newly demands for the President's tariffs.

Again, consider the similarities between *Dames & Moore* and this case. *Dames & Moore* involved complicated questions of foreign policy and national security. The statutes in *Dames & Moore* were generally worded and did not specifically authorize suspension of claims. But Presidents had historically exercised a similar power. See *id*., at 677–682. Here, we likewise have a generally worded statutory authorization to "regulate . . . importation." And Presidents have historically imposed tariffs.

If IEEPA permitted the President to lawfully suspend claims in *Dames & Moore*—despite the Court's transparent acknowledgment that the actual statutory text did not clearly authorize the President's actions—then surely IEEPA's authorization to "regulate . . . importation" easily justifies these tariffs.

THE CHIEF JUSTICE's opinion would chart a new course for the major questions doctrine, extending it for the first time deep into the foreign affairs sphere. If the Court had applied the major questions doctrine in *Hamdi* and *Dames & Moore*, those two landmark cases almost certainly would have been decided differently. So today's opinion marks a significant change. Will the Court apply the major questions doctrine in the foreign affairs context again in the future? Or is this a ticket good for one day and one train only? Time will tell. But in the meantime, the decision could engender significant uncertainty over the Executive's exercise of statutory authority in the foreign affairs realm.

As the *Hamdi* and *Dames & Moore* examples demonstrate, applying the major questions doctrine in the foreign policy and national security contexts in the past would have seriously hindered the President's ability to

exercise power granted by Congress to achieve important foreign policy and national security objectives for America. And if applied in the foreign affairs context in the future, it could impair Presidents' vital statutory authorities with respect to foreign policy and national security.[24]

\*     \*     \*

Having said all of that on foreign affairs, I reiterate that the major questions doctrine—even if it applies in this foreign affairs context—does not defeat major executive actions that are *clearly authorized* by Congress. See Bradley & Goldsmith, 172 U. Pa. L. Rev., at 1790–1791. And as explained in Part III–A above, in IEEPA Congress clearly authorized the President to impose tariffs to "regulate . . . importation" in national emergencies. In other words, even if the major questions doctrine applies in the foreign affairs context exactly as it does in domestic affairs, the President should still prevail in this case.

## IV

Finally, no Member of the Court today relies on the nondelegation doctrine. But the plaintiffs briefly raise such an argument, and I will therefore briefly address it. The

---

[24] What is the status going forward of the major questions doctrine in foreign affairs cases? Only three Justices (at most) today suggest that the major questions doctrine should apply in the foreign affairs context— THE CHIEF JUSTICE, JUSTICE GORSUCH, and JUSTICE BARRETT. I doubt that the major questions doctrine analysis in THE CHIEF JUSTICE's opinion for those three Justices is controlling for future cases as a matter of precedent under the *Marks* rule. See *Marks* v. *United States*, 430 U. S. 188, 193 (1977). That is because three Justices (JUSTICE SOTOMAYOR, JUSTICE KAGAN, and JUSTICE JACKSON) do not recognize the major questions doctrine at all. *Ante,* at 1–2 (KAGAN, J., concurring in part and concurring in judgment). And this dissent would not apply it in the foreign affairs context. So it appears that six Justices would not apply it in the foreign affairs context. In my view, the question of whether or how the major questions doctrine applies in foreign affairs cases remains at least an open question.

argument is unavailing for many of the reasons already noted in the major questions analysis above. This Court has repeatedly rejected constitutional challenges to congressional delegations to the President in the foreign affairs area, including delegations of tariff authority.

For matters of foreign affairs and national security, the Court has traditionally recognized that Congress "must of necessity paint with a brush broader than that it customarily wields in domestic areas." *Zemel* v. *Rusk*, 381 U. S. 1, 17 (1965). And to reiterate, numerous statutes "'authorizing action by the President in respect of subjects affecting foreign relations'" "'either leave the exercise of the power to his unrestricted judgment, or provide a standard far more general than that which has always been considered requisite with regard to domestic affairs.'" *Department of Transportation* v. *Association of American Railroads*, 575 U. S. 43, 80, n. 5 (2015) (THOMAS, J., concurring in judgment) (quoting *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 324 (1936)). Therefore, as JUSTICE THOMAS has explained, the Court's precedents establish that "the Constitution grants the President a greater measure of discretion in the realm of foreign relations." *Association of American Railroads*, 575 U. S., at 80, n. 5; see *Curtiss-Wright Export Corp.*, 299 U. S., at 319–322; *Panama Refining Co.* v. *Ryan*, 293 U. S. 388, 422 (1935).

Justice Robert Jackson likewise noted the "'unwisdom of requiring Congress in this field of governmental power to lay down narrowly definite standards by which the President is to be governed.'" *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 636, n. 2 (1952) (concurring opinion) (quoting *Curtiss-Wright*, 299 U. S., at 321–322). As such, the "strict limitation upon congressional delegations of power to the President over internal affairs does not apply with respect to delegations of power in

external affairs." *Youngstown*, 343 U. S., at 636, n. 2 (concurring opinion).

Because statutes that "involv[e] the external relations of the United States" do not trigger the same kind of delegation concerns as purely domestic ones, *Association of American Railroads*, 575 U. S., at 80 (opinion of THOMAS, J.), the Court has regularly upheld delegations of power to the President in the national security and foreign policy realms. See, *e.g.*, *Curtiss-Wright*, 299 U. S., at 319–322; *Loving* v. *United States*, 517 U. S. 748, 771–774 (1996). Indeed, if a strict nondelegation doctrine applied in those areas, numerous statutes—including many authorizations for use of military force in the Nation's history—would have been unconstitutional delegations of authority to the President. See Authorization for Use of Military Force, 115 Stat. 224 (Sept. 18, 2001) ("[T]he President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001").

As to tariffs in particular: Broad delegations of tariff authority to the President have been in the heartland of permissible delegations upheld by this Court. Congress may, without running afoul of the Constitution, "invest the President with large discretion in matters arising out of the execution of statutes relating to trade and commerce with other nations." *Marshall Field & Co.* v. *Clark*, 143 U. S. 649, 691 (1892). Congressional delegations of tariffs and other foreign trade authorities to the President date back to near the Founding. And this Court has uniformly rejected nondelegation challenges to statutes delegating that authority to the President. *E.g.*, *Federal Energy Administration* v. *Algonquin SNG, Inc.*, 426 U. S. 548, 558–560 (1976); *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394, 409 (1928); *Marshall Field*, 143 U. S., at 690–694;

*Cargo of Brig Aurora* v. *United States*, 7 Cranch 382, 386–388 (1813).

This Court's decision in *Algonquin* is again instructive. There, the Court held that Section 232 did not constitute an unconstitutional delegation. 426 U. S., at 558–560. The Court found it sufficient that the President could act "only" to the extent "he deems necessary to adjust the imports" of an article such that it "will not threaten to impair the national security." *Id.*, at 559 (quotation marks omitted).

To be clear, I am not suggesting that there is no nondelegation doctrine in the foreign affairs realm. But the Court has consistently recognized that the doctrine affords more flexibility to Congress and the President in that area to deal with the complex foreign relations issues and national security threats facing America. See *Association of American Railroads*, 575 U. S., at 80, n. 5 (opinion of THOMAS, J.); *Youngstown*, 343 U. S., at 636, n. 2 (Jackson, J., concurring); *Curtiss-Wright*, 299 U. S., at 319–322; *Panama Refining*, 293 U. S., at 422.

In all events, for purposes of this Court's nondelegation precedents, IEEPA sufficiently constrains the President's authority to declare an emergency and impose tariffs. See *J. W. Hampton*, 276 U. S., at 409; *FCC* v. *Consumers' Research*, 606 U. S. 656, 673–675, 681–691 (2025). The President may exercise the authorities in IEEPA "only" "to deal with an unusual and extraordinary threat" that "has its source in whole or substantial part outside the United States" and "with respect to which a national emergency has been declared." 50 U. S. C. §1701. Congress placed numerous limits on IEEPA, including a default 1-year time limit, an enumerated list of exceptions, and comprehensive congressional reporting requirements. See §§1622(d), 1702(b), 1703.

It is also useful to underscore the extraordinary nature of the plaintiffs' nondelegation argument here. The plaintiffs' submission would mean that these tariffs would be

unlawful *even if* IEEPA explicitly authorized tariffs. Unlike their statutory and major questions doctrine arguments, their nondelegation argument is *not* based on a lack of an explicit reference to "tariffs" or "duties" or the like. Their nondelegation argument instead goes much further and would require very specific congressional directions to the President on when and under what circumstances he could impose tariffs and how high those tariffs could be. The plaintiffs' theory would have dramatic consequences and likely wipe out many of the existing tariff statutes that have long been upheld by this Court, as well as TWEA. And if the tariff authority here is unlawful, so too are most if not all IEEPA authorities such as asset freezes, embargoes, and quotas. And it would not stop there. The plaintiffs' nondelegation theory would threaten various other national security and foreign affairs statutes that similarly grant substantial discretion to the President. The Court today thankfully does not go down that road.[25]

V

The overarching theme of the Court's opinion is that tariffs are not a clear means to "regulate . . . importation" and that Congress was therefore required to use the word "tariff," "duty," or the like in IEEPA in 1977 if it wanted to authorize tariffs on foreign imports. But that conclusion

---

[25] Some last points for completeness: The plaintiffs also raise two other arguments that the Court today does not address or rely on. First, they argue that Section 122, a non-emergency tariff statute that addresses trade deficits, implicitly displaces IEEPA's tariff authority. Second, they argue that the tariffs here do not deal with an "unusual and extraordinary threat" as to which a national emergency has been declared. In my view, those arguments are insubstantial, as Judge Taranto persuasively explained in the Federal Circuit. See 149 F. 4th 1312, 1359–1361, 1371–1375 (2025) (dissenting opinion). Because the Court today does not address or rely on them, I will not discuss them further here. Finally, I agree with footnote 1 of the Court's opinion regarding jurisdiction. *Ante,* at 5, n. 1.

contravenes text, history, and precedent. To summarize: *Algonquin* in 1976 unanimously held the opposite. The Nixon and Ford tariffs were based on statutory provisions that did not use the word "tariff" or "duty." There is a long tradition of Presidents imposing tariffs as a means of regulating importation and commerce. The predecessor Trading with the Enemy Act has long been understood to authorize tariffs during wartime as a means to "regulate . . . importation," even though it does not use the word "tariff" or "duty." The history of the Polk, Lincoln, and McKinley tariffs shows that tariffs are a means of regulating importation. Marshall, Story, and Madison stated that tariffs are a means of regulating foreign commerce. The dictionary definitions and ordinary usage establish that tariffs are a means of regulating importation.

All of that and much more, in my view, overwhelmingly establish that IEEPA clearly authorizes the President to impose tariffs.

That said, with respect to tariffs in particular, the Court's decision might not prevent Presidents from imposing most if not all of these same sorts of tariffs under other statutory authorities. For example, Section 122 of the Trade Act of 1974 permits the President to impose a "temporary import surcharge" to "deal with large and serious United States balance-of-payments deficits." 19 U. S. C. §2132(a). Section 201 of the Trade Act of 1974 provides that, if the International Trade Commission determines an article is being imported in such quantities that it is "a substantial cause of serious injury, or the threat thereof, to the domestic industry producing an article like or directly competitive with the imported article," the President may take "appropriate and feasible action," including imposing a "duty." §§2251(a), 2253(a)(3)(A). Section 301 of the Trade Act of 1974 authorizes the President through a subordinate officer to "impose duties" if he determines that "an act, policy, or practice of a foreign country" is "unjustifiable and

burdens or restricts United States commerce." §§2411(a)–(c). Section 338 of the Tariff Act of 1930 permits the President to impose tariffs when he finds that "any foreign country places any burden or disadvantage upon the commerce of the United States." §1338(d). And Section 232 of the Trade Expansion Act of 1962 authorizes the President to, after receiving a report from the Secretary of Commerce, "adjust the imports of [an] article and its derivatives so that such imports will not threaten to impair the national security." §1862(c)(1)(a).

So the Court's decision is not likely to greatly restrict Presidential tariff authority going forward. But the Court's decision is likely to generate other serious practical consequences in the near term. One issue will be refunds. Refunds of billions of dollars would have significant consequences for the U. S. Treasury. The Court says nothing today about whether, and if so how, the Government should go about returning the billions of dollars that it has collected from importers. But that process is likely to be a "mess," as was acknowledged at oral argument. Tr. of Oral Arg. 153–155. A second issue is the decision's effect on the current trade deals. Because IEEPA tariffs have helped facilitate trade deals worth trillions of dollars—including with foreign nations from China to the United Kingdom to Japan, the Court's decision could generate uncertainty regarding various trade agreements. That process, too, could be difficult.

\* \* \*

The tariffs at issue here may or may not be wise policy. But as a matter of text, history, and precedent, they are clearly lawful. I respectfully dissent.